# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| KWABENA MAWULAWDE, M.D. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL ACTION |
| | ) FILE NO. 1:05-CV-99 |
| BOARD OF REGENTS OF THE UNIVERSITY SYSTEM | ) |
| OF GEORGIA; MEDICAL COLLEGE OF GEORGIA; | ) |
| DANIEL W. RAHN, M.D., Indiv. and in his Official Capacity as | ) |
| President, Medical College of Georgia; DAVID STERN, MD., | ) |
| Indiv., and in his Official Capacity as Dean, School of Medicine, | ) |
| Medical College of Georgia; and DON SNELL, Indiv. and in his | ) |
| Official Capacity as President and CEO, MCG Health, Inc., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## CERTIFICATION OF COUNSEL
## PURSUANT TO F.R.C.P. 26©

The undersigned attorney for Plaintiff Kwabena Mawulawde, M.D., George W. McGriff, hereby certifies in accordance with F.R.C.P 26© that his office has in good faith conferred and attempted to confer with counsel for Defendant, James Ellington, Esq., in an attempt to resolve the dispute regarding the Discovery sought in the above referenced case. Counsel for Plaintiff has also written a letter to Mr. Ellington, however, the dispute was not resolved. A copy of the written correspondence has been attached to this Certification of Counsel, and while the attached letter refers only to discovery propounded to Mr. Don Snell, Defendants have taken the same position as to all Defendants.

GEORGE W. MCGRIFF
State Bar No.493225

Sworn to and subscribed before me
This _21st_ day of February 2006.

NOTARY PUBLIC
Date of Commission Expiration:

PRISCILLA OLIVEIRA
NOTARY PUBLIC, FULTON COUNTY, GEORGIA
MY COMMISSION EXPIRES OCTOBER 20, 2006

*Law Offices*

## GEORGE W. McGRIFF & ASSOCIATES

CENTURY LAKE OFFICE PARK
1774 CENTURY BOULEVARD, N.E.
ATLANTA, GEORGIA 30345-3312
(404) 325-2755

December 20, 2005

VIA FASCIMILE AND U.S. MAIL

Jim Ellington, Esq.
HULL, TOWILL, NORMAN, BARRETT & SALLEY
801 Broad Street, Seventh Floor
Post Office Box 1564
Augusta, Georgia 30903-1564

      RE:   *Kwabena Mawulawde, M.D. v. Board of Regents, et al.,*
               U.S.D.C. Southern District of Georgia, Augusta Division
               Civil Action No.: 1:05-CV-00099-DHB

Dear Mr. Ellington:

      Please consider this letter as Plaintiff's good faith effort to resolve a discovery dispute.

      We are in receipt of Defendant Don Snell's Responses to Plaintiff's First Interrogatories. Defendant Don Snell has failed to respond beyond Interrogatory Number 5 claiming that Plaintiff's discrete sub-parts should be separate Interrogatories. Defendant Don Snell has further claimed peer review, medical review privilege and the federal self critical analysis privilege. Also, Defendant Don Snell contends that he should not answer questions that predate July 1, 2000.

      Without leave of court or written stipulation, any party may serve upon any other party written interrogatories, not exceeding 25 in number including all discrete subparts. Fed.R.Civ.P. Rule 33. Communications of a particular type should be treated as a single interrogatory. 1993 Amendment to Rule 33. The subparts in Plaintiff's First Interrogatories to Defendant Don Snell are communications of a particular type and should therefore be answered.

      Further, your assertion of a peer review privilege does not comply with Rule 26(5) and your assertion of a peer review privilege, medical review privilege and the federal self critical analysis privilege have no legal basis.

      Morever, your contention that Defendant Don Snell should not answer interrogatories that request information predating July 1, 2000, because the MCG Health Inc. did not operate the hospital and clinic of the Medical College of Georgia prior to that time is without merit. I am confident that whatever entity operated the Medical College of Georgia prior to MCG Health Inc. did in fact turn over the entire operation to MCG Health, Inc. and they therefore have access to

documents and things including files, contracts, etc. concerning the Medical College of Georgia.

Therefore, please respond to Interrogatories number 3 through 25 including all sub-parts.

Sincerely,

Deborah B. Brown
Attorney at Law

cc: Alana Heaton, Esq.

# EXHIBIT 2



Medical College of Georgia
State of Georgia / Department of Labor
**Separation Notice**

1. Employee's Name    Kwabena Mawulawde                2. SSN   **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**

    a. State any other name(s) under which employee worked. _____

3. Period of Last Employment: From:    **8/1/2000**         To         **12/31/03**

4.    REASON FOR SEPARATION: Reorganization

      **a.**    LACK OF WORK
      **b.**    If for other than lack of work, state fully and clearly the circumstances of the separation:
        **Contract not renewed**

5.    Employee received payment for: (Severance Pay, Separation Pay, Wages-In-Lieu of Notice, bonus, profit sharing, etc.) (DO NOT include vacation pay or earned wages)
           in the amount of $ _____    for period from _____    to _____

Date above payment(s) was/will be issued to the employee    _____

    IF EMPLOYEE RETIRED, furnish amount of retirement pay and what percentage of contributions were paid by the employer.

_____ per month _____% of contributions paid by employer
6.    Did this employee earn at least $3,500.00 in your employer? YES **X**    NO    If NO, how much? _____

                             Average Weekly Wage    _____

Employer's Name: **MEDICAL COLLEGE OF GEORGIA**

Address: **HUMAN RESOURCES**

City: **Augusta**    State:    **GA**        ZIP: **30912-8100**

Employer's Telephone No.: **706    721-0961**

---

Ga. D.O.L Account Number    **110002-03**
(Number shown on Employer's Quarterly Tax and Wage Report, Form DOL-4)

I CERTIFY that the above worker has been separated from work and the information furnished hereon is true and correct. This report has been handed to or mailed to the worker.

*Rena G. Pickett*

_____
**Signature of Official, Employee of the Employer
Or authorized agent for the employer**

_____
**Employment Manager**

Title of Person Signing

**January 13, 2004**

_____
**Date Completed and Released to Employee**

---

**NOTICE TO EMPLOYER**
At the time of separation, you are required by the Employment Security Law, OCGA Section 34-8-190 ( c ), to provide the employee with this document, properly executed, giving the reasons for separation. If you subsequently receive a request for the same information on a DOL-1199FF, you may attach a copy of this form (DOL-800) as a part of your response.

**NOTICE TO EMPLOYEE**
OCGA Section 34-8-190( c ) of the Employment Security Law requires that you take this notice to the Georgia Department of Labor Field Service Office if you file a claim for unemployment insurance benefits.

MCGHI 01097

# EXHIBIT 3





Medical College of Georgia
State of Georgia / Department of Labor
**Separation Notice**

1. Employee's Name    **Kwabena Mawulawde**                           2. SSN    **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**

    a. State any other name(s) under which employee worked. _____

3. Period of Last Employment: From:    **8/1/00**              To:              **12/31/03**

4.   REASON FOR SEPARATION: **Termination**

    a.  LACK OF WORK  ☐
    b.  If for other than lack of work, state fully and clearly the circumstances of the separation:
      **Reorganization**

5. Employee received payment for:  (Severance Pay, Separation Pay, Wages-In-Lieu of Notice, bonus, profit sharing, etc.)  (DO NOT include vacation pay or earned wages)

_____    in the amount of $ _____    for period from _____    to _____

Date above payment(s) was/will be issued to the employee  _____

    IF EMPLYEE RETIRED, furnish amount of retirement pay and what percentage of contributions were paid by the employer.

_____  per month _____% of contributions paid by employer

6. Did this employee earn at least $3,500.00 in your employ?  YES X    NO         If NO, how much?

                                                        Average Weekly Wage    _____

Employer's Name: **MEDICAL COLLEGE OF GEORGIA**

Address: **HUMAN RESOURCES**

City: **Augusta**    State:   **GA**    ZIP: **30912-8100**

Employer's Telephone No.: **706    721-0961**

---

Ga. D.O.L Account Number    **110002-03**
(Number shown on Employer's Quarterly Tax and Wage Report, Form DOL-4)

I CERTIFY that the above worker has been separated from work and the information furnished hereon is true and correct. This report has been handed to or mailed to the worker.

*Dena J Pickett*

**Signature of Official, Employee of the Employer Or authorized agent for the employer**

**Employment Manager**

Title of Person Signing

**January 30, 2004 (DS)**

Date Completed and Released to Employee

---

**NOTICE TO EMPLOYER**
At the time of separation, you are required by the Employment Security Law, OCGA Section 34-8-190 ( c ), to provide the employee with this document, properly executed, giving the reasons for separation.  If you subsequently receive a request for the same information on a DOL-1199FF, you may attach a copy of this form (DOL-800) as a part of your response.

**NOTICE TO EMPLOYEE**
OCGA Section 34-8-190( c ) of the Employment Security Law requires that you take this notice to the Georgia Department of Labor Field Service Office if you file a claim for unemployment insurance benefits.

MCGHI 01096

# REASON FOR SEPARATION

**Medical College of Georgia**
**Human Resources Division**

---

## PART 1: TO BE COMPLETED BY EMPLOYEE

**Employee Information**

Name Dr. Kwabena Mawulawde

Title Assistant Professor

Department Surgery/Cardio-Thoracic

Supervisor Dr. Kevin Landolfo

Last Day of Work 12/31/2003

Future Address/Telephone:

304 Woodhill Trail

Augusta, GA 30909

**Reason for Separation:** This section is to be completed by employees who have resigned their position. Please check the code corresponding to the reason you are leaving MCG (do not check more than one code). If you have been terminated involuntarily, skip this section and sign below.

A ☐ Better pay or advancement
B ☐ Returning to school
C ☐ Leaving Augusta area
D ☐ Staying home with family
E ☐ Employment elsewhere
F ☐ Working conditions
G ☐ Health reasons / disability
H ☐ Marriage
I ☐ Pregnancy
J ☐ Personal reasons

K ☐ Transportation problems
L ☐ Looking for another job
M ☐ Conflict with co-worker
N ☐ Steadily increasing workload
P ☐ Dissatisfied with job
Q ☐ Temporary employee
R ☐ Military service
S ☐ Retirement (normal)
T ☐ Early retirement (one-time option)
U ☐ Other_____

Signature of Employee _____   Date_____

---

## PART 2: TO BE COMPLETED BY SUPERVISOR

The above-named employee was terminated involuntarily for the reason indicated below (check the appropriate code). If employee voluntarily resigned his/her position, skip the reason code section.

1 ☐ Lack of funding and/or work
2 ☑ Reorganization
3 ☐ Terminated / dismissed for cause (list reasons in Remarks section)
4 ☐ Unable to return to work due to health reasons, or unable to fulfill the work commitment
5 ☐ Deceased (list date of death)_____
6 ☐ Quit without notice; did not call or report for work on (list dates)_____

Is this employee recommended for re-employment?   ☐ YES   ☐ NO (If no, state reason in Remarks section.

Remarks:_____

Signature of Supervisor_____ Title_____ Date_____

Supervisor: Please enter on termination PAR, the separation code indicated on this form.

WTG-FAH MC 422 / 8772 5/02

MCGHI 01095

# EXHIBIT 4

**Medical College**
**of Georgia**

**Inter-Office**
**Communication**

---

## MEMORANDUM

**TO:**      Solomon W. Walker, II, CAAP
            Director, AA/EEO Office

**FROM:**    Clay Steadman
            VP for Legal Affairs

**DATE:**    June 11, 2004

**RE:**      EEOC Charge No. 110-2004-03137: Dr. Kwabena Mawulawde

In response to your memorandum of May 24, I have assisted Dr. Stern in preparing a response to the charges of discrimination made by Dr. Mawulawde. Attached to this memorandum are a "Position Statement" setting forth the position of the School of Medicine regarding this personnel action and responding specifically to Dr. Mawulawde's claims in his EEOC charge. Also attached is a "Response to Request for Information" which addresses each of the specific requests made to MCG by the EEOC.

You also asked for a copy of "...all reorganization plans implemented by Dr. Landolfo". Dr. Mawulawde alleges that his termination was due to a "reorganization" but this is not accurate. Dr. Landolfo did decide not to renew two (out of three) faculty in the Section of Cardiothoracic Surgery (the other faculty member was Dr. Mark Anstadt, a white male, with whose case I believe you are familiar) because he believed that their research and clinical skills were not at an acceptable level. However, there has been no formal reorganization of the Section.

There are no grounds for mediating this case.

Please let me know if you have any questions about the information enclosed or if you want to discuss this matter in more detail. Thank you for your assistance.

c:      Dr. David M. Stern
        Dr. Kevin A. Landolfo
        Dr. Bruce MacFadyen

MCGHI 00998

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

KWABENA MAWULAWDE, M.D.,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　) Civil Action File
vs.　　　　　　　　　　　　　　　　) No. 1:05-CV-99
　　　　　　　　　　　　　　　　　　)
BOARD OF REGENTS OF THE　　　　　)
UNIVERSITY SYSTEM OF GEORGIA;　 )
MEDICAL COLLEGE OF GEORGIA;　　 )
DANIEL W. RAHN, M.D.,　　　　　　)
Individually and in his　　　　　)
official capacity as president, )
Medical College of Georgia;　　 )
DAVID STERN, M.D., Individually )
and in his official capacity as )
dean, School of Medicine, MCG;　)
DON SNELL, Individually and in　)
his official capacity as　　　　 )
president and CEO, MCG　　　　　　)
Health, Inc.,　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　)
_____)

- - - - -

## DEPOSITION OF THOMAS R. GADACZ, M.D. - EXCERPTS

Taken By Counsel For the Plaintiff

Before Laurie M. Hannon-Stair, Certified Court Reporter

At the Offices of Augusta West Reporting

505 Courthouse Lane, Augusta, Georgia

On February 7, 2006

**AUGUSTA WEST REPORTING**
**Certified Court Reporters**
**505 Courthouse Lane**
**Augusta, Georgia 30901**
**(706) 722-3746 or  (706) 863-3918**
**1-800-592-3376 (Depo)**

APPEARANCES OF COUNSEL


For the Plaintiff:              Mr. George William McGriff
                               Ms. Dell Cody
                               McGriff & Associates
                               Century Lake Office Park
                               1774 Century Boulevard NE
                               Atlanta, Georgia  30345-3312


For the Defendants             Mr. James B. Ellington
MCG Health Inc./               Hull, Towill, Norman, Barrett
Don Snell:                       & Salley
                               801 Broad Street
                               SunTrust Bank Building, Floor 7
                               Augusta, Georgia  30901


For the Defendants             Ms. Alana Kyriakakis Heaton
Board of Regents/              Hull, Towill, Norman, Barrett
Daniel Rahn, MD/                 & Salley
David Stern, MD:               801 Broad Street
                               SunTrust Bank Building, Floor 7
                               Augusta, Georgia  30901


                    - - - - -


            INDEX TO DEPOSITION EXCERPTS

                                                      Page


EXAMINATION BY MR. MCGRIFF

      FIRST CERTIFIED QUESTION EXCERPT . . . . . . . . 3 - 10

      SECOND CERTIFIED QUESTION EXCERPT . . . . . . 10 - 13

      THIRD CERTIFIED QUESTION EXCERPT . . . . . . . 13 - 24

      FOURTH CERTIFIED QUESTION EXCERPT . . . . . . 24 - 26

CERTIFICATE OF COURT REPORTER . . . . . . . . . . . . . 27

*AUGUSTA WEST REPORTING*

                    EXCERPTS FROM DEPOSITION OF

                      THOMAS R. GADACZ, M.D.

        [Pursuant to O.C.G.A. 9-11-28(d), Augusta West

        Reporting has no contract with any of the parties or

        their counsel.  The court reporter's charges are the

        usual and customary charges for services within the

        industry and are available upon request by either

        party, with no financial or services discount being

        given to any party named in this litigation.]


                          -  -  -  -  -

                      THOMAS R. GADACZ, M.D.,

           Having Been First Duly Sworn, was Examined

                     and Testifies as Follows:

               FIRST CERTIFIED QUESTION EXCERPT

    BY MR. MCGRIFF:

        Q.   Now, while you were chairman at MCG these outcomes

    that we are talking about, were they reported in--in any

    particular--to any particular agency?

        A.   Well, the hospital personnel would usually

    coordinate the reports and the provide them, you know, for

    example, to me and then I would--if it had to do with other

    sections within the department of surgery I would also

    provide that information then to the section chiefs.  And we

    would have monthly meetings of where we did quality

                                                        -3-

                                       *AUGUSTA WEST REPORTING*

1    assurance reviews.

2        Q.   Now, when that would occur would all of the

3    different sections roll up into one report or would you have

4    a report for urology, a report for thoracic, a report for

5    general--how would that--

6        A.   There were individual reports for each of the

7    specialties.

8        Q.   And as--with respect to each of the reports for

9    each of the specialties, would they roll up into one broad

10   report of surgery?

11       A.   Sometimes they would, yes.

12       Q.   Would mortality reports roll up into surgery

13   mortality reports?

14       A.   Yes.

15       Q.   Now, when you would see those mortality reports

16   they would come from where?

17       A.   They--well, there were sort of two systems that

18   existed, at least during my stay.  You know, initially that

19   would come from people within the hospital that would review

20   the various cases and then they would send that to me and

21   then once Health, Inc. was created some of that data was--

22   and I think that might have been even before Health, Inc.

23   Some of the data on some of the specialities was sent to

24   University Hospital Consortium and then some of that data

25   was compared with other University Hospitals that

-4-

1    participated in--in the reports.

2         Q.    Such as Duke University.

3         A.    I don't know specifically if Duke was in--

4         Q.    But I mean just--

5         A.    But other--

6         Q.    Teaching hospitals.

7         A.    Other--exactly.  Other academically--other

8    academic hospitals.

9         Q.    Okay.  Now, those reports, how would they come to

10   you?  Would it come to you as a person that was on the

11   distribution list or how would it come to you?

12        A.    Usually the surgery--I was on the distribution

13   list but I would just--I would get specifically the surgery

14   reports.  I did not get OB/GYN or medicine or other

15   specialties.

16        Q.    Now, when you got those reports who--and it was

17   someone within the hospital that would provide the report to

18   you.

19        A.    Yes.

20        Q.    Now, at the time that the reports would be

21   provided to you you were employed by the hospital--by--not

22   the hospital, I'm sorry, MCG Medical College.

23        A.    Correct.

24        Q.    But you also was a physician that was under the

25   physician--what do you call it, physician program or?

-5-

1        A.    The PPG, the Physicians Practice Group.

2        Q.    Okay.  And were you employed with MCG Health,

3   Inc.?

4        A.    Yes.

5        Q.    Now, what were your--how were you employed with

6   MCG Health, Inc.?

7        A.    How?  As a person who practiced in MCG Health,

8   Inc. Hospital.

9        Q.    Okay.  Now, back to those--we call the mortality

10  tables or do you call them morbidity?  Is it morbidity or

11  mortality?  Which is it?

12       A.    Well, a combination.  They are usually called M&M

13  reports which stands for mortality and morbidity so they're

14  usually combined.

15       Q.    Okay.  And those reports are maintained and you

16  maintain a copy of them in your office where you were

17  physically located; would that be a correct statement?

18       A.    That's correct.

19       Q.    Now, during the course of your getting those

20  reports did you ever question any of the information that

21  was on those reports?

22       A.    Well, the information would be reviewed by the

23  individual section chiefs as well as by myself.  And if

24  there were, for example, deaths that were reported or

25  complications that were reported that we weren't certain of,

-6-

*AUGUSTA WEST REPORTING*

1    then we would look into that further to see whether or not

2    that was a valid occurrence on our service.

3         Q.   If there was an error on the report in your

4    service how would you--where would you go to make someone

5    aware that there was such an error?

6         A.   Well, usually to the quality assurance individual.

7    There was a person that was designated as a quality

8    assurance individual.

9         Q.   Do you recall the name of that person that was

10   designated at that time?

11        A.   Well, we went through--there were several

12   individuals so I don't--I don't remember any sort of

13   specific person, but there were usually several people who

14   would come to our mortality and morbidity meetings, and also

15   to the QA meetings.

16        Q.   They would be bringing data--

17        A.   Correct.

18        Q.   --to get your response or your section chief's

19   response to the data.

20        A.   That's correct.

21        Q.   And was that particular individual--if there was

22   an error on any such report, would that particular

23   individual respond to that error in changing it or--

24        A.   They were supposed to, yes.

25        Q.   You ever have errors that were morbidity or

1    mortality errors that was not in your department?

2        A.   Yes.

3        Q.   Now, did you--at any point was there a comparison

4    of those morbidity and mortality rates compared with a

5    national average for an academic teaching school?

6            MS. HEATON:  Objection, form, just as to what

7        those--which of those you mean.

8        A.   Okay.  They were compared usually to the

9    University Hospital Consortium data.

10       Q.   [Mr. McGriff]  And when you say the University

11   Hospital Consortium data I would assume that's the

12   organization that you were talking about the other--just a

13   few minutes ago when you said you didn't know if Duke was a

14   member of it.  Is that what you were talking about?

15       A.   Yes.

16       Q.   Now, did you rate yourself, your department within

17   that--within the data that had been provided?

18       A.   Yes.

19       Q.   What would be the various ratings that you would

20   see or you would use?

21       A.   Well, usually they had what's called a risk

22   adjusted mortality, and part of the, I guess, challenge is

23   to make sure that the risks were properly evaluated.  And

24   that data was turned in to the University Hospital

25   Consortiums by the hospital and so we would have to

-8-

1    sometimes go back and make sure that that in fact they were

2    risk adjusted according to what we considered risk-adjusted

3    standards.

4        Q.   When you say risk-adjusted standards what are you

5    talking about?

6        A.   It means if somebody, for example, required an

7    operation and they came in as an emergency.  The risks to

8    that patient performing an emergency operation would be

9    considerably higher than if the patient came in for an

10    elected procedure.  So that would affect your statistics.

11        Q.   Now, was that--those statistics important to you

12    as the chairman of the department of surgery?

13        A.   Yes.

14        Q.   How so?  Why?

15        A.   Well, because it--we wanted to make sure that we

16    were within what we would consider a standard of acceptable

17    outcomes in mortality and morbidity.  And I know we did have

18    some problems, you know, with accuracy of the data.

19        Q.   Tell me about the accuracy of the data.  What do

20    you mean when you say problems with the accuracy of the

21    data?

22        A.   Well, we had what at least seemed to all of us

23    within the department of surgery, a reported high mortality

24    rate and--

25            MR. ELLINGTON:  And let me at this point interpose

-9-

1          an objection to the question to the extend that it is

2          seeking disclosure of information protected by

3          Georgia's Peer Review Process set out at OCGA 31-7-133,

4          Georgia's Medical Review Committee Privilege set out at

5          31-7-141, and the Federal Self Critical Analysis

6          Privilege; to the extent that it calls on this witness

7          to offer any information protected by those privileges

8          and violate those privileges I object to that question.

9          MR. MCGRIFF:  Okay.  Your objection is noted.  Dr.

10         Gadacz, you were personally aware of the discrepancies

11         that was in the information; is that correct?

12         A.   Yes.

13         MR. ELLINGTON:  Objection to the form.

14         Q.   [Mr. McGriff]  Now, you stated that there were

15    inaccuracies in that information and that you would get with

16    your section chiefs to try and discern whether or not that

17    information--the accuracy of it, and do the followup; is

18    that a fair statement of what you were just saying?

19         A.   Yes.

20                         - - - - -

21              SECOND CERTIFIED QUESTION EXCERPT

22

23         Q.   [Mr. McGriff]  Now, did you ever sit with Mr.

24    Snell and go through the mortality and morbidity numbers

25    with him, for your department I mean?

                                                    -10-

*AUGUSTA WEST REPORTING*

1    A.    Yes.

2    Q.    Did you ever go with Mr. Snell and sit down and

3    agree that Dr. Mawulawde's mortality and morbidity numbers

4    were unacceptable?

5         MR. ELLINGTON:  Objection to that question on the

6         grounds that it is seeking information protected from

7         disclosure by the Peer Review Privilege set out at OCGA

8         31-7-133, Medical Review Committee Privilege at OCGA

9         31-7-141, and the Federal Self Critical Analysis

10        Privilege, and is seeking by this question to have this

11        witness testify in violation of those privileges.

12   Q.    [Mr. McGriff]  Doctor--

13        MR. MCGRIFF:  Your objection is noted.

14   Q.    [Mr. McGriff]  Did you understand my question, Dr.

15   Gadacz?

16   A.    Yes.

17   Q.    Okay.  You can answer the question.

18   A.    Not that I recall.

19   Q.    Did--anytime that you can recall anyone from

20   anywhere within MCG and MCG Health, Inc. come to you and say

21   give me your professional evaluation as the chairman of the

22   department of surgery of Dr. Kwabena Mawulawde?

23   A.    Of his clinical outcomes.

24   Q.    Yes.

25   A.    No.

1          Q.   How can I, how could Mr. Snell, how could anyone

2     determine whether or not Dr. Mawulawde or any other

3     surgeon's clinical skills were lacking?  How would you

4     determine that?

5          A.   Well, part of it would be through a review of

6     whatever outcome data that was available.  And the other way

7     is basically by knowing what, you know, these individuals

8     had performed.

9          Q.   Now, when you said outcome data you don't really

10    have to leave the hospital to go find that, do you?  You

11    said in the hospital, contained--

12         A.   Right.

13         Q.   --within the hospital.

14         A.   Correct.

15         Q.   It's contained within your quality assurances

16    department; right?

17         A.   Correct.

18         Q.   So there is no need--if I wanted an accurate

19    picture of what Dr. Zumbro's outcomes were I can go lay

20    hands on that by going to specific departments within the

21    MCG Health, Inc. Hospital, couldn't I?

22              MR. ELLINGTON:  Objection, form, leading.

23         A.   Yes, that information is in the hospital.

24         Q.   [Mr. McGriff]  And I think you were testifying

25    earlier that there are several people who kept that data

-12-

1    information about outcomes and so forth.

2         A.   Correct.

3         Q.   Now, these people that kept that outcome data and

4    had control of it, do they work for MCG Medical School?

5         A.   For the medical school?

6         Q.   Yes.

7         A.   No.  I believe they work for the hospital.

8         Q.   Okay.  Did you ever sit with Dr. Zumbro and Dr.

9    Mawulawde and say, Dr. Mawulawde, your clinical deficiencies

10   are A, B, C, D, and make him aware of what those were?

11        A.   Not that I recall.

12        Q.   Now, you were there when Dr. Landolfo came, were

13   you not?

14        A.   Yes.

15                        - - - - -

16

17             THIRD CERTIFIED QUESTION EXCERPT

18        Q.   [Mr. McGriff]  We were talking about Dr. Mawulawde

19   coming to the program or to become a faculty member.  The

20   focus, if I understand you, when I said Dr. Zumbro, that was

21   Dr. Zumbro's responsibility and you concurred with him

22   coming to University.

23        A.   Correct.

24        Q.   So you had to make the offer to him.  Was the

25   offer made by Dr. Zumbro or made by you or whom?

                                                    -13-

1       A.   It was made by Dr. Zumbro.

2       Q.   At the time that Dr. Zumbro, Dr. Mawulawde, Dr.

3  Anstadt were there was there a Dr. Victor Moore there?

4       A.   Yes.

5       Q.   What was his role?

6       A.   He was the pediatric cardiac surgeon.

7       Q.   Now, with that group of surgeons in that section

8  did that section function as you had expected it should

9  function?

10      A.   Yes.

11      Q.   Now, let's go back to outcomes.  Is it possible

12  for me, who is a lay person compared to you, a physician, to

13  go to any central location without looking at the actual

14  records of outcomes which would be in the hospital, is it

15  possible for me to go look anyplace else in the world, in

16  the country, any agency and find any information that would

17  reflect or show me or tell me that the cardiac--

18  cardiothoracic surgery program performed below the national

19  average?

20      A.   The only monitor would be the University Hospital

21  Consortium data and that information would be contained in

22  that, but, again, you know, all of that stuff is coded so

23  you just couldn't go to it and identify MCG specifically

24  unless, you know, you were authorized to do so.  So that's

25  not what I would call public information.

                                                        -14-

1          Q.    Okay.  If I was MCG could I pull it back from that

2    organization?

3          A.    Yes.

4          Q.    And I could pull my ranking to see where I fit?

5          A.    You would see where you were compared to other

6    programs that entered data for cardiac surgery, yes.

7          Q.    Did you ever--yourself ever go look at that or do

8    any comparisons there?

9          A.    I remember on one occasion where I was given a

10   report that our mortality rate for coronary artery bypass--

11              MR. ELLINGTON:  And, Doctor, let me step in here

12          at this point.  I am going to object to the question

13          because it appears that it is, by the question, seeking

14          responsive information from this witness that is

15          protected from and would--protected from disclosure by

16          and would violate the Peer Review Privilege, the

17          Medical Review Committee Privilege, and the Federal

18          Self Critical Analysis Privilege by this witness

19          providing any additional information in response to

20          that question.

21              MR. MCGRIFF:  Your objection is noted.  And when

22          Mr. Ellington made those objections would you certify

23          all of those so that we can show how he's attempting to

24          use the objection.

25          Q.    [Mr. McGriff]  Dr. Gadacz, the question was did

-15-

1    you go.  You understood my question?  Did you see any

2    information or go get any information?

3         A.   Did I go get any--the information was brought to

4    me.

5         Q.   Okay.  What was brought to you?

6              MR. ELLINGTON:  And I have the same objection.

7              MR. MCGRIFF:  Okay, I understand.

8         A.   Well, that in one report our mortality rate for

9    coronary mortality rate for coronary artery bypass was

10   higher than the usual.

11        Q.   [Mr. McGriff]  Okay.  Now, did you do the analysis

12   to determine if in fact that was true or were there other

13   issues?

14        A.   Well, when I got that report obviously I checked

15   into it and went back to see what data was entered.

16        Q.   And what did you decide from that?

17        A.   That the data that was entered--

18             MR. ELLINGTON:  Let me interpose the objection

19             based on the question because the question is seeking

20             information from this witness in violation of the

21             Georgia Privilege on Peer Review at OCGA 31-7-133--

22             MR. MCGRIFF:  Let's do this because you're now

23             starting to interrupt the deposition.  Why don't you

24             state that you--if you would, so the witness doesn't

25             get off track, state that you have the same continuing

                                                        -16-

1    objection so that the witness can remember what his

2    answer to start would be because you can't stop him

3    from answering.

4         MR. ELLINGTON:  Let me finish the objection and

5    then we will classify it as a continuing objection so

6    it's clear as to what the objection is on the record.

7         MR. MCGRIFF:  Certify this one, please.

8         MR. ELLINGTON:  The objection is that the question

9    as asked is seeking information from this witness of

10    information protected from disclosure by the Georgia

11    Peer Review Privilege at OCGA section 31-7-133, the

12    Medical Review Committee Privilege at 31-7-141, and the

13    Federal Self Critical Analysis Privilege which we will

14    henceforth deem to be the continuing objection on peer

15    review privilege.

16         MR. MCGRIFF:  Okay.

17    Q.    [Mr. McGriff]  Now, Dr. Gadacz, we have determined

18    by your testimony that you were given some data that had to

19    do with the cardiac bypass and that you went to look at the

20    data to confirm whether or not the data was correct or not,

21    and I think the--you said that it showed that it was

22    higher--high, if I understand correctly.  And I was trying

23    to get you to tell me what did you do as a result of looking

24    at that data.  Can you tell me?

25    A.    Yes.  We took a look at the data that was

-17-

1    submitted to UHC and found that the data was not accurate.

2         Q.   Now, that data was submitted by MCG Health, Inc.?

3              MR. ELLINGTON:  Objection, form.

4         Q.   [Mr. McGriff]  Or do you know?

5         A.   I don't know.

6         Q.   Okay.  Did you take the data that you had deemed

7    was inaccurate and go talk to anyone about it?

8         A.   Yes.

9         Q.   Who was that?

10        A.   I talked to the QA person and also the person that

11   entered the data from the operating room.

12        Q.   And was that data changed to your knowledge?

13        A.   I was told that--

14             MR. ELLINGTON:  Objection on the continuing basis

15        of the peer review privilege as delineated above.

16        A.   I was told that the data cannot be resubmitted.

17        Q.   [Mr. McGriff]  Now, who told you that the data

18   could not be resubmitted?

19        A.   I think it was somebody from the operating room.

20   I don't know.  But I when I made the inquiry that's what I

21   was told, that the date could not be resubmitted.

22        Q.   In your mind what was the impact of that incorrect

23   data on your department of surgery section, cardiothoracic

24   surgery section, what was the impact?

25        A.   Well, I mean it--from a report process it made the

                                                      -18-

                                      *AUGUSTA WEST REPORTING*

1   cardiothoracic section look like they weren't performing

2   like they should.

3        Q.   And your position was?

4        A.   That it was not correct, that they--they--internal

5   analysis we did showed that they were performing

6   satisfactorily.

7        Q.   If you needed to pull internal data to controvert

8   such a report as that you could--could you pull that from

9   within the MCG Health, Inc., the hospital?

10       A.   Well, we pulled that from the surgeon's records.

11       Q.   Okay.  And was the--the accuracy rate minor or

12   substantial?

13            MR. ELLINGTON:  Same continuing objection on the

14            basis of the peer review privilege as delineated above.

15       A.   I don't know how to gauge that.  I know that

16   they--they were not correct.

17       Q.   [Mr. McGriff]  Okay.

18       A.   It showed that we had a higher mortality than what

19   we--what we actually had calculated.

20       Q.   Assuming that it was corrected, would it have

21   brought in your--based on your recollection would it have

22   brought the mortality or morbidity rate down below what it

23   should've been?

24       A.   It would have been within the range of the mean.

25       Q.   Okay.  Now, did anyone ever during the course of

-19-

*AUGUSTA WEST REPORTING*

1    your--from the year 2000 through the year 2004 come to you

2    and say, Dr. Gadacz, here is where your outcomes, your

3    morbidity in all, have consistently fallen below the norm

4    and you need to do A, B, C, D.  Anyone ever did that?

5            MR. ELLINGTON:  And objection to that question to

6         the extent that it seeks information based on the

7         continuing peer review privilege.

8        A.   In so far as I would have meetings with Mr. Snell,

9    then that's when that mortality data would be reviewed.  And

10   also it would be reviewed when we had our QA meetings.

11       Q.   Now, the QA is within your own area at the

12   instance of yourself or people within MCG?

13       A.   It would be--no, it would be a combination of the

14   department and the hospital.

15       Q.   Okay.  And did Mr. Snell ever say, oh, I

16   understand, we should not have included this data that

17   contained errors in your evaluation?

18           MR. ELLINGTON:  The same continuing objection on

19        the peer review privilege.

20       A.   I don't know if he ever said that.  I mean

21   basically the discrepancies were pointed out to him.

22       Q.   [Mr. McGriff]  Okay.  Now, if they were pointed

23   out to Mr. Snell, if you believe that they were, and based

24   on that piece, then would you think that Mr. Snell would

25   continue to say that there were--Dr. Mawulawde's clinical

                                                          -20-

1    abilities were below the norm?

2         MR. ELLINGTON:  Objection to the form of that

3         question.

4         A.   I can't recall having a conversation with Mr.

5    Snell specifically regarding Dr. Mawulawde's outcomes.

6         Q.   [Mr. McGriff]  Okay.  Can you look at that

7    department of thoracic surgery and make a collective

8    determination of the performance of that section?

9         A.   Yes.

10        Q.   You could.  Do you recall Mr. Snell ever or anyone

11   else ever attempting to make a collective evaluation of a

12   performance or a collective evaluation of the section on a

13   collective basis?

14        MR. ELLINGTON:  Objection to that question on the

15        basis of the continuing peer review privilege objection

16        delineated earlier.

17        A.   I don't recall specifically it being done for

18   cardiothoracic surgery.

19        Q.   [Mr. McGriff]  Do you recall that if during the

20   entire time that Dr. Mawulawde was there for the entire

21   three-year period that you knew him that he was ever peer

22   reviewed in the sense of, quote, doctors as peers looked at

23   any procedures or treatment that he performed?  Were you

24   aware of any such peer review?

25        MR. ELLINGTON:  Objection to that question because

-21-

*AUGUSTA WEST REPORTING*

1          that question does seek information protected by the

2          continuing peer review objection delineated above.

3               MR. MCGRIFF:  Okay.  It's noted.

4          Q.   [Mr. McGriff]  Do you want to answer it, Doctor?

5          A.   He, as other surgeons, were subject to peer review

6     at mortality and morbidity conferences and also Keyway

7     [phonetic] meetings.

8          Q.   But was he singled out to say Dr. Mawulawde as to

9     patient X, poor judgment, you did the--

10         A.   No, no.

11              MR. ELLINGTON:  Same continuing objection.

12         A.   Not that I recall.

13         Q.   [Mr. McGriff]  If that occurred what would that

14    infer or imply within the medical practice at MCG and MCG

15    Health, Inc.?

16         A.   Well, if it became a recurrent report then that

17    would usually trigger a general review of a surgeon's

18    performance.

19         Q.   Or a catastrophic issue or incident or event, that

20    could trigger it; right?

21         A.   That--right.  That would trigger an incident

22    report and an investigation.

23         Q.   When we say a death on the operating-room table

24    would that trigger one?

25         A.   Yes.

1        Q.    A death that is--did you ever sit in any mortality

2    or morbidity committee where the specifics of certain

3    patients of--treatment of patients by Dr. Landolfo was

4    discussed?

5              MR. ELLINGTON:  Objection to that question on the

6         basis that it is seeking information protected from

7         disclosure by the continuing peer review privilege

8         delineated above.

9              MS. HEATON:  And objection on the grounds that

10        it's seeking to have this witness reveal information,

11        protected health information, which is protected by

12        HIPAA.

13       A.    Not that I recall.

14       Q.    [Mr. McGriff]  With respect to Dr. Landolfo--not

15   Landolfo but Dr. Mark Anstadt, the same question.

16             MR. ELLINGTON:  The same objection; it is seeking

17        information protected from disclosure by the continuing

18        peer review privilege, also seeks disclosure of

19        protected health information as defined by 45 CFR

20        section 160 point--

21             MR. MCGRIFF:  Do you want to make the objection a

22        continuing?

23             MR. ELLINGTON:  Well, this is an additional

24        objection.  On the basis it is seeking disclosure of

25        protected health information as defined by 45 CFR,

1        section 160.103 under the terms of HIPAA.

2        A.    Not that I recall.

3        Q.    [Mr. McGriff]  That's you noting these kind of--

4   all of these given in certified form.

5

6                          - - - - -

7              FOURTH CERTIFIED QUESTION EXCERPT

8        Q.    [Mr. McGriff]  Dr. Gadacz, as the chairman of the

9   department of surgery you would have access to all bad

10  outcomes when they happen within your department, if

11  somebody--let me give you an example of one.  You are

12  familiar with the--an incident where Mark Anstadt--there was

13  an error in the surgery when Mark Anstadt was performing

14  some heart operation on the patient and the patient died and

15  there was a lawsuit.  Do you remember?

16       A.    Yes.

17       Q.    Now, but you were made aware of that approximately

18  how long after that incident?

19            MR. ELLINGTON:  And I object to that question on

20            the basis of the continuing objection of the peer

21            review privilege to the extent it calls for this

22            witnesses knowledge gained through the peer review

23            process.

24       A.    Almost immediately.

25       Q.    [Mr. McGriff]  Dr. Gadacz, you've heard counsel's

                                                    -24-

                              *AUGUSTA WEST REPORTING*

1    continuing objection and let me just ask you, this incident

2    that we just spoke about with Dr. Anstadt--you know what a

3    peer review process is, don't you?

4         A.   Yes.

5         Q.   Your knowledge didn't come from any peer review

6    process, did it?

7              MR. ELLINGTON:  I object to the form of that

8         question.

9         A.   Of the incident.

10        Q.   [Mr. McGriff]  Yes.

11        A.   Correct.

12        Q.   Your knowledge came as a result of your status and

13   position, wasn't it?

14        A.   Correct.

15             MR. ELLINGTON:  Objection, form.

16        Q.   [Mr. McGriff]  In fact, you were Dr. Anstadt's

17   superior and supervisor at--

18             MR. ELLINGTON:  Objection--

19        Q.   [Mr. McGriff]  --that time when the incident

20        occurred.

21             MR. ELLINGTON:  Objection, form, leading.

22        A.   Yes.

23        Q.   [Mr. McGriff]  So any knowledge that you gained as

24   a result--in fact, you never sat in on a peer review of

25   anyone or did you sit in on a peer review of Dr. Mark

                                                        -25-

1    Anstadt at any time?

2            MR. ELLINGTON:  And I object to that question to

3        the extent it calls for him to reveal information

4        protected by the continuing peer review privilege set

5        forth above.

6        A.    I--I can't remember.  We did go through a review

7    process regarding the incident and it was included in the

8    overall peer review process.

9        Q.    [Mr. McGriff]  Okay.  But when you first heard

10   about it there was no peer review process in place to even

11   look at that incident at that time, was there?

12       A.    When I first heard about it, no.

13           MR. ELLINGTON:  Objection, form.

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

CERTIFICATE OF COURT REPORTER

I hereby certify that the foregoing deposition was reported as stated in the caption, by the method of Stenomask, and the questions and the answers thereto were reduced to typewriting by me or under my direction; that the foregoing pages numbered 3 through 26 represent a true, correct, and complete transcript of the evidence given on February 7, 2006, by the witness, Thomas Gadacz, M.D., and signature was waived.

I further certify that I am not kin or counsel to the parties in the case and I am not in the regular employ of counsel of said parties.

I further certify that I have no contract with any of the parties or their counsel.  The court reporting charges are the usual and customary charges for services within the industry and are available upon request by either party.  No financial or services discount has been or will be given to any party named in this litigation.

This the 9th day of February, 2006.

LAURIE M. HANNON-STAIR, CCR, CVR

CERTIFIED COURT REPORTER

GEORGIA CERTIFICATE # B-2199

-27-

*AUGUSTA WEST REPORTING*

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

KWABENA MAWULAWDE, M.D.                    )
                                           )
    Plaintiff,                             )
                                           )
    vs.                                    )  CIVIL  ACTION
                                           )  FILE NO. 1:05-CV-99
BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF   )
GEORGIA; MCG HEALTH, INC. d/b/a MCG HEALTH*CARE*;  )
DANIEL W. RAHN, M.D., Indiv. and in his Official Capacity  )
as President, Medical College of Georgia; DAVID STERN, M.D.,  )
 Indiv. and in his Official Capacity as Dean, School of Medicine,  )
Medical College of Georgia; and DON SNELL, Indiv. and in his  )
Official Capacity as President and CEO, MCG Health, Inc.,   )
                                           )
    Defendants.                            )
_____  )

**ORIGINAL**

## PLAINTIFF' S FIRST CONTINUING INTERROGATORIES TO DEFENDANT MCG HEALTH, INC. D/B/A MCG HEALTH*CARE*

TO:    MCG Health, Inc. d/b/a MCG Health*Care*
        C/o Alana Heaton, Esq.
        HULL, TOWILL, NORMAN, BARRETT & SALLEY
        Post Office Box 1564
        Augusta, Georgia 30903-1564

      COMES NOW PLAINTIFF, KWABENA MAWULAWDE, M.D., and pursuant to Rule

33. of the Federal Rules of Civil Procedure and hereby request that Defendant, MCG Health, Inc.

d/b/a MCG Health*Care*, and for purposes of these Interrogatories, hereinafter, <u>you</u> answer the

following Interrogatories separately and fully, in writing and under oath, and serve the answers to

the Interrogatories thereto upon counsel for the plaintiff within thirty days from the date of

service hereof.

      If there is a privilege claimed as to any information so inquired into and/or requested or

otherwise covered by these Interrogatories plaintiff specifically request that when there is

information that the claim of privilege is asserted that the information be identified in such a manner that upon submission to the Court, the Court may determine by a review of any such information so submitted can be identified whether or not such information and or documents are entitled to be accorded any privileged status.  Specifically, if there is a document involved that you the named defendant is responding to under Rule 33. that you assert and state that you should be  accorded any privileged status, then with respect to such privileged status so asserted, please state (a) the document's sender, or author, recipient, date of document, type of document (e. g., letter, memorandum, record, etc.) and general subject matter; and (b) the basis upon which you claim the privilege.

If you deem any of the following Interrogatories objectionable, it is demanded that you answer the Interrogatories not deemed objectionable within thirty (30) days from the date of service hereof.

These Interrogatories seek information concerning documents that are in the possession of defendants, their agents and attorneys unless otherwise specifically stated.

In these Interrogatories:

(a) The words "defendant" and "you" or "your" shall be deemed synonymous and shall be deemed to include any and all agents, servants, employees, attorneys, you individually and any other representatives of MCG Health, Inc. d/b/a MCG Health*Care*, and any and all agents, servants, employees, attorneys, and other representatives of MCG Health, Inc. d/b/a MCG Health*Care*, who have supervisory, reporting, or other responsibility with respect to MCG Health, Inc. d/b/a MCG Health*Care*;

(b) The word "person(s)" means all entities, and without limiting the generality of the

2

foregoing, include natural persons, joint owners, associations, companies, partnerships, joint

ventures, corporations, trusts and estates in conjunction with MCG Health, Inc. d/b/a MCG

Health*Care*;

( c)  The word "documents(s)" means all written, printed, recorded or graphics matter,

photographic matter or sound reproductions, however produced or reproduced, pertaining in any

manner to the subject matter indicated;

(d) The words "identity" and "identification" when used with respect to a person or

persons, mean to state the full name and present or last known residence and business address of

such person or persons, and if a natural person, his present or last known job title, and the name

and address of his present or last known employer;

(e)  The words "identity" and "identification," when used with respect to a document

or documents, mean to describe the document or documents by date, subject matter, name(s) or

person(s) that wrote, signed, initialed, dictated or otherwise participated in the creation of the

same, the name(s) of the addressee(s) and the address(es) of each person or persons who have

possession, custody or control of said documents.  If any such document was, but is no longer in

your possession, custody or control, or in existence, state the date and manner of its disposition;

(f) The word "information" means any and all data, facts, statistics or other information

relating to the medical professionals who were on the medical staff of MCG Health, Inc. d/b/a

MCG Health*Care*, during the time period that is requested by the specific Interrogatory and any

employees of MCG Health, Inc. d/b/a MCG Health*Care*, who were and are employed by MCG

Health, Inc. d/b/a MCG Health*Care*

(g) The phrase "discovery period" unless otherwise specified includes the time period

3

beginning January 1, 1993, and for each month thereafter and ending on the date of your response to the discovery request.

(h) If you elect under Rule 33 of the Federal Rules of Civil Procedure to produce the business documents and or records in lieu of a response to a Interrogatory, it is requested that you state in your response as to each such Interrogatory so responded to under the option to produce documents and records, that you so state that the documents and or records so produced under the option to produce documents and records provide the information sought in the Interrogatory, where such information is in the documents that is responsive to the Interrogatory and that there are no other documents and or records not produced that contain any of the information sought in said Interrogatory and in the event that you do not so state where such information is to be found or located in the documents responsive to the Interrogatory that you elect to respond pursuant to Rule 33. "Option To Produce Business records" and so state that there are no other documents and or records not produced that contain any of the information sought in said Interrogatory, plaintiff will take such a lack of such response to mean that there are no other documents and or records not produced that contain any of the information sought in said Interrogatory so responded to pursuant to Rule 33. "Option To Produce Business Records."

(i) With respect to each such Interrogatory responded to, please state the name, title, business address, and telephone number of any and all persons involved in the compilation, gathering of information, and providing responses to each such Interrogatory responded to.

(j) If you deem any of the following Interrogatories objectionable, it is demanded that you answer the Interrogatories not deemed objectionable within thirty (30) days from the date of service hereof.

4

(k) These Interrogatories seek information concerning documents that are in the possession of Defendant, MCG Health, Inc. d/b/a MCG Health*Care*, his agents and attorneys unless otherwise specifically stated.

**INTERROGATORY NO. 1**

Please explain, describe fully, completely and in detail for each year starting January, 2001, the manner in which office space is allocated to physicians within the Medical College of Georgia and with respect to the allocation of office space to any such physicians within the Medical College of Georgia, please provide: a. each and every reason that office space is assigned to any such physician(s) within the Medical College of Georgia; b. the name and department of each person that is and was responsible for the allocation of office space to physicians within the Medical College of Georgia; c. the name(s) and job title of each person that was entitled to have office space allocated to him or her within the Medical College of Georgia; d. identify any and all written policies and procedures that touch upon, address and or govern how office space is allocated to physicians within the Medical College of Georgia; e. identify any and all charts, lists, memorandum or writings of any kind that detail and or state where each such physician(s) within the Medical College of Georgia was assigned an office and or offices within the Medical College of Georgia; f. identify by name, job title, business address, and business telephone number of each such person that has custody and control of any documents referenced, referred to and or used in any way in response to this Interrogatory No. 1.

**INTERROGATORY NO. 2**

If Interrogatory No. 2., was responded to in any way in the affirmative, then please provide the following information: a. the names, job titles and departments within the Medical

5

College of Georgia of each such physician that was required by the Medical College of Georgia to relinquish and or be reassigned office space that had been assigned to any such physician; b. the dates that each such physician was required by the Medical College of Georgia to relinquish and or be reassigned office space that had been assigned to any such physician; c. the reasons that were provided to any such physician that was required by the Medical College of Georgia to relinquish and or be reassigned office space that had been assigned to any such physician; d. the names and titles of each department chairman of each such physician that was required by the Medical College of Georgia to relinquish and or be reassigned office space that had been assigned to any such physician; e. identify any notes, writings and or memorandum of any kind that touch upon and relate to any physician required by the Medical College of Georgia to relinquish and or be reassigned office space that had been assigned to any such physician; and f. identify by name, job title, business address, business telephone number of each such person that has custody, control of any documents referenced and or referred to and or used in response to this Interrogatory No. 2.

**INTERROGATORY NO. 3**

Please provide with respect to the cardiothoracic department of the Medical College of Georgia, the following: a. the amount of office space that was assigned to the cardiothoracic department within the Medical College of Georgia; b. the name of each person and job title that was assigned office space within the cardiothoracic department within the Medical College of Georgia; c. the reasons that each such person was assigned the specific office space that was assigned to each such person within the  cardiothoracic department within the Medical College of Georgia; d. the name and job title of each person within the cardiothoracic department of the

6

Medical College of Georgia that was responsible for the assignment of office space to physicians

within the cardiothoracic department of the Medical College of Georgia, and; e. identify any and

all notes, memorandum and writings of any kind that touch upon and reference the assignment of

office space within the cardiothoracic department within the Medical College of Georgia;

f. identify by name, job title, business address, business telephone number of each such person

that has custody, control of any documents referenced and or referred to and or used in response

to this Interrogatory No. 3.

**INTERROGATORY NO. 4**

Please state whether Plaintiff was required to relinquish and or be reassigned office space

by anyone at the Medical College of Georgia and if Interrogatory No. 4., is responded to in the

affirmative, then please provide: a. the dates that Plaintiff was required to relinquish and or be

reassigned office space at the Medical College of Georgia; b. each and every reason that Plaintiff

was required to relinquish and or be reassigned office space at the Medical College of Georgia;

c. the name and job title of each person that was involved in any discussion and or decision that

involved the matter of Plaintiff's relinquishment and or reassignment of office space at the

Medical College of Georgia; d. identify and describe the office space that Plaintiff was required

to relinquish and or be reassigned from at the Medical College of Georgia; e. identify and

describe the office space that Plaintiff was reassigned to at the Medical College of Georgia; f.

identify any and all notes, memorandum and writings of any kind that touch upon and reference

the assignment and reassignment of office space to the Plaintiff at the Medical College of

Georgia, and; g. identify by name, job title, business address, business telephone number of each

such person that has custody, control and possession of any documents referenced and or referred

to and or used in response to this Interrogatory No. 4.

**INTERROGATORY NO. 5**

      With respect to any office space referred to in the preceding Interrogatories No 1.,

through 4., above, and with respect to offices occupied by Dr. Kevin Landolfo, Dr. Mark

Anstadt, Dr. Lionel Zumbro, Jr., Dr. Thomas Gadacz, and Dr. Kwabena Mawulawde, please

describe fully and completely; a. each and every office space within the cardiothoracic

department of the Medical College of Georgia that was occupied by Dr. Kevin Landolfo, Dr.

Mark Anstadt, Dr. Lionel Zumbro, Jr., and Dr. Thomas Gadacz; b. the specific dates that each

such physician Dr. Kevin Landolfo, Dr. Mark Anstadt, Dr. Lionel Zumbro, Jr., Dr. Thomas

Gadacz, and Dr. Kwabena Mawulawde occupied any such assigned office space; c. identify any

and all notes, memorandum and writings of any kind that touch upon and reference offices

occupied by Dr. Kevin Landolfo, Dr. Mark Anstadt, Dr. Lionel Zumbro, Jr., Dr. Thomas Gadacz,

and Dr. Kwabena Mawulawde at the Medical College of Georgia, and; d. identify by name, job

title, business address, business telephone number of each such person that has custody, control

and possession of any documents referenced and or referred to and or used in response to this

Interrogatory No. 5.

**INTERROGATORY NO. 6**

      Please provide the name, job title and annual salary to include any bonus that Dr. Kevin

Landolfo, Dr. Mark Anstadt, Dr. Lionel Zumbro, Jr., Dr. Thomas Gadacz, and Dr. Kwabena

Mawulawde were entitled to and received during any year of the discovery period, and with

respect to the annual salary and bonus of the named physicians; a. identify any and all notes,

memorandum and writings of any kind that touch upon and reference the salary and bonus of Dr.

Kevin Landolfo, Dr. Mark Anstadt, Dr. Lionel Zumbro, Jr., Dr. Thomas Gadacz, and Dr.

Kwabena Mawulawde at the Medical College of Georgia, and; b. identify by name, job title,

business address, business telephone number of each such person that has custody, control and

possession of any documents referenced and or referred to and or used in response to this

Interrogatory No. 6.

## INTERROGATORY NO. 7

With respect to the cardiothoracic department of the Medical College of Georgia, Dr.

Kevin Landolfo, Dr. Mark Anstadt, Dr. Lionel Zumbro, Jr., Dr. Thomas Gadacz, and Dr.

Kwabena Mawulawde, and with respect to each person named, please provide: a. the date that

each person so named became employed with the Medical College of Georgia; b. the job title and

job position that each such person held at the time that each person so named became employed

with the Medical College of Georgia; c. the number of and the names of each resident that each

such person was assigned at the time that each person was employed with the Medical College of

Georgia; d. the dates and names of each resident that was assigned to Dr. Kevin Landolfo, Dr.

Mark Anstadt, Dr. Lionel Zumbro, Jr., Dr. Thomas Gadacz, and Dr. Kwabena Mawulawde for

training; e. identify each and every letter, note, memorandum and writing of any kind that touch

upon the information requested in Interrogatory No. 7., f. identify by name, job title, business

address, business telephone number of each such person that has custody, control and possession

of any letter, note, memorandum and writing of any kind that touch upon, references, refers to

and or was used in response to this Interrogatory No. 7.

## INTERROGATORY NO. 8

Please describe in detail how the Medical College of Georgia recruits for physicians who

are engaged in training residents to include the cardiothoracic surgery department at the Medical College of Georgia, and with respect to such recruitment procedure, please provide the following: a. each and every step in the recruitment process for physicians who are engaged in training residents in the cardiothoracic surgery department at the Medical College of Georgia; b. the name, title, business address, and business telephone number of each and every person that assists in recruiting for physicians who are engaged in training residents in the cardiothoracic surgery department at the Medical College of Georgia; c. any and all written policies and procedures that touch upon, address and or govern recruitment procedure for physicians who are engaged in training residents in the cardiothoracic surgery department at the Medical College of Georgia; d. the name, title, and address of each person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern recruitment procedure for physicians who are engaged in training residents in the cardiothoracic surgery department at the Medical College of Georgia.

## INTERROGATORY NO. 9

Please describe in detail the budget earmarked and dedicated for the cardiothoracic department at the Medical College of Georgia, for each year beginning January 2001, and in regards to the budget earmarked and dedicated for the cardiothoracic department, please provide the following: a. the percentage of the budget that was allocated for research in the cardiothoracic department at the Medical College of Georgia; b. the name of each and every person who performed research pursuant to the budget earmarked and dedicated for the cardiothoracic department at the Medical College of Georgia; c. each and every source from which monies for the research budget was received; d. the name of each and every physician in the cardiothoracic

10

department of the Medical College of Georgia who had a research budget assigned to them, and

the specific dollar amount allocated to each physician for research; e. the name of each and every

research project within the cardiothoracic department of the Medical College of Georgia; f. the

criteria for a physician to receive a research budget within the cardiothoracic department of the

Medical College of Georgia; g. a detailed job description of each and every physician in the

cardiothoracic department of the Medical College of Georgia who had a research budget assigned

to them; h. any and all written policies and procedures that touch upon, address and or govern the

research budget for the cardiothoracic department at the Medical College of Georgia; i. the name,

title, business address, and business phone number of each person who currently has possession,

control and custody of all written policies and procedures that touch upon, address and or govern

the research budget for the cardiothoracic department at the Medical College of Georgia.

**INTERROGATORY NO. 10**

Please identify by name, and job title each and every physician at the Medical College of

Georgia whose contract was terminated or not renewed, and for each and every physician whose

contract was terminated or not renewed at the Medical College of Georgia, please provide the

following: a. each and every reason for the decision to terminate the contract or not to renew the

contract of each and every physician at the Medical College of Georgia; b. the name, title,

business address and business telephone number of each and every person who participated in

any meetings, sessions, conversations and/or discussions regarding the decision to terminate the

contract or not to renew the contract of each and every physician at the Medical College of

Georgia; c. the role of each and every person in each and every meeting, session, conversation

and/or discussion that resulted in a decision to terminate the contract or not to renew the contract

11

of each and every physician at the Medical College of Georgia; d. each and every document that was generated as a result of each and every meeting, session, conversation and/or discussion regarding the decision to terminate the contract or not to renew the contract of each and every physician at the Medical College of Georgia; e. the date(s) and time(s) that such person(s) participated in each and every decision to terminate the contract or not to renew the contract of each and every physician at the Medical College of Georgia; f. any and all letters, notes, memorandum and/or documents that were reviewed and/or generated by each and every person that participated in each and every decision to terminate the contract or not to renew the contract of each and every physician at the Medical College of Georgia; g. any and all written policies and procedures that touch upon, address and or govern the termination or non-renewal of a physician's contract at the Medical College of Georgia; h. the name, title, business address, and business telephone number of each person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern the termination or non-renewal of a physician's contract at the Medical College of Georgia.

**INTERROGATORY NO. 11**

Please identify by name, and job title each and every physician at the Medical College of Georgia who was denied a promotion, and for each and every physician who was denied a promotion at the Medical College of Georgia, please provide the following: a. each and every reason for the decision to deny the promotion of each and every physician at the Medical College of Georgia; b. the name, title, business address and business telephone number of each and every person who participated in any meetings, sessions, conversations and/or discussions regarding the decision to deny the promotion of each and every physician at the Medical College of

Georgia; c. the role of each and every person in each and every meeting, session, conversation

and/or discussion that resulted in a decision to deny the promotion of each and every physician at

the Medical College of Georgia; d. each and every document that was generated as a result of

each and every meeting, session, conversation and/or discussion regarding the decision to deny

the promotion of each and every physician at the Medical College of Georgia; e. the date(s) and

time(s) that such person(s) participated in each and every decision to deny the promotion of each

and every physician at the Medical College of Georgia; f. any and all letters, notes, memorandum

and/or documents that were reviewed and/or generated by each and every person that participated

in each and every decision to deny the promotion of each and every physician at the Medical

College of Georgia; g. any and all written policies and procedures that touch upon, address and or

govern the denial of a physician's promotion at the Medical College of Georgia; h. the name,

title, business address, and business telephone number of each person who currently has

possession, control and custody of all written policies and procedures that touch upon, address

and or govern the denial of a physician's promotion at the Medical College of Georgia.

**INTERROGATORY NO. 12**

Please provide the name of each and every chief of each and every department in the

Medical College of Georgia, and with respect to each chief of each department, provide the

following: a. the name of each and every department in the Medical College of Georgia; b. the

purpose of each and every department in the Medical College of Georgia; c. how long each and

every department has been in existence at the Medical College of Georgia; d. the business

address and business telephone number of each and every chief of each and every department in

the Medical College of Georgia; e. the job description of each and every chief in each and every

13

department at the Medical College of Georgia; f. the salary and bonus of each and every chief in each and every department at the Medical College of Georgia; g. any and all written policies and procedures that touch upon, address and or govern the position of each and every chief in each and every department in the Medical College of Georgia; h. the name, title, business address, and business telephone number of each person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern the position of each and every chief in each and every department in the Medical College of Georgia.

**INTERROGATORY NO. 13**

Please describe in detail the job description for chief of cardiothoracic surgery after the departure of Dr. Lionel Zumbro, Jr. and with regard to the position for chief of cardiothoracic surgery after the departure of Dr. Zumbro, please provide the following: a: the date that Dr. Zumbro vacated the position of chief of cardiothoracic surgery at the Medical College of Georgia; b. the name, title, business address and business telephone number of each and every person that applied  for the position of chief of cardiothoracic surgery at the Medical College of Georgia after the position was vacated by Dr. Lionel Zumbro, Jr.; c. the date the position of chief of cardiothoracic surgery at the Medical College of Georgia was actually filled after the position was vacated by Dr. Zumbro; d. the name, previous job title, business address, and business telephone number of the person who filled the position of chief of cardiothoracic surgery after the departure of Dr. Zumbro; e. the previous job description of the person who filled the position of chief of cardiothoracic surgery after the departure of Dr. Zumbro; f. the salary and bonus of the position that was previously held by the person who filled the position of chief of cardiothoracic surgery after the departure of Dr. Zumbro; g. the interview procedures used to fill the position of

14

chief of cardiothoracic surgery after the position was vacated by Dr. Zumbro; h. the name, title, business address and business telephone number of each and every person involved in the interview process to fill the position of chief of cardiothoracic surgery after the departure of Dr. Zumbro; i. the name, title, business address, and business telephone number of each and every person that made the final decision as to who would be the chief of cardiothoracic surgery at the Medical College of Georgia after the position was vacated by Dr. Zumbro; j. the salary and bonus of the person selected to fill the position of chief of cardiothoracic surgery after the departure of Dr. Zumbro; k. any and all written policies and procedures that touch upon, address and or govern filling the position of chief of cardiothoracic surgery after the departure of Dr. Zumbro; l. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern filling the position for chief of cardiothoracic surgery after the departure of Dr. Zumbro.

**INTERROGATORY NO. 14**

Please identify each and every lawsuit that names the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc. or any of its affiliates as a party defendant, to include each and every medical malpractice lawsuit, which involved a physician and/or surgeon, and with respect to each lawsuit, please provide; a. the nature of the complaint filed in each and ever lawsuit filed against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.; b. the name, business address and business telephone number of each and every patient who filed each and every lawsuit against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.; c. the name, business address and business telephone number of each and every

15

physician involved in each and every lawsuit against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.; d. whether the involved physician's medical staff privileges were summarily suspended or limited due to any issues of quality of care of a patient, or not demonstrating the skills required for adequate patient care and that said physician's medical treatment fell below the standard of care; e. the date(s) that the physician's medical staff privileges were summarily suspended or limited in any way; f. whether the physician's contract was terminated or not renewed due to a lawsuit being filed; g. the date(s) that the physician's contract was terminated, or not renewed due to a lawsuit being filed; h. a complete chronology, including specific dates, and the names of any committees that became involved in any way with any physician that is named in response to this Interrogatory No. 15 due to a lawsuit being filed; i. specifically identify any and all memorandum, notes, letters, minutes and writings of any kind that touch upon, address and or deal with any instance of any physician so involved in a lawsuit regarding medical malpractice against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.; j. the complete names of all party Plaintiffs, all named Defendants, the name of the court and State in which the lawsuit was filed, the docket number of each lawsuit and the status and/or disposition of each and every lawsuit; k. any and all written policies and procedures that touch upon, address and/or govern any filed against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.; l. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern any lawsuits filed against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.

**INTERROGATORY NO. 15**

16

Please identify and list each and every formal and informal complaint of any kind against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc. or any of its affiliates to include each and every Equal Employment Opportunity Commission (EEOC) complaint and each and every violation of the Georgia Fair Employment Act which involved a physician and/or surgeon, and with respect to each and every formal and informal complaint, please provide; a. the name, title, business address, and business telephone number of each and every employee of the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc. who filed such complaint against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.; b. whether or not each and every employee who filed a formal or informal complaint received a right to sue letter from the EEOC; c. the date(s) and time(s) that each and every employee received a right to sue letter from the EEOC; d. the name, title, business address, and business telephone number of each and every employee who filed a lawsuit after receipt of a right to sue letter; e. the Plaintiff name, Defendant name, case number, court and State where lawsuit was filed and disposition of each and every lawsuit that was filed; f. a complete chronology, including specific dates, and the names of any committee that became involved in any way with any employee that is named in response to this Interrogatory No. 16 due to a formal complaint, an informal complaint or lawsuit of any kind against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.; g. specifically identify any and all memorandum, notes, letters, minutes and writings of any kind that touch upon, address and or deal with any instance of any employee so involved with a formal or informal EEOC complaint or lawsuit of any kind against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.; h. any and all written policies and procedures that touch upon, address and/or

17

govern any informal complaints, formal complaints, and/or lawsuits of any kind filed against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.; i. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern any informal complaints, formal complaints, and/or lawsuits of any kind against the Medical College of Georgia, MCG HealthCare, and MCG Health, Inc.

**INTERROGATORY NO. 16**

Please provide fully and in detail the job responsibility of chief of cardiothoracic surgery at the Medical College of Georgia and with respect to the position of chief of cardiothoracic surgery at the Medical College of Georgia, please provide the following: a. a description of the position of chief of cardiothoracic surgery at the Medical College of Georgia; b. the name, title, business address and business telephone number of the person who created the position of chief of cardiothoracic surgery at the Medical College of Georgia; c. the date that the position became a part of the cardiothoracic surgery department at the Medical College of Georgia; d. the name, title, business address and business telephone number of each and every person who has held the position of chief of cardiothoracic surgery at the Medical College of Georgia; e. the dates that each person held the position of chief of cardiothoracic surgery at the Medical College of Georgia; f. each and every reason why each and every chief of cardiothoracic surgery vacated the position of chief of cardiothoracic surgery at the Medical College of Georgia; g. the name, title, business address and business telephone number of the supervisor of each and every chief of cardiothoracic surgery at the Medical College of Georgia; h. any and all written policies and procedures that touch upon, address and/or govern the position of chief of cardiothoracic surgery

18

at the Medical College of Georgia; i. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern the position of chief of cardiothoracic surgery at the Medical College of Georgia.

**INTERROGATORY NO. 17**

Please provide the name of each and every patient that expired under the care of Dr. Landolfo and Dr. Anstadt, and with respect to each and every patient, provide the following: a. the occupation, business address and business telephone number of each and every patient at the time of each and every surgical procedure; b. the age of the deceased patient at the time of each and every surgical procedure; c. each and every reason that each and every patient underwent surgery; d. the type of surgical procedure that patient received; e. the date and time of each and every surgical procedure performed by Dr. Landolfo and Dr. Anstadt that resulted in the expiration of each and every patient; f. the name, title, business address, and business telephone number of each and every person who was in attendance during the surgical procedure performed by Dr. Landolfo and Dr. Anstadt that resulted in the expiration of each and every patient to include each and every physician, technician, anesthesiologist, scrub nurse, assisting nurses, etc.; g. each and every administrative procedure that was followed as a result of the expiration of each and every patient while under the care of Dr. Landolfo and Dr. Anstadt during a surgical procedure; h. any and all written policies and procedures that touch upon, address and/or govern the expiration of a patient during a surgical procedure performed by Dr. Landolfo and Dr. Anstadt at the Medical College of Georgia; i. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of

19

all written policies and procedures that touch upon, address and or govern the expiration of a patient during a surgical procedure performed by Dr. Landolfo and Dr. Anstadt at the Medical College of Georgia.

## INTERROGATORY NO. 18

Please provide each and every job title ever held by Drs. Kevin Landolfo, Mark Anstadt, Lionel Zumbro, Thomas Gadacz, and Kwabena Mawulawde at the Medical College of Georgia, and with respect to each and every job title, please provide the following: a. the job description of each and every position held by each named physician; b. the beginning and ending dates that each named physician held each and every position; c. each and every reason why each named physician vacated each and every position held by each named physician; d. the salary and bonus for each and every position held by each named physician; e. the immediate supervisor of each named physician in each and every position held by each named physician; f. any and all written policies and procedures that touch upon, address and/or govern the job titles and responsibilities of Drs. Kevin Landolfo, Mark Anstadt, Lionel Zumbro, Thomas Gadacz, and Kwabena Mawulawde at the Medical College of Georgia; g. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern the job titles and responsibilities of Drs. Kevin Landolfo, Mark Anstadt, Lionel Zumbro, Thomas Gadacz, and Kwabena Mawulawde at the Medical College of Georgia.

## INTERROGATORY NO. 19

Please provide the name, title, business address, business telephone number, and social security number of each and every person who provided or assisted in providing responses to

Plaintiff Kwabena Mawulawde, M.D.'s, First Interrogatories to Defendant Medical College of Georgia.

**INTERROGATORY NO. 20**

Please provide the name of each and every person that assisted Dr. Mark Anstadt in performing each and every surgical procedure in the cardiothoracic department at the Medical College of Georgia, and with respect to each and every surgical procedure for which Dr. Anstadt received assistance, please provide the following: a. the name, title, business address and business telephone number of each and every physician who assisted Dr. Anstadt with each and every surgical procedure; b. the name, title, business address and business telephone number of each and every medical personnel and/or administrative personnel who assisted in the operating room or who assisted Dr. Anstadt outside of the operating room in preparation for each and every surgical procedure that Dr. Anstadt performed with the assistance of another physician; c. the name, business address, and business telephone number of each and every patient on which Dr. Anstadt performed a surgical procedure with the assistance of another physician; d. each and every type of surgical procedure that was performed by Dr. Anstadt with the assistance of another physician; e. the number of surgical procedures that Dr. Anstadt performed with the assistance of another physician; f. the date(s) and time(s) of each and every surgical procedure that Dr. Anstadt performed with the assistance of another physician; g. please provide the name, and address, at the time of each and every surgical procedure, of each and every patient that expired while Dr. Anstadt was performing a surgical procedure with the assistance of another physician; h. state whether any physicians refused to assist Dr. Anstadt with his surgical procedures and the date(s) and time(s) such refusals occurred; i. if Dr. Anstadt performed surgical procedures without the

assistance of another physician, the name, business address, and business telephone number of each and every patient on which Dr. Anstadt performed surgical procedures without the assistance of another physician; j. each and every type of surgical procedure that was performed by Dr. Anstadt without the assistance of another physician; k. the number of surgical procedures that Dr. Anstadt performed without the assistance of another physician; l. the date(s) and time(s) of each and every surgical procedure performed by Dr. Anstadt without the assistance of another physician; m. the name, and address, at the time of the surgical procedure, of each and every patient that expired while Dr. Anstadt was performing a surgical procedure without the assistance of another physician; n. any and all written policies and procedures that touch upon, address and/or govern Dr. Mark Anstadt's surgical procedures in the cardiothoracic department at the Medical College of Georgia; o. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern Dr. Mark Anstadt's surgical procedures in the cardiothoracic department at the Medical College of Georgia.

**INTERROGATORY NO. 21**

Please describe fully and in detail the surgical residency program at the Medical College of Georgia and with respect to the surgical residency program, please provide the following: a. the name of each and every physician that was involved in the surgical residency program; b. the role of each and every physician in the surgical residency program at the Medical College of Georgia; c. the number of residents in the surgical residency program at a given time; d. the number of residents who successfully completed the surgical residency program at the Medical College of Georgia; e. the number of residents that left the surgical residency program prior to

completion of the program; f. each and every reason why each and every resident left the surgical residency program at the Medical College of Georgia; g. name of each and every department under the surgical residency program at the Medical College of Georgia; h. any and all written policies and procedures that touch upon, address and/or govern the surgical residency program at the Medical College of Georgia; o. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern the surgical residency program at the Medical College of Georgia.

**INTERROGATORY NO. 22**

Please describe fully and in detail each and every consideration that was given to Dr. Mawulawde concerning the position of chief of cardiothoracic surgery at the Medical College of Georgia, and with respect to consideration that was given to Dr. Mawulawde, please provide the following: a. each and every interview that was given to Dr. Mawulawde for the position of chief of cardiothoracic surgery at the Medical College of Georgia; b. the criteria used to determine if Dr. Mawulawde would proceed to the next round of interviews for the position of chief of cardiothoracic surgery at the Medical College of Georgia; c. the date(s) and time(s) of each and every interview that was given to Dr. Mawulawde for the position of chief of cardiothoracic surgery at the Medical College of Georgia; d. the name, title, business address, and business telephone number of each and every person that was involved in the decision making process to interview Dr. Mawulawde for the position of chief of cardiothoracic surgery at the Medical College of Georgia; e. the name, title, business address, and business telephone number of each and every person that was involved in the decision making process to advance Dr. Mawulawde to

23

the next round of interviews for the position of chief of cardiothoracic surgery at the Medical

College of Georgia; f. the name, title, business address, and business telephone number of each

and every person who made the decision not to give the position of chief of cardiothoracic

surgery to Dr. Mawulawde; g. each and every reason that Dr. Mawulawde was not selected for

the position of chief of cardiothoracic surgery at the Medical College of Georgia; h. any and all

written policies and procedures that touch upon, address and/or govern each and every

consideration that was given to Dr. Mawulawde concerning the position of chief of

cardiothoracic surgery at the Medical College of Georgia; i. the name, title, business address, and

business telephone number of each and every person who currently has possession, control and

custody of all written policies and procedures that touch upon, address and or govern each and

every consideration that was given to Dr. Mawulawde concerning the position of chief of

cardiothoracic surgery at the Medical College of Georgia.

## INTERROGATORY NO. 23

Please explain in detail how long Dr. Mark Anstadt has been practicing medicine, and

with respect to Dr. Anstadt's practice of medicine, please provide the following: a. the process by

which Dr. Anstadt was recruited to become a physician at the Medical College of Georgia; and

by whom he was recruited to become a physician at the medical College of Georgia, including

the name, title, business address, and business telephone number of each and every person

involved in recruiting Dr. Anstadt as a physician at the Medical College of Georgia; b. the date

and time Dr. Anstadt began to practice medicine at the Medical College of Georgia; c. each and

every job title ever held by Dr. Anstadt while at the Medical College of Georgia; d. each and

every recommendation that was made on behalf of Dr. Anstadt and the name, title, business

address, and business telephone number of each person who made each and every

recommendation; e. each and every position held by Dr. Anstadt while at the Medical College of

Georgia and how long he held each and every position; f. each and every reason why Dr. Anstadt

was given each and every position that he held at the Medical College of Georgia; g. the name,

title, business address, and business telephone number of each and every supervisor of Dr.

Andstadt while at the Medical College of Georgia; h. the salary and bonus including all

subsequent pay raises of Dr. Anstadt in each and every position at the Medical College of

Georgia; i. each and every contract applicable to each and every position held by Dr. Anstadt at

the Medical College of Georgia; j. the name, title, business address, and business telephone

number of each and every surgeon that ever trained Dr. Anstadt in surgical procedures at the

Medical College of Georgia; k. Dr. Anstadt's pediatric cardiac experience if any; l. each and

every off-pump surgery performed by Dr. Anstadt at the Medical College of Georgia including

the name and address of each patient on which the off-pump surgery was performed; m. describe

in detail each and every evaluation of Dr. Anstadt while working at the Medical College of

Georgia in each and every capacity, including the name, title, business address, and business

telephone number of each and every person who made the evaluation of Dr. Anstadt; n. any and

all written policies and procedures that touch upon, address and/or govern Dr. Anstadt's practice

of medicine; g. the name, title, business address, and business telephone number of each and

every person who currently has possession, control and custody of all written policies and

procedures that touch upon, address and or govern Dr. Anstadt's practice of medicine.

**INTERROGATORY NO. 24**

Please explain fully and in detail each and every reason why the thoracic surgery section

of the Medical College of Georgia was placed on probation and in danger of losing its accreditation, and with respect to said probation and accreditation, please provide the following: a. the date and time that the thoracic surgery section of the Medical College of Georgia began its probation; b. the name, title, business address and business telephone number of each and every person that made the decision to place the thoracic surgery section of the Medical College of Georgia on probation; c. the name, title, business address and business telephone number of each and every physician that was on staff in the thoracic surgery section of the Medical College of Georgia when the thoracic surgery section of the Medical College of Georgia began its probation; d. each and every reason why the thoracic surgery section of the Medical College of Georgia was removed from probation; e. the date and time that the thoracic surgery section of the Medical College of Georgia was removed from probation; f. the name, title, business address and business telephone number of each and every person that made the decision to remove the thoracic surgery section of the Medical College of Georgia from probation; g. the name, title, address and business phone of each and every physician that was on staff in the thoracic surgery section of the Medical College of Georgia when the thoracic surgery section of the Medical College of Georgia was removed from probation; h. the date that the thoracic surgery section of the Medical College of Georgia received full accreditation; i. provide the name, title, business address, and business telephone number of each and every physician that was on staff when the thoracic surgery section of the Medical College of Georgia received full accreditation; j. the job description of each and every physician that was on staff when the thoracic surgery section of the Medical College of Georgia received full accreditation; k. a list of any special skills of each and every physician that was on staff when the thoracic surgery section of the Medical College of

26

Georgia received full accreditation; l. any and all written policies and procedures that touch upon, address and/or govern the thoracic surgery section of the Medical College of Georgia's probation and accreditation; m. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern the thoracic surgery section of the Medical College of Georgia's probation and accreditation.

**INTERROGATORY NO. 25**

Please explain in detail how long Dr. Landolfo has been practicing medicine, and with respect to Dr. Landolfo's practice of medicine, please provide the following: a. the process by which Dr. Landolfo was recruited to become a physician at the Medical College of Georgia, and by whom he was recruited including the name, title business address, and business telephone number of each and every person involved in recruiting Dr. Landolfo as a physician at the Medical College of Georgia; b. the date and time Dr. Landolfo began to practice medicine at the Medical College of Georgia; c. each and every job title ever held by Dr. Landolfo while at the Medical College of Georgia, including the beginning and ending dates that Dr. Landolfo held each and every position that he held while at the Medical College of Georgia; d. the name, title business address, and business telephone number of each and every person who recommended Dr. Landolfo for each and every position he held at the Medical College of Georgia; e. the salary and bonus of each and every position held by Dr. Landolfo while at the Medical College of Georgia; f. each and every contract applicable to each and every position held by Dr. Landolfo while at the Medical College of Georgia; g. the name, title, business address, and business telephone number of each and every one of Dr. Landolfo's superiors while Dr. Landolfo was

27

employed by the Medical College of Georgia; h. each and every recommendation that was made

on behalf of Dr. Landolfo concerning each and every position held by Dr. Landolfo at the

Medical College of Georgia, including the name, title, business address, and business telephone

number of each and every person who made the recommendation; i. Dr. Landolfo's pediatric

cardiac experience, if any; j. each and every off-pump surgery performed by Dr. Landolfo at the

Medical College of Georgia or any other health care facility, including the name and address of

each patient on which the off-pump surgery was performed; k. each and every evaluation of Dr.

Landolfo while working at the Medical College of Georgia in each and every position held by Dr.

Landolfo, including the name, title business address, and business telephone number of each

person who gave the evaluation of Dr. Landolfo; l. describe in detail the contracts that controlled

each and every position held by Dr. Landolfo at the Medical College of Georgia; m. the date and

time Dr. Landolfo ceased to practice medicine at the Medical College of Georgia; n. each and

every separation notice, termination letter, or letter of resignation given to or received from Dr.

Landolfo at the time of his departure from the Medical College of Georgia; o. any and all written

policies and procedures that touch upon, address and/or govern Dr. Landolfo's practice of

medicine; p. the name, title, business address, and business telephone number of each and every

person who currently has possession, control and custody of all written policies and procedures

that touch upon, address and or govern Dr. Landolfo's practice of medicine.

**INTERROGATORY NO. 26**

Please describe in detail each and every complaint that was made against Dr. Anstadt

during his tenure in whatever capacity at the Medical College of Georgia or any other health care

facility, and with respect to any such complaints, please provide the following; a. each and every

28

complaint of any kind that was made against Dr. Anstadt by any and all of Dr. Anstadt's peers at the Medical College of Georgia and the nature of each such complaint; b. the name, title, business address, and business telephone number of each and every peer who made a complaint of any kind against Dr. Anstadt; c. each and every complaint that was made against Dr. Anstadt by any and all of Dr. Anstadt's superiors at the Medical College of Georgia and the nature of each such complaint; d. the name, title, business address, and business telephone number of each and every superior who made a complaint of any kind against Dr. Anstadt; e. each and every complaint of any kind that was made against Dr. Anstadt by any and all of Dr. Anstadt's patients at the Medical College of Georgia and the nature of each such complaint; f. the name, title, business address, and business telephone number of each and every patient who made a complaint of any kind against Dr. Anstadt; f. each and every complaint that was made against Dr. Anstadt by each and every resident nurse who worked with Dr. Anstadt at the Medical College of Georgia and the nature of each such complaint; g. the name, title, business address, and business telephone number of each and every resident nurse who made a complaint of any kind against Dr. Anstadt; h. each and every peer review process due to any complaints of any kind against Dr. Anstadt, including the reason for the peer review, and the name, title, business address, and business telephone number of all members of any peer review committee; i. any and all written policies and procedures that touch upon, address and/or govern complaints that were made against Dr. Anstadt during his tenure in whatever capacity at the Medical College of Georgia or any other health care facility; j. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern complaints that were made against Dr.

29

Anstadt during his tenure in whatever capacity at the Medical College of Georgia.

**INTERROGATORY NO. 27**

Please describe in detail each and every reason why Dr. Anstadt was terminated from the Medical College of Georgia, and with respect to Dr. Anstadt's termination from the Medical College of Georgia, please provide the following; a. whether or not Dr. Anstadt objected to his termination; b. if yes, each and every objection made by Dr. Anstadt regarding his termination; c. describe in detail each and every separation notice, termination letter, or letter of resignation given to Dr. Anstadt at the time of his departure from the Medical College of Georgia; d. each and every EEOC claim and/or lawsuit filed regarding Dr. Anstadt's termination from the Medical College of Georgia; e. the dates of any such EEOC claim and/or lawsuit; f. the name, title, business address and business telephone number of each and every person named as a party to each and every EEOC claim and/or lawsuit; g. the date(s) and time(s) of each and every deposition that was taken in each and every EEOC claim and/or lawsuit against the Medical College of Georgia and by whom the deposition(s) were taken; h. the date that Dr. Anstadt was terminated from the Medical College of Georgia; i. Dr. Anstadt's duties and job function prior to being terminated from the Medical College of Georgia; j. the name, title, business address, and business telephone number of each and every person who performed the duties, that were previously performed by Dr. Anstadt, after his termination from the Medical College of Georgia; k. any and all written policies and procedures that touch upon, address and/or govern Dr. Anstadt's termination from the Medical College of Georgia or any other health care facility; j. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch

30

upon, address and or govern Dr. Anstadt's termination from the Medical College of Georgia or any other health care facility.

**INTERROGATORY NO. 28**

Identify all officers and directors of the Medical College of Georgia who have served in such capacity from 1993 to the present, and who has served on any other Boards or Commissions of any other legal entity that has a legal relationship to the Medical College of Georgia and with respect to each such person please state: a. the date on which such person became an officer and/or director of each entity; b. the manner in which such person was selected to become an officer and/or director of each such entity; c. any other job title(s) and/or office(s) held by such person at any time as an officer, director and/or employee of the Medical College of Georgia; d. a description of the responsibilities and duties of such person in his or her capacity with the Medical College of Georgia; e. identify any notes, writings and or memorandum of kind that touch upon and relate to officers and directors of the Medical College of Georgia who have served in such capacity from 1993 to the present, and who have served on any other Boards or Commissions of any other legal entity that has a legal relationship to the Medical College of Georgia, and; f. identify by name, job title, business address, business telephone number of each such person that has custody, control of any documents referenced and or referred to and or used in response to this Interrogatory No. 28.

**INTERROGATORY NO. 29**

Please describe in detail the duties of Plaintiff Kwabena Mawulawde from March 2003 through June 2003, in the cardiothoracic department of the Medical College of Georgia, and with regard to those duties, please provide the following: a. Dr. Mawulawde's job title from March

2003 through June 2003, in the cardiothoracic department of the Medical College of Georgia; b. Dr. Mawulawde's job description from March 2003 through June 2003, in the cardiothoracic department of the Medical College of Georgia; c. Dr. Mawulawde's salary and bonus from March 2003 through June 2003, in the cardiothoracic department of the Medical College of Georgia; d. the name, business address and business telephone number of each resident that was trained by Dr. Mawulawde from March 2003 through June 2003, in the cardiothoracic department of the Medical College of Georgia; e. please provide the location of Dr. Mawulawde's office and a description of Dr. Mawulawde's office from March 2003 through June 2003, in the cardiothoracic department of the Medical College of Georgia; f. any and all written policies and procedures that touch upon, address and/or govern each and every consideration that was given to Dr. Mawulawde concerning the position of chief of cardiothoracic surgery at the Medical College of Georgia; g. the name, title, business address, and business telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern each and every consideration that was given to Dr. Mawulawde concerning the position of chief of cardiothoracic surgery at the Medical College of Georgia.

**INTERROGATORY NO. 30**

Please explain, describe fully, completely and in detail the mortality rate in the thoracic surgery department at the Medical College of Georgia during each year of the discovery period, and with respect to the mortality rate, please provide the following: a. any and all written policies and procedures that touch upon, address and/or govern the mortality rate in the thoracic surgery department at the Medical College of Georgia; b. the name, title, business address, and business

telephone number of each and every person who currently has possession, control and custody of all written policies and procedures that touch upon, address and or govern the mortality rate in the thoracic surgery department at the Medical College of Georgia.

This _____ day of December, 2005.

Respectfully submitted,

GEORGE W. McGRIFF, & ASSOCIATES
For the firm:
Deborah B. Brown, Esq.
Georgia Bar No. 068328
Attorney for Plaintiff

GEORGE W. McGRIFF & ASSOCIATES
Century Lake Office Park
1774 Century Boulevard, NE
Atlanta, Georgia 30345-3312
(404) 325-2755

33

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

KWABENA MAWULAWDE, M.D.                          )
                                                 )
    Plaintiff,                                   )
                                                 )
      vs.                                      ) CIVIL  ACTION
                                                 ) FILE NO. 1:05-CV-99
BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF     )
GEORGIA; MCG HEALTH, INC. d/b/a MCG HEALTH*CARE*;)
DANIEL W. RAHN, M.D., Indiv. and in his Official Capacity )
as President, Medical College of Georgia; DAVID STERN, M.D., )
 Indiv. and in his Official Capacity as Dean, School of Medicine, )
Medical College of Georgia; and DON SNELL, Indiv. and in his )
Official Capacity as President and CEO, MCG Health, Inc.,  )
                                                 )
    Defendants.                                  )
_____ )

## CERTIFICATE OF SERVICE

This is to certify that I have caused a copy of the foregoing *Plaintiff's First Continuing*

*Interrogatories to Defendant, MCG Health, Inc. d/b/a MCG HealthCare,* upon opposing counsel

by depositing a copy of the same in the U.S. Mail with adequate postage affixed thereon,

properly addressed as follows:

ALANA HEATON, Esq. & JAMES B. ELLINGTON, Esq.
HULL, TOWILL, NORMAN, BARRETT & SALLEY
SunTrust Bank Building, Seventh Floor
801 Broad Street
Augusta, Georgia 30901

This _9th_ day of December, 2005.

Respectfully submitted,

GEORGE W. McGRIFF, & Associates
For the firm:
Deborah B. Brown, Esq.
Georgia Bar No. 068328
Attorney for Plaintiff


GEORGE W. McGRIFF & ASSOCIATES
Century Lake Office Park
1774 Century Boulevard, NE
Atlanta, Georgia 30345-3312
(404) 325-2755

# EXHIBIT 7

on ι

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

*Rec 1/18/06*

| | |
|---|---|
| KWABENA MAWULAWDE, M.D., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BOARD OF REGENTS OF THE | ) |
| UNIVERSITY SYSTEM OF GEORGIA; | ) |
| | ) |
| MCG HEALTH, INC. d/b/a MCG | ) |
| HEALTH*CARE*; | ) |
| | ) |
| DANIEL W. RAHN, M.D., Individually | ) |
| and in his Official Capacity as President, | ) |
| Medical College of Georgia; | ) |
| | ) |
| DAVID STERN, M.D., Individually and in | ) |
| his Official Capacity as Dean, School of | ) |
| Medicine, Medical College of Georgia; and | ) |
| | ) |
| DON SNELL, Individually and in his | ) |
| Official Capacity as President and CEO, | ) |
| MCG Health, Inc., | ) |
| | ) |
|     Defendants. | ) |

Civil Action File No.:
1:05-CV-00099-DHB

**DEFENDANT MCG HEALTH, INC.'S
RESPONSES TO PLAINTIFF'S
FIRST INTERROGATORIES**

NOW COMES Defendant MCG Health, Inc. ("MCG Health"),[1] and responds to the

Plaintiff's First Interrogatories to it as follows:

<u>GENERAL OBJECTIONS</u>

MCG Health objects to each interrogatory to the extent that such interrogatory seeks

information falling within the attorney-client privilege or within the scope of attorney work product

---

[1] MCG Health*Care*, which the plaintiff references in his Amended Complaint as a name
under which MCG Health, Inc. does business, is not a legal entity capable of suing or being sued,
but is instead a common law service mark occasionally used as a trade name by MCG Health,
Inc.

on the ground that such information and documents are beyond the scope of discovery.

MCG Health objects to the "discovery period" designated by the plaintiff in instruction (g). Requests for discovery of information predating July 1, 2000 are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence and are overbroad as to time because MCG Health only began operating the hospitals and clinics of the Medical College of Georgia on July 1, 2000. Prior to July 1, 2000, MCG Health did not operate the hospitals and clinics of the Medical College of Georgia.

MCG Health objects to the request designated by the plaintiff as instruction (i) on the ground that such request is actually an interrogatory, not an instruction, and should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Orders of October 6, 2005 and November 15, 2005.

MCG Health objects to the plaintiff's interrogatories to the extent that the plaintiff has served MCG Health with more than 25 interrogatories, including discrete subparts, on the ground that the excess interrogatories violate Federal Rule of Civil Procedure 33(a) and the Court's Orders of October 6, 2005 and November 15, 2005.

MCG Health is responding to these interrogatories upon the basis of information now known to it and without reference to facts, documents and writings that may be subsequently discovered. MCG Health reserves the right to make further responses and, if necessary, corrections to these responses based upon information which may be subsequently acquired.

Subject to the above, MCG Health responds as follows:

## RESPONSES TO INTERROGATORIES

### Interrogatory One

1.      Please explain, describe fully, completely and in detail for each year starting January, 2001, the manner in which office space is allocated to physicians within the Medical College of Georgia and with respect to the allocation of office space to any such physicians within the Medical College of Georgia, please provide:

    1(a) each and every reason that office space is assigned to any such physician(s) within the Medical College of Georgia;

    1(b) the name and department of each person that is and was responsible for the allocation of office space to physicians within the Medical College of Georgia;

**Response:**

MCG Health leases certain real property located on the campus of MCG from the Board of Regents of the University System of Georgia ("Board of Regents") and then leases portions of the facilities included in that real property back to the Board of Regents. MCG Health assigns office space in the portions of the property which it leases from Board of Regents in accordance with the policies and procedures identified in response to Interrogatory 1(d) below. The Board of Regents assigns office space in the portions of the property which it leases back from MCG Health at its discretion and according to its own methods. MCG Health does not control the allocation of space in the portions of the property which the Board of Regents leases back from MCG Health. Further, MCG Health does not normally assign the space that it leases from the Board of Regents to physicians or employees of the Board of Regents.

MCG Health allocates office space that it leases from the Board of Regents as needed and requested on a case-by-case basis. In general, a change of use of such space is first reviewed by administrators in MCG Health's Facility Services department, including Richard Tobias and David

3

Weathers. Such change of use is then reviewed by MCG Health's Space Management Committee. The minutes of the Space Management Committee are then submitted to Don Snell for approval. This procedure applies only to the allocation of space leased by MCG Health from the Board of Regents. Space leased back by the Board of Regents from MCG Health is allocated at the discretion and according to the methods of the Board of Regents.

## Interrogatory Two

**1(c) the name(s) and job title of each person that was entitled to have office space allocated to him or her within the Medical College of Georgia;**

**Response:**

MCG Health objects to the plaintiff's designation of Interrogatory numbered 1(c) as a subpart of Interrogatory numbered 1 on the grounds that Interrogatory numbered 1(c) can be answered fully and completely without reference to any other interrogatory, is not logically or factually subsumed within any other interrogatory, is unnecessary to the understanding of any other interrogatory and can stand alone and for these reasons should be counted individually as a discrete interrogatory and not as a subpart of any other interrogatory pursuant to Federal Rule of Civil Procedure 33 and the Court's Orders of October 6, 2005 and November 15, 2005.

Subject to and without waiving this objection, MCG Health states that, as explained above, it allocates certain office space within those portions of the real property that it leases from the Board of Regents while the Board of Regents allocates certain office space within other portions of the real property that it leases back from MCG Health. Within those portions of real property leased by MCG Health from the Board of Regents, MCG Health endeavors to provide sufficient space to everyone who works in the hospital. However, MCG Health does not normally provide office space

4

to physicians or employees of the Board of Regents. Those individuals are generally provided office space by the Board of Regents at its discretion and according to its own methods.

### Interrogatory Three

**1(d) identify any and all written policies and procedures that touch upon, address and or govern how office space is allocated to physicians within the Medical College of Georgia;**

**Response:**

MCG Health objects to the plaintiff's designation of Interrogatory numbered 1(d) as a subpart of Interrogatory numbered 1 on the grounds that Interrogatory numbered 1(d) can be answered fully and completely without reference to any other interrogatory, is not logically or factually subsumed within any other interrogatory, is unnecessary to the understanding of any other interrogatory and can stand alone and for these reasons should be counted individually as a discrete interrogatory and not as a subpart of any other interrogatory pursuant to Federal Rule of Civil Procedure 33 and the Court's Orders of October 6, 2005 and November 15, 2005.

Subject to and without waiving this objection, MCG Health states that, as explained above, space leased back by the Board of Regents from MCG Health is allocated at the discretion and according to the methods of the Board of Regents. Policies and procedures addressing the allocation of space by MCG Health that is leased by MCG Health from the Board of Regents are available for inspection at the offices of its counsel, Hull, Towill, Norman, Barrett & Salley, at a time mutually convenient to the parties.

### Interrogatory Four

**1(e) identify any and all charts, lists, memorandum or writings of any kind that detail or state where each such physician(s) within the Medical College of Georgia was assigned an office and or offices within the Medical College of Georgia;**

5

**Response:**

MCG Health objects to the plaintiff's designation of Interrogatory numbered 1(e) as a subpart of Interrogatory numbered 1 on the grounds that Interrogatory numbered 1(e) can be answered fully and completely without reference to any other interrogatory, is not logically or factually subsumed within any other interrogatory, is unnecessary to the understanding of any other interrogatory and can stand alone and for these reasons should be counted individually as a discrete interrogatory and not as a subpart of any other interrogatory pursuant to Federal Rule of Civil Procedure 33 and the Court's Orders of October 6, 2005 and November 15, 2005.

Subject to and without waiving this objection, MCG Health states that it does not have documents of the type sought by Interrogatory numbered 1(e) in its possession or custody.

**Interrogatory Five**

**1(f) identify by name, job title, business address, and business telephone number each such person that has custody and control of any documents referenced, referred to and or used in any way in response to this Interrogatory No. 1.**

**Response:**

MCG Health objects to the plaintiff's designation of Interrogatory numbered 1(f) as a subpart of Interrogatory numbered 1 on the grounds that Interrogatory numbered 1(f) can be answered fully and completely without reference to any other interrogatory, is not logically or factually subsumed within any other interrogatory, is unnecessary to the understanding of any other interrogatory and can stand alone and for these reasons should be counted individually as a discrete interrogatory and not as a subpart of any other interrogatory pursuant to Federal Rule of Civil Procedure 33 and the Court's Orders of October 6, 2005 and November 15, 2005.

Subject to and without waiving this objection, MCG Health states that the following

individuals have custody of documents used in responding to Interrogatories numbered 1, 1(a), 1(b), 1(c), 1(d) or 1(e):

Alethia Albright: Admin Specialist, MCG Health, 1120 15th Street, Augusta, Georgia 30912. Ms. Albright may be contacted through counsel for MCG Health.

Donald F. Snell, President and CEO, MCG Health, 1120 15th Street, Augusta, Georgia 30912. Mr. Snell may be contacted through counsel.

Richard A. Tobias: Vice President of Facilities Services, MCG Health, 1120 15th Street, Augusta, Georgia 30912. Mr. Tobias may be contacted through counsel for MCG Health.

<u>**Interrogatory Six**</u>

**2.      If Interrogatory No. 2, was responded to in any way in the affirmative, then please provide the following information:**

**2(a) the names, job titles and departments within the Medical College of Georgia of each such physician that was required by the Medical College of Georgia to relinquish and or be reassigned office space that had been assigned to any such physician;**

**2(b) the dates that each such physician was required by the Medical College of Georgia to relinquish and or be reassigned office space that had been assigned to any such physician;**

**2(c) the reasons that were provided to any such physician that was required by the Medical College of Georgia to relinquish and or be reassigned office space that had been assigned to any such physician;**

**Response:**

MCG Health objects to this interrogatory to the extent that it seeks discovery of information predating July 1, 2000 on the grounds that such request is not relevant and not reasonably calculated to lead to the discovery of admissible evidence and overbroad as to time because MCG Health only began operating the hospitals and clinics of the Medical College of Georgia on July 1, 2000. Prior

to July 1, 2000, MCG Health did not operate the hospitals and clinics of the Medical College of Georgia.

MCG Health further objects to this interrogatory to the extent that such interrogatory seeks discovery regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such request is not relevant and not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome in that approximately 633 physicians are members of the MCG Health Medical Staff, and a response to this interrogatory as stated would encompass all 633 physicians, while only those physicians in the Section of Cardiothoracic Surgery are arguably similarly situated to the plaintiff for the purpose of the plaintiff's claims against MCG Health.

Subject to and without waiving these objections, MCG Health states that the Medical College of Georgia is a division of the Board of Regents. The Board of Regents oversees the Medical College of Georgia, and the Medical College of Georgia is not overseen by MCG Health. As described above, office space leased back by the Board of Regents from MCG Health is allocated by the Board of Regents and not MCG Health. Consequently, MCG Health is not aware of any physicians who were required to relinquish or be reassigned office space by the Medical College of Georgia, the dates on which any such action may have occurred or the reasons why any such action may have been required.

### Interrogatory Seven

**2(d) the names and titles of each department chairman of each such physician that was required by the Medical College of Georgia to relinquish and or be reassigned office space that had been assigned to any such physician;**

8

**Response:**

MCG Health objects to the plaintiff's designation of Interrogatory numbered 2(d) as a subpart of Interrogatory numbered 2 on the grounds that Interrogatory numbered 2(d) can be answered fully and completely without reference to any other interrogatory, is not logically or factually subsumed within any other interrogatory, is unnecessary to the understanding of any other interrogatory and can stand alone and for these reasons should be counted individually as a discrete interrogatory and not as a subpart of any other interrogatory pursuant to Federal Rule of Civil Procedure 33 and the Court's Orders of October 6, 2005 and November 15, 2005.

MCG Health further objects to the scope of this interrogatory to the extent that such interrogatory seeks discovery of information predating July 1, 2000 and to the extent that such interrogatory seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such requests are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in Mr. Snell's response to Interrogatories numbered 2(a), 2(b) and 2(c).

Subject to and without waiving these objections, MCG Health states that, as explained in response to Interrogatories numbered 2(a), 2(b) and 2(c), MCG Health is not aware of any physicians who were required to relinquish or be reassigned office space by the Medical College of Georgia, which is a division of the Board of Regents. Moreover, MCG Health does not employ "department chairmen" as described in this Interrogatory, and "department chair" is not a title used by MCG Health. Consequently, MCG Health is not aware of any such department chairmen as sought by this

9

Interrogatory.

**Interrogatory Eight**

> **2(e) identify any notes, writings and or memorandum of any kind that touch upon and relate to any physician required by the Medical College of Georgia to relinquish or be reassigned office space that had been assigned to any such physician; and**

**Response:**

MCG Health objects to the plaintiff's designation of Interrogatory numbered 2(e) as a subpart of Interrogatory numbered 2 on the grounds that Interrogatory numbered 2(e) can be answered fully and completely without reference to any other interrogatory, is not logically or factually subsumed within any other interrogatory, is unnecessary to the understanding of any other interrogatory and can stand alone and for these reasons should be counted individually as a discrete interrogatory and not as a subpart of any other interrogatory pursuant to Federal Rule of Civil Procedure 33 and the Court's Orders of October 6, 2005 and November 15, 2005.

MCG Health further objects to the scope of this interrogatory to the extent that such interrogatory seeks discovery of information predating July 1, 2000 and to the extent that such interrogatory seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such requests are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in Mr. Snell's response to Interrogatories numbered 2(a), 2(b) and 2(c).

Subject to and without waiving these objections, MCG Health states that it does not have documents of the type sought by Interrogatory numbered 2(e) in its possession or custody.

10

**Interrogatory Nine**

**2(f) identify by name, job title, business address, business telephone number of each such person that has custody, control of any documents referenced and or referred to and or used in response to this Interrogatory No. 2.**

**Response:**

MCG Health objects to the plaintiff's designation of Interrogatory numbered 2(f) as a subpart of Interrogatory numbered 2 on the grounds that Interrogatory numbered 2(f) can be answered fully and completely without reference to any other interrogatory, is not logically or factually subsumed within any other interrogatory, is unnecessary to the understanding of any other interrogatory and can stand alone and for these reasons should be counted individually as a discrete interrogatory and not as a subpart of any other interrogatory pursuant to Federal Rule of Civil Procedure 33 and the Court's Orders of October 6, 2005 and November 15, 2005.

Subject to and without waiving this objection, MCG Health states that the following individuals have custody of documents used in responding to Interrogatories numbered 2, 2(a), 2(b), 2(c), 2(d) or 2(e):

Alethia Albright: Admin Specialist, MCG Health, 1120 15th Street, Augusta, Georgia 30912. Ms. Albright may be contacted through counsel for MCG Health.

Richard A. Tobias: Vice President of Facilities Services, MCG Health, 1120 15th Street, Augusta, Georgia 30912. Mr. Tobias may be contacted through counsel for MCG Health.

**Interrogatory Ten**

**3.     Please provide with respect to the cardiothoracic department of the Medical College of Georgia, the following:**

**3(a) the amount of office space that was assigned to the cardiothoracic department within the Medical College of Georgia;**

11

**Response:**

MCG Health objects to the scope of this interrogatory to the extent that such interrogatory seeks discovery of information predating July 1, 2000 on the grounds that such request is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in Mr. Snell's response to Interrogatories numbered 2(a), 2(b) and 2(c).

Subject to and without waiving this objection, MCG Health states that the Section of Cardiothoracic Surgery, now known as the Department of Cardiothoracic and Vascular Surgery, occupies an area of approximately 2,400 square feet on the fourth floor of the Talmadge Building. This location is in an area leased back by the Board of Regents from MCG Health as described above.

**Interrogatory Eleven**

**3(b) the name of each person and job title that was assigned office space within the cardiothoracic department within the Medical College of Georgia;**

**3(c) the reasons that each such person was assigned the specific office space that was assigned to each such person within the cardiothoracic department within the Medical College of Georgia;**

**3(d) the name and job title of each person within the cardiothoracic department of the Medical College of Georgia that was responsible for the assignment of office space to physicians within the cardiothoracic department of the Medical College of Georgia, and;**

**Response:**

MCG Health objects to the plaintiff's designation of Interrogatories numbered 3(b), 3(c) and 3(d) as subparts of Interrogatory numbered 3 on the grounds that Interrogatories numbered 3(b), 3(c)

12