correspondence, notes, memoranda, letters and writings of any kind pertaining to each and every recommendation for each and every candidate that was interviewed for the position of chief of cardiothoracic surgery to succeed Dr. G. Lionel Zumbro, Jr. at the Medical College of Georgia, including each and every recommendation of each and every candidate/interviewee who was interviewed at any time whatsoever for the position of chief of cardiothoracic surgery to succeed Dr. Zumbro, Jr. at the Medical College of Georgia, including but not limited to all documents and things used in your response to Interrogatory No. 23(d), and Interrogatory No. 25(h).

<u>Response:</u>

Documents responsive to Request for Production numbered 28 have been previously produced to the plaintiff in response to the Plaintiff's Requests for Production of Documents to Defendant Don Snell numbered 30 and 36. Apart from these documents, there are no documents responsive to Request for Production numbered 28 in the possession or custody of MCG Health.

**29.    Please produce any and all correspondence, notes, any and all memorandum, letters and writings of any kind pertaining to the criteria and requirements for becoming chief of cardiothoracic surgery at the Medical College of Georgia, including all documents used to answer Interrogatory No. 22(b) and (f).**

<u>Response:</u>

There are no documents responsive to Request for Production numbered 29 in the possession or custody of MCG Health.

**30.    Please produce any and all correspondence, notes, memoranda, letters and writings of any kind that describe the job responsibilities of chief of cardiothoracic surgery at the Medical College of Georgia, including all documents used to respond to Interrogatory No. 13.**

<u>Response:</u>

There are no documents responsive to Request for Production numbered 30 in the possession or custody of MCG Health.

**31.    Please produce any and all correspondence, notes, memoranda, letters and writings of any kind that describe the job responsibilities of Dr. Mawulawde, Dr. Anstadt, Dr.**

21

Landolfo while in the cardiothoracic surgery department at the Medical College of Georgia, including all documents used to respond to Interrogatory No. 24(j) Interrogatory No. 29(b).

**Response:**

There are no documents responsive to Request for Production numbered 31 in the possession or custody of MCG Health.

32.    Please provide a detailed list of the number of surgeons that were at the Medical College of Georgia while Dr. Zumbro was chief of cardiothoracic surgery and their curricula vitae, and the curriculum vitae of the person who succeeded Dr. Zumbro as chief of cardiothoracic surgery at the Medical College of Georgia, and the curriculum vitae of the chief of cardiothoracic surgery at the time that you answer this request.

**Response:**

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 and to the extent that it seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such request is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7, Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Order of October 6, 2005.

Subject to and without waiving these objections, MCG Health states that responsive curricula vitae have been previously produced to the plaintiff in response to the Plaintiff's Requests for Production of Documents to Defendant Don Snell numbered 30 and 33. In further response, no list responsive to Request for Production numbered 32 is in the possession or custody of MCG Health.

**33.    Please produce a detailed report of the budget for the cardiothoracic department at the Medical College of Georgia from January 2001, up to the day that you answer this Request, including all documentation that depicts the budget for the cardiothoracic department at the Medical College of Georgia from January 2001, including all documentation used to answer Interrogatory No. 9.**

<u>Response:</u>

There are no documents responsive to Request for Production numbered 33 in the possession or custody of MCG Health.

**34.    Please produce a list of every board certified surgeon at the Medical College of Georgia from January 1, 2001, through the present who has used the technique of off-pump surgery including name, title, business address, business telephone number of each surgeon, the dates that named surgeons were employed at the Medical College of Georgia and the names of all patients that off-pump surgery was performed on and the outcome of each and every surgery where the technique of off-pump surgery was used, including all documentation used to answer Interrogatory No. 23(l) and Interrogatory No. 25(j).**

**Response:**

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such request is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production to the extent that it seeks protected health information as defined by 45 C.F.R. § 160.103 under the terms of the Health Insurance Portability and Accountability Act of 1986 ("HIPAA"), which may only be produced subject to the entry of a qualified protective order as described by 45 C.F.R. § 164.512(e)(1)(v).

MCG Health further objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Order of October 6, 2005.

Subject to and without waiving this objection, MCG Health states that there are no documents responsive to Request for Production numbered 34 in its possession or custody.

35.    Please produce a list of each and every person that is part of the decision making process that denies, accepts, or rejects surgeons for positions, demotions, and contract renewals in the cardiothoracic surgery department at the Medical College of Georgia, including the name, title, business address, and business telephone number of each and every person that denies, accepts, or rejects surgeons for positions, promotions, demotions, and

contract renewals in the cardiothoracic surgery department at the Medical College of Georgia, including all documents used to respond to Interrogatory No. 22.

Response:

MCG Health objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Order of October 6, 2005.

Subject to and without waiving this objection, MCG Health states that there are no documents responsive to Request for Production numbered 35 in its possession or custody.

36.    Please produce each and every policy, document or thing used to determine how office space is allocated for physicians in the cardiothoracic surgery department at the Medical College of Georgia, including all documents used to respond to Interrogatory Nos. 1-5.

Response:

Responsive documents in MCG Health's possession are available for inspection at the offices of its counsel, Hull, Towill, Norman, Barrett and Salley, at a time mutually convenient to the parties.

37.    Please produce each and every policy, document or thing that depicts each and every office space that was allocated for Dr. Mawulawde, Dr. Anstadt, and Dr. Landolfo in the cardiothoracic surgery department at the Medical College of Georgia, including all documents used to respond to Interrogatory Nos. 1-5.

Response:

Responsive documents in MCG Health's possession are available for inspection at the offices of its counsel, Hull, Towill, Norman, Barrett and Salley, at a time mutually convenient to the parties.

38.    Please produce each and every commendation and recommendation of any kind that was received by Dr. Mawulawde while at the Medical College of Georgia including the name, title, business address, and business telephone number of each and every person that

25

produced a commendation or recommendation on behalf of Dr. Mawulawde during his entire tenure at the Medical College of Georgia or affiliation of any kind with the Medical College of Georgia.

Response:

MCG Health objects to this request for production to the extent that it seeks information protected from disclosure by Georgia's peer review privilege, set out in O.C.G.A. § 31-7-133, et seq.,and by Georgia's medical review committee privilege, set out in O.C.G.A. § 31-7-141, et seq., and by the federal self critical analysis privilege. Such request is not relevant and not reasonably calculated to lead to the discovery of admissible evidence, and MCG Health further objects on this ground.

In further response, MCG Health states that it does not have documents of the type sought by this request for production in its possession or custody, other than documents which may be contained in Dr. Mawulawde's quality file, which is subject to the privileges asserted above as indicated in MCG Health's Privilege Log, produced in conjunction with these Responses.

39.    Please produce a list of each and every administrator, emergency room assistant, operating room assistant, and student of Dr. Mawulawde's while a surgeon at the Medical College of Georgia including the name, title, business address, and business telephone number of each and every administrator, emergency room assistant, operating room assistant, and student of Dr. Mawulawde's while a surgeon at the Medical College of Georgia.

Response:

MCG Health objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Order of October 6, 2005.

26

MCG Health further objects to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome in that the plaintiff treated hundreds of patients at the hospitals and clinics of the Medical College of Georgia, and a response to this interrogatory as stated would require an individualized review of each and every medical record for each of those patients.

**40.    Please produce each and every document from each and every administrator, emergency room assistant, operating room assistant, and student of Dr. Mawulawde's that comments on the administrator's emergency room assistant's, operating room assistant's, and student's relationship with and attitude toward Dr. Mawulawde.**

<u>Response:</u>

MCG Health objects to this request for production to the extent that it seeks information protected from disclosure by Georgia's peer review privilege, set out in O.C.G.A. § 31-7-133, et seq.,and by Georgia's medical review committee privilege, set out in O.C.G.A. § 31-7-141, et seq., and by the federal self critical analysis privilege.  Such request is not relevant and not reasonably calculated to lead to the discovery of admissible evidence, and MCG Health further objects on this ground.

In further response, MCG Health states that it does not have documents of the type sought by this request for production in its possession or custody, other than documents which may be contained in Dr. Mawulawde's quality file, which is subject to the privileges asserted above as indicated in MCG Health's Privilege Log, produced in conjunction with these Responses.

**41.    Please produce a list of each and every physician that was terminated from the Medical College of Georgia or their contract was not renewed with the Medical College of Georgia, and each and every termination letter or letter stating that a contract will not be renewed, including the name, title, business address, and business telephone number of each physician that was terminated or their contract not renewed, and the name, title, business address, and business telephone number of each and every person that made the decision to**

27

terminate or not renew the contract of a physician, the reason for each and every termination, and the dates of each and every termination, including all documents and things used to respond to Interrogatory No. 10 and Interrogatory No. 27.

<u>Response:</u>

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 and to the extent that it seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such requests are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7, Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Order of October 6, 2005.

Subject to and without waiving these objections, MCG Health states that there are no documents responsive to Request for Production numbered 41 in its possession or custody.

42.     Please produce each and every handbook, rule, outline, manual, regulation, provision and/or document which outlines, governs, explains, lists or otherwise refers and/or explains each and every step in the process that a physician must go through for such physician to be terminated or not have his contract renewed at the Medical College of Georgia.

<u>Response:</u>

There are no documents responsive to Request for Production numbered 42 in the possession or custody of MCG Health.

**43.    Identify each and every contract, agreement, lease and/or other document, to include any and all amendments, which outline, govern, explain or otherwise refer to the relationship between the Medical College of Georgia and MCG Health*Care*.**

<u>Response:</u>

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 on the grounds that such request is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production to the extent that it seeks discovery of material protected by the attorney-client privilege or within the scope of the attorney work product doctrine.

Documents in MCG Health's possession or custody to which these privileges apply are indicated in MCG Health's Privilege Log, produced in conjunction with these Responses.

Subject to and without waiving these objections, MCG Health states that non-privileged responsive documents are available for inspection at the offices of its counsel, Hull, Towill, Norman, Barrett and Salley, at a time mutually convenient to the parties.

**44.    Identify each and every contract, agreement, lease and/or other document, to include any and all amendments, which outline, govern, explain or otherwise refer to the relationship between the Medical College of Georgia and MCG Health Systems.**

<u>Response:</u>

29

There are no documents responsive to Request for Production numbered 44 in the possession

or custody of MCG Health.

**45.    Identify each and every contract, agreement, lease and/or other document, to include any and all amendments, which outline, govern, explain or otherwise refer to the relationship between MCG Health*Care* and MCG Health Systems.**

Response:

There are no documents responsive to Request for Production numbered 44 in the possession

or custody of MCG Health.

**46.    Please produce each and every formal and informal EEOC complaint against a physician at the Medical College of Georgia, including the name, title, business address, and business telephone number of each physician said to have caused the complaint, and the name of each and every person that played a role in any formal and informal EEOC proceeding, including the name, title, business address, and business telephone number of each and every person that played a role in any formal and informal EEOC proceeding, the reason for each and every formal and informal EEOC complaint, the dates that each and every formal and informal EEOC complaint was filed, and all tape recordings, memorandum, notes, letters, minutes and writings of any kind that touch upon, address or deal with any instance of any employee filing a formal and an informal EEOC complaint against a physician, including all documents used to respond to Interrogatory 15.**

Response:

MCG Health objects to the scope of this request for production to the extent that it seeks

discovery of information predating July 1, 2000 and to the extent that it seeks discovery of

information regarding individuals other than surgeons who were members of the Section of

Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical

College of Georgia on the grounds that such requests are not relevant and are not reasonably

calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the

reasons described more fully in MCG Health's response to Request for Production numbered 7,

Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

30

MCG Health further objects to this request for production on the grounds that it is not relevant, is not reasonably calculated to lead to the discovery of admissible evidence, is unduly burdensome and is served for the improper purpose of harassing the defendant, causing unnecessary delay and leading to a needless increase in the cost of litigation.

47.    **Please produce the outcome and/or judgment concerning each and every formal and informal EEOC complaint against a physician listed in Request No. 42.**

**Response:**

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 and to the extent that it seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such requests are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7, Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production on the grounds that it is not relevant, is not reasonably calculated to lead to the discovery of admissible evidence, is unduly burdensome and is served for the improper purpose of harassing the defendant, causing unnecessary delay and leading to a needless increase in the cost of litigation.

48.    **Please produce each and every allegation of discrimination of any kind against a physician at the Medical College of Georgia, including the name, title, business address, and business telephone number of each physician said to have discriminated in any manner, and the name of each and every person that played any role in any proceedings regarding the discrimination caused by a physician, including the name, title, business address, and business telephone number of each and every person that played any role in the handling of any**

31

allegation of discrimination, the reason for each and every allegation of discrimination, the dates that each and every allegation of discrimination complaint was made, and all tape recordings, memorandum, notes, letters, minutes and writings that discuss each and every discrimination allegation.

<u>Response:</u>

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 and to the extent that it seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such requests are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7, Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Order of October 6, 2005.

MCG Health further objects to this request for production on the grounds that it is not relevant, is not reasonably calculated to lead to the discovery of admissible evidence, is unduly burdensome and is served for the improper purpose of harassing the defendant, causing unnecessary delay and leading to a needless increase in the cost of litigation.

49.    Please produce the outcome and/or judgment concerning each and every allegation of discrimination against a physician listed in Request No. 44.

32

**Response:**

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 and to the extent that it seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such requests are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7, Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production on the grounds that it is not relevant, is not reasonably calculated to lead to the discovery of admissible evidence, is unduly burdensome and is served for the improper purpose of harassing the defendant, causing unnecessary delay and leading to a needless increase in the cost of litigation.

**50.    Please produce each and every allegation of each and every physician and/or surgeon that was involved in any violations of the Georgia Fair Employment Practices while working at the Medical College of Georgia, including the name, title and address of each physician, the circumstances surrounding each and every violation of the Georgia Fair Employment Practices, the dates that each and every violation took place, and the name, title, business address, and business telephone number of each and every person that played a role in any proceedings, and all tape recordings, memorandum, notes, letters, minutes and writings of any kind that touch upon, address or deal with any instance of any employee violating the Georgia Fair Employment Practices, including all documents used to respond to Interrogatory 15.**

**Response:**

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 and to the extent that it seeks discovery of

33

information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such requests are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7, Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Order of October 6, 2005.

Subject to and without waiving these objections, MCG Health states that there are no documents responsive to Request for Production numbered 50 in its possession or custody.

**51.    Please produce the outcome and/or judgment concerning each and every proceeding pertaining to any violations of the Georgia Fair Employment practices against a physician listed in Request No. 46.**

<u>Response:</u>

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 and to the extent that it seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such requests are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the

34

reasons described more fully in MCG Health's response to Request for Production numbered 7,

Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

Subject to and without waiving these objections, MCG Health states that there are no

documents responsive to Request for Production numbered 51 in its possession or custody.

**52.     Please produce a detailed report of the exact amount of funds to include any direct payment of funds that were used for wages, salaries, bonuses and operational expenses that have been contributed to the Medical College of Georgia, including the name of the entity that contributed such funds by dates of contribution, amount of contribution, amount used for operations expenses, amount used for salaries, wages and bonuses and the name, title, business address, and business telephone number of the individual(s) at the Medical College of Georgia who allocated such funds, and how much of the funds were allocated for the cardiothoracic surgery unit at the Medical College of Georgia and the name, title, business address, and business telephone number of the individual responsible for directing said funds concerning the cardiothoracic surgery unit at the Medical College of Georgia.**

Response:

MCG Health objects to the scope of this request for production to the extent that it seeks

discovery of information predating July 1, 2000 on the grounds that such request is not relevant and

is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly

burdensome for the reasons described more fully in MCG Health's response to Request for

Production numbered 7 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production on the ground that it is outside the

scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible

things in the possession or custody of MCG Health.  Such request is actually an interrogatory, not

a request for production, and it should be designated and numbered as such pursuant to Federal Rule

of Civil Procedure 33 and the Court's Order of October 6, 2005.

35

Subject to and without waiving these objections, MCG Health states that responsive documents are available for inspection at the offices of its counsel, Hull, Towill, Norman, Barrett and Salley, at a time mutually convenient to the parties.

**53.    Please produce any and all memorandum, notes, letters, minutes, tape recordings, and writings of any kind that touch upon, address or deal with any instance of racially derogatory language from anyone at the Medical College of Georgia or anyone during discussions in dealing with anyone at the Medical College of Georgia regarding Dr. Mawulawde or any other minority personnel at the Medical College of Georgia at any time.**

<u>Response:</u>

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 on the grounds that such request is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7 and Interrogatories numbered 2(a), 2(b) and 2(c).

Subject to and without waiving these objections, MCG Health states that there are no documents responsive to Request for Production numbered 53 in its possession or custody.

**54.    Please produce a detailed report of each and every time that any physician assisted Dr. Mark Anstadt in performing surgical procedures including the name, title, business address, and business telephone number of each and every physician who assisted Dr. Anstadt in performing surgical procedures at the Medical College of Georgia; a list of hospital personnel who has information and knowledge concerning physicians who assisted Dr. Anstadt in performing surgical procedures including the name, title, business adders, and business telephone number of each and every hospital personnel who has information and knowledge concerning physicians who assisted Dr. Anstadt in performing surgical procedures, and a list of patients on whom Dr. Anstadt performed surgical procedures with the assistance of another physician, including the name, title, business address, and business telephone number of each and every patient upon which Dr. Anstadt performed surgical procedures with the assistance of another physician, including all documents and things used in response to Interrogatory No. 20.**

<u>Response:</u>

36

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 on the grounds that such request is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production to the extent that it seeks protected health information as defined by 45 C.F.R. § 160.103 under the terms of the Health Insurance Portability and Accountability Act of 1986 ("HIPAA"), which may only be produced subject to the entry of a qualified protective order as described by 45 C.F.R. § 164.512(e)(1)(v).

MCG Health further objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Order of October 6, 2005.

Subject to and without waiving these objections, MCG Health states that there are no documents responsive to Request for Production numbered 54 in its possession or custody.

**55.    Please produce each and every recommendation from each and every person who recommended Dr. Kevin Landolfo for the position of chief of cardiothoracic surgery, including the name, title, business address, and business telephone number of each and every person who gave such recommendation.**

Response:

Documents responsive to Request for Production numbered 55 have been previously produced to the plaintiff in response to the Plaintiff's Requests for Production of Documents to

Defendant Don Snell numbered 30 and 36. Apart from these documents, there are no documents responsive to Request for Production numbered 55 in the possession or custody of MCG Health.

56. **Please produce each and every recommendation from each and every person who recommended Dr. Mark Anstadt for the position of chief of cardiothoracic surgery, including the name, title, business address, and business telephone number of each and every person who gave such recommendation, including the name, title, business address, and business telephone number of each and every person that recommended that Dr. Mark Anstadt share the position of chief of cardiothoracic surgery with Dr. Mawulawde.**

Response:

There are no documents responsive to Request for Production numbered 56 in the possession or custody of MCG Health.

57. **Please produce the complaint or the lawsuit of <u>Anstadt v. The Medical College of Georgia</u>, and any correspondence of any kind associated with said lawsuit, including each and every document and thing that was used to answer Interrogatory No. 27.**

Response:

There are no documents responsive to Request for Production numbered 57 in the possession or custody of MCG Health.

58. **Please produce the curricula vitae of each and every physician at the Medical College of Georgia who pediatric cardiac experience, including the name, title, business address, business telephone number of each physician, the dates that named physicians were employed at the Medical College of Georgia, and the names of all patient children with heart problems on which named physicians performed surgical procedures, including the name of the parents of each child and the business address and business telephone number of the parents of each child, including each document and thing used to respond to Interrogatory No. 23(k) and Interrogatory No. 25(i).**

Response:

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of

Georgia/Medical College of Georgia on the grounds that such request is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production to the extent that it seeks information protected from disclosure by Georgia's peer review privilege, set out in O.C.G.A. § 31-7-133, et seq.,and by Georgia's medical review committee privilege, set out in O.C.G.A. § 31-7-141, et seq., and by the federal self critical analysis privilege. Such request is not relevant and not reasonably calculated to lead to the discovery of admissible evidence, and MCG Health further objects on this ground.

MCG Health further objects to this request for production as being unduly vague in its use of the term "pediatric cardiac experience" on the ground that this term does not provide MCG Health with sufficient notice of the information being requested to formulate an answer to this request for production.

MCG Health further objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Order of October 6, 2005.

59.    **Please produced each and every application, including any and all correspondence, notes, memoranda, letters and writings of any kind pertaining to each and every application for each and every candidate that was interviewed for the position of chief of cardiothoracic surgery to succeed Dr. G. Lionel Zumbro, Jr. at the Medical College of Georgia, including each and every application of each and every candidate/interviewee who**

39

was interviewed at any time whatsoever for the position of chief of cardiothoracic surgery to succeed Dr. Zumbro, Jr. at the Medical College of Georgia.

**Response:**

Documents responsive to Request for Production numbered 59 have been previously produced to the plaintiff in response to the Plaintiff's Request for Production of Documents to Defendant Don Snell numbered 30. Apart from these documents, there are no documents responsive to Request for Production numbered 59 in the possession or custody of MCG Health.

60.    Please provide each and every report, document, memo, letter, rule, regulation, etc. that outlines, discusses or references the probation of the thoracic surgery section of the Medical College of Georgia, including the name, title, business address and business telephone number of each and every person that was a part of each and every committee that placed the thoracic surgery section of the Medical College of Georgia on probation, including every document and thing that was used to answer Interrogatory No. 24.

**Response:**

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 on the grounds that such request is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil Procedure 33 and the Court's Order of October 6, 2005.

40

Subject to and without waiving this objection, MCG Health states that are no documents responsive to Request for Production numbered 60 in its possession or custody.

**61.    Please provide each and every employment contract between the Medical College of Georgia and each and every physician in the cardiothoracic department of the Medical College of Georgia who had any research budget assigned to them, including the name, title, business address and business telephone number of each and every physician in the cardiothoracic department of the Medical College of Georgia who had any research budget assigned to them.**

Response:

There are no documents responsive to Request for Production numbered 61 in the possession or custody of MCG Health.

**62.    Please produce each and every proposal concerning each and every physician in the cardiothoracic department of the Medical College of Georgia who had a research budget assigned to them.**

Response:

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 and to the extent that it seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such requests are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7, Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

Subject to and without waiving this objection, MCG Health states that there are no documents responsive to Request for Production numbered 62 in its possession or custody.

63.    Please produce a detailed report of the surgical residency program at the Medical College of Georgia, including the name, title, business address and business telephone number of each and every physician in the surgical residency program, and a detailed report of each and every resident who successfully completed the surgical residency program, including the name, title, business address and business telephone number of each and every resident who successfully completed the surgical residency program, and a detailed report of each and every resident who left the surgical residency program, including each and every reason that they left the program, including every document and thing used to respond to Interrogatory No. 21.

Response:

MCG Health objects to the scope of this request for production to the extent that it seeks discovery of information predating July 1, 2000 and to the extent that it seeks discovery of information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery of the Board of Regents of the University System of Georgia/Medical College of Georgia on the grounds that such requests are not relevant and are not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly burdensome for the reasons described more fully in MCG Health's response to Request for Production numbered 7, Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production on the grounds that it is not relevant and not reasonably calculated to lead to the discovery of admissible evidence but rather is served for the improper purpose of harassing the defendant, causing unnecessary delay and leading to a needless increase in the cost of litigation.

MCG Health further objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not

42

a request for production, and it should be designated and numbered as such pursuant to Federal Rule

of Civil Procedure 33 and the Court's Order of October 6, 2005.

Subject to and without waiving these objections, MCG Health states that are no documents

responsive to Request for Production numbered 63 in its possession or custody.

**64.    Please produce each and every complaint that was made against Dr. Anstadt by each and every employee at the Medical College of Georgia, including the name, title, business address and business telephone number of each and every employee at the Medical College of Georgia, and each and every complaint of each and every patient of Dr. Anstadt's at the Medical College of Georgia including the name, title, business address and business telephone number of each and every patient of Dr. Anstadt's at the Medical College of Georgia, including each and every document and thing used to answer Interrogatory No. 26.**

**Response:**

MCG Health objects to the scope of this request for production to the extent that it seeks

discovery of information predating July 1, 2000 on the grounds that such request is not relevant and

is not reasonably calculated to lead to the discovery of admissible evidence, overbroad and unduly

burdensome for the reasons described more fully in MCG Health's response to Request for

Production numbered 7 and Interrogatories numbered 2(a), 2(b) and 2(c).

MCG Health further objects to this request for production to the extent that it seeks

information protected from disclosure by Georgia's peer review privilege, set out in O.C.G.A. § 31-

7-133, et seq., and by Georgia's medical review committee privilege, set out in O.C.G.A. § 31-7-141,

et seq., and by the federal self critical analysis privilege.  Such request is not relevant and not

reasonably calculated to lead to the discovery of admissible evidence, and MCG Health further

objects on this ground.

MCG Health further objects to this request for production to the extent that it seeks protected

health information as defined by 45 C.F.R. § 160.103 under the terms of the Health Insurance

43

Portability and Accountability Act of 1986 ("HIPAA"), which may only be produced subject to the

entry of a qualified protective order as described by 45 C.F.R. § 164.512(e)(1)(v).

Subject to and without waiving these objections, MCG Health states that are no documents

responsive to Request for Production numbered 64 in its possession or custody.

**65.    Please produce each and every complaint that was made against Dr. Landolfo by each and every employee at the Medical College of Georgia, including the name, title, business address and business telephone number of each and every employee at the Medical College of Georgia, and each and every complaint of each and every patient of Dr. Landolfo's at the Medical College of Georgia including the name, title, business address and business telephone number of each and every patient of Dr. Landolfo's at the Medical College of Georgia, including each and every document and thing used to answer Interrogatory No. 25(n).**

<u>Response:</u>

MCG Health objects to this request for production to the extent that it seeks information

protected from disclosure by Georgia's peer review privilege, set out in O.C.G.A. § 31-7-133, et

seq.,and by Georgia's medical review committee privilege, set out in O.C.G.A. § 31-7-141, et seq.,

and by the federal self critical analysis privilege.  Such request is not relevant and not reasonably

calculated to lead to the discovery of admissible evidence, and MCG Health further objects on this

ground.

MCG Health further objects to this request for production to the extent that it seeks protected

health information as defined by 45 C.F.R. § 160.103 under the terms of the Health Insurance

Portability and Accountability Act of 1986 ("HIPAA"), which may only be produced subject to the

entry of a qualified protective order as described by 45 C.F.R. § 164.512(e)(1)(v).

Subject to and without waiving these objections, MCG Health states that are no documents

responsive to Request for Production numbered 65 in its possession or custody.

44

66.    Please produce each and every separation notice, termination letter, and/or letter of resignation regarding Dr. Lionel Zumbro, Jr.'s departure from the Medical College of Georgia as chief of cardiothoracic surgery, including the name, title, business address, and business telephone number of each and every person that authored any separation notice and termination letter.

Response:

MCG Health objects to this request for production to the extent that it seeks information protected from disclosure by Georgia's peer review privilege, set out in O.C.G.A. § 31-7-133, et seq., and by Georgia's medical review committee privilege, set out in O.C.G.A. § 31-7-141, et seq., and by the federal self critical analysis privilege. Such request is not relevant and not reasonably calculated to lead to the discovery of admissible evidence, and MCG Health further objects on this ground.

In further response, MCG Health states that it does not have documents of the type sought by this request for production in its possession or custody, other than documents which may be contained in Dr. Zumbro's credentialing file, which is subject to the privileges asserted above as indicated in MCG Health's Privilege Log, produced in conjunction with these Responses.

67.    Please produce a detailed report of the type of staff support and surgical team support, that was given to Dr. Mawulawde while in the cardiothoracic department at the Medical College of Georgia, including the name, title, business address, and business telephone number of each staff person and the name, title, business address, and business telephone number of each member of Dr. Mawulawde's surgical team.

Response:

MCG Health objects to this request for production on the ground that it is outside the scope of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things in the possession or custody of MCG Health. Such request is actually an interrogatory, not a request

45

for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil

Procedure 33 and the Court's Order of October 6, 2005.

Subject to and without waiving this objection, MCG Health states that are no documents

responsive to Request for Production numbered 67 in its possession or custody.

**68.      Please produce a detailed report identifying each and every officer and director of the Medical College of Georgia and each and every officer and director who served on any other Board or Commission of any other legal entity that has a legal relationship with the Medical College of Georgia; including the name, title, business address, and business telephone number of each and every officer and director, the date on which each person became an officer and/or director of each such entity, any other titles or offices held by such person while at the Medical College of Georgia, a description of the responsibilities and duties of such officer or director in any capacity at the Medical College of Georgia.**

**Response:**

MCG Health objects to this request for production on the ground that it is outside the scope

of Federal Rule of Civil Procedure 34 in that it does not request documents or other tangible things

in the possession or custody of MCG Health.  Such request is actually an interrogatory, not a request

for production, and it should be designated and numbered as such pursuant to Federal Rule of Civil

Procedure 33 and the Court's Order of October 6, 2005.

Subject to and without waiving this objection, MCG Health states that are no documents

responsive to Request for Production numbered 68 in its possession or custody.

This 17 day of _January_, 2006.

James B. Ellington
Georgia Bar No. 243858

Thomas L. Cathey
Georgia Bar No.  116622

46

Of Counsel:

Hull, Towill, Norman, Barrett & Salley
P.O. Box 1564
Augusta, Georgia 30903-1564
(706) 722-4481

Attorneys for Defendant MCG Health, Inc.

Appendix

Privilege Log

The following represent documents that have been withheld from defendant MCG Health's

Responses to Plaintiff's First Request for Production of Documents pursuant to claim of privilege.

1.    Quality File for Dr. Kwabena Mawulawde.  This file contains material generated

during the time that Dr. Mawulawde was a member of the MCG Health, Inc. Medical Staff that

pertains to peer review or quality management functions performed to assess the quality of care

delivered by Dr. Mawulawde.  This file was prepared so that MCG Health could evaluate the quality

and efficiency of the services performed by Dr. Mawulawde at the hospitals and clinics of the

Medical College of Georgia.  It is maintained by Peppy R. McBride, MCG Health's Director of

Quality Management.  This file is protected by the peer review privilege found at O.C.G.A. § 31-7-

133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the

federal self critical analysis privilege.  This file satisfies these privileges because it memorializes

proceedings or activities of a review organization as defined under the Georgia peer review statute,

is a record of a medical review committee as defined by the Georgia medical review committee

statute and memorializes a matter created by MCG Health for purposes of a critical analysis for

future quality purposes, the discovery of which would curtail the flow of similar information at MCG

Health.

2.    Credentialing File for Dr. Kwabena Mawulawde.  This file contains material

generated during the time that Dr. Mawulawde was a member of the MCG Health, Inc. Medical Staff

that pertains to MCG Health's evaluation of Dr. Mawulawde's applications to be appointed and re-

appointed to its Medical Staff.  This file was prepared so that MCG Health could evaluate the quality

1

It is maintained by Peppy R. McBride, MCG Health's Director of Quality Management. This file is protected by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. This file satisfies these privileges because it memorializes proceedings or activities of a review organization as defined under the Georgia peer review statute, is a record of a medical review committee as defined by the Georgia medical review committee statute and memorializes a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

8.    Credentialing File for Dr. Lionel Zumbro. This file contains material generated during the time that Dr. Zumbro was a member of the MCG Health, Inc. Medical Staff that pertains to MCG Health's evaluation of Dr. Zumbro's applications to be appointed and re-appointed to its Medical Staff. This file was prepared so that MCG Health could evaluate the quality and efficiency of the services performed by Dr. Zumbro as part of its credentialing process. It is maintained by Joan Lewis, MCG Health's Medical Staff Coordinator. This file is protected by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. This file satisfies these privileges because it memorializes proceedings or activities of a review organization as defined under the Georgia peer review statute, is a record of a medical review committee as defined by the Georgia medical review committee statute and memorializes a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

9.    Credentialing File for Dr. Thomas R. Gadacz. This file contains material generated

5

during the time that Dr. Gadacz was a member of the MCG Health, Inc. Medical Staff that pertains to MCG Health's evaluation of Dr. Gadacz's applications to be appointed and re-appointed to its Medical Staff. This file was prepared so that MCG Health could evaluate the quality and efficiency of the services performed by Dr. Gadacz as part of its credentialing process. It is maintained by Joan Lewis, MCG Health's Medical Staff Coordinator. This file is protected by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. This file satisfies these privileges because it memorializes proceedings or activities of a review organization as defined under the Georgia peer review statute, is a record of a medical review committee as defined by the Georgia medical review committee statute and memorializes a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

  10. A document entitled "QA I Log 2005." This document contains a list of those physicians on MCG Health's Medical Staff who had cases on which Quality Assessment and Investigations were performed during 2005. This document was prepared by and is maintained by Peppy R. McBride, MCG Health's Director of Quality Management. It was prepared so that MCG Health could evaluate the quality and efficiency of the services performed by professional health care providers at the hospitals and clinics of the Medical College of Georgia. This document is protected by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. This document satisfies these privileges because it memorializes proceedings or activities of a review organization as defined under the Georgia peer review statute, is a record of a medical review

6

committee as defined by the Georgia medical review committee statute and memorializes a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

11.    A document entitled "QA I Log 2004." This document contains a list of those physicians on MCG Health's Medical Staff who had cases on which Quality Assessment and Investigations were performed during 2004. This document was prepared by and is maintained by Peppy R. McBride, MCG Health's Director of Quality Management. It was prepared so that MCG Health could evaluate the quality and efficiency of the services performed by professional health care providers at the hospitals and clinics of the Medical College of Georgia. This document is protected by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. This document satisfies these privileges because it memorializes proceedings or activities of a review organization as defined under the Georgia peer review statute, is a record of a medical review committee as defined by the Georgia medical review committee statute and memorializes a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

12.    A document entitled "QA I Log 2003." This document contains a list of those physicians on MCG Health's Medical Staff who had cases on which Quality Assessment and Investigations were performed during 2003. This document was prepared by and is maintained by Peppy R. McBride, MCG Health's Director of Quality Management. It was prepared so that MCG Health could evaluate the quality and efficiency of the services performed by professional health care providers at the hospitals and clinics of the Medical College of Georgia. This document is protected

7

by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. This document satisfies these privileges because it memorializes proceedings or activities of a review organization as defined under the Georgia peer review statute, is a record of a medical review committee as defined by the Georgia medical review committee statute and memorializes a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

13. A document entitled "MCG Health, Inc. Service Report Cardio/Thoracic and Vascular Surgery." This document reflects the mortality rate for the Department of Cardiothoracic and Vascular Surgery for the time period from January 2005 to December 2005. This document is maintained by Peppy R. McBride, MCG Health's Director of Quality Management. It was prepared so that MCG Health could evaluate the quality and efficiency of the services performed by professional health care providers in the Department of Cardiothoracic and Vascular Surgery. This document is protected by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. This document satisfies these privileges because it memorializes proceedings or activities of a review organization as defined under the Georgia peer review statute, is a record of a medical review committee as defined by the Georgia medical review committee statute and memorializes a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

14. A document entitled "MCG Health, Inc. Service Report Surgery." This document

8

reflects the mortality rate for the Section of Cardiothoracic Surgery for the time period from July 2004 to June 2005. This document is maintained by Peppy R. McBride, MCG Health's Director of Quality Management. It was prepared so that MCG Health could evaluate the quality and efficiency of the services performed by professional health care providers in the Section of Cardiothoracic Surgery. This document is protected by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. This document satisfies these privileges because it memorializes proceedings or activities of a review organization as defined under the Georgia peer review statute, is a record of a medical review committee as defined by the Georgia medical review committee statute and memorializes a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

15.    A document entitled "MCG Health, Inc. Service Report Surgery." This document reflects the mortality rate for the Section of Cardiothoracic Surgery for the time period from July 2003 to June 2004. This document is maintained by Peppy R. McBride, MCG Health's Director of Quality Management. It was prepared so that MCG Health could evaluate the quality and efficiency of the services performed by professional health care providers in the Section of Cardiothoracic Surgery. This document is protected by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. This document satisfies these privileges because it memorializes proceedings or activities of a review organization as defined under the Georgia peer review statute, is a record of a medical review committee as defined by the Georgia medical review committee

statute and memorializes a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

16.    A document entitled "Root Cause Analysis for Sentinel Event." This document reflects a root cause analysis undertaken regarding Dr. Mark Anstadt's care for a patient at the hospitals and clinics of the Medical College of Georgia. This document is maintained by Peppy R. McBride, MCG Health's Director of Quality Management. It was prepared so that MCG Health could evaluate the quality and efficiency of the services performed by Dr. Anstadt. This document is protected by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. This document satisfies these privileges because it memorializes proceedings or activities of a review organization as defined under the Georgia peer review statute, is a record of a medical review committee as defined by the Georgia medical review committee statute and memorializes a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

17.    E-mail from Sharon Faircloth, V.P. of Strategic Support, MCG Health, to Timothy E. Moses, attorney for MCG Health, dated February 12, 2001, regarding registration of the trademark "MCG." This e-mail represents confidential communications between Ms. O'Neal and Mr. Moses for the purpose of seeking legal assistance and is thus protected by the attorney-client privilege.

18.    In addition, quality and credentialing files for other physicians who are or were members of the MCG Health, Inc. Medical Staff may be responsive to certain of the plaintiff's Requests for Production of Documents. Given the overbreadth of certain of the plaintiff's Requests

for Production, as explained more in MCG Health's response to Request for Production numbered 11 and Interrogatories numbered 2(a), 2(b) and 2(c), an enumeration of these physicians on an individual basis is unduly burdensome. However, quality and credentialing files are prepared so that MCG Health could evaluate the quality and efficiency of the services performed by professional health care providers at the hospitals and clinics of the Medical College of Georgia. They are maintained by Peppy R. McBride, MCG Health's Director of Quality Management and Joan Lewis, MCG Health's Medical Staff Coordinator. They are protected by the peer review privilege found at O.C.G.A. § 31-7-133, et seq., the medical review committee privilege found at O.C.G.A. § 31-7-140, et seq., and the federal self critical analysis privilege. These documents satisfy these privileges because they memorialize proceedings or activities of a review organization as defined under the Georgia peer review statute, are a record of a medical review committee as defined by the Georgia medical review committee statute and memorialize a matter created by MCG Health for purposes of a critical analysis for future quality purposes, the discovery of which would curtail the flow of similar information at MCG Health.

11

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing Defendant MCG Health, Inc.'s Responses to

Plaintiff's First Request for Production of Documents and Things was served upon counsel of record

by placing same in United States First-Class Mail, postage prepaid, addressed as follows:

**George W. McGriff**
**Deborah B. Brown**
**Nicholas G. Dumich**
George W. McGriff & Associates
Century Lake Office Park
1774 Century Boulevard, NE
Atlanta, GA 30345-3312

and by hand delivery as follows:

**Alana Kyriakakis Heaton**
Hull, Towill, Norman, Barrett & Salley, P.C.
P.O. Box 1564
Augusta, GA 30903-1564

This ___17___ day of ___January___, 2006.

Thomas L. Cathey

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

KWABENA MAWULAWDE, M.D.,            )
                                   )
        Plaintiff,                 )
                                   )    Civil Action File
vs.                                )    No. 1:05-CV-99
                                   )
BOARD OF REGENTS OF THE            )
UNIVERSITY SYSTEM OF GEORGIA;      )
MEDICAL COLLEGE OF GEORGIA;        )
DANIEL W. RAHN, M.D.,              )
Individually and in his           )
official capacity as president,    )
Medical College of Georgia;        )
DAVID STERN, M.D., Individually    )
and in his official capacity as    )
dean, School of Medicine, MCG;     )
DON SNELL, Individually and in     )
his official capacity as          )
president and CEO, MCG             )
Health, Inc.,                      )
                                   )
        Defendants.                )
_____ )

- - - - -

**30 (b)(6) DEPOSITION OF DON SNELL - EXCERPTS**

Taken By Counsel For the Plaintiff

Before Laurie M. Hannon-Stair, Certified Court Reporter

At the Law Offices of Hull, Towill, Norman, Barrett & Salley

801 Broad Street, Augusta, Georgia

On February 3, 2006

- - - - -

**AUGUSTA WEST REPORTING**
**Certified Court Reporters**
**505 Courthouse Lane**
**Augusta, Georgia  30901**
**(706) 722-3746 or (706) 863-3918**
**1-800-592-3376 (Depo)**

APPEARANCES OF COUNSEL

For the Plaintiff:              Mr. George William McGriff
                                Ms. Dell Cody
                                McGriff & Associates
                                Century Lake Office Park
                                1774 Century Boulevard NE
                                Atlanta, Georgia  30345-3312


For the Defendants             Mr. James B. Ellington
MCG Health Inc./               Hull, Towill, Norman, Barrett
Don Snell:                        & Salley
                                801 Broad Street
                                SunTrust Bank Building, Floor 7
                                Augusta, Georgia  30901


For the Defendants             Ms. Alana Kyriakakis Heaton
Board of Regents/              Hull, Towill, Norman, Barrett
Daniel Rahn, MD/                  & Salley
David Stern, MD:               801 Broad Street
                                SunTrust Bank Building, Floor 7
                                Augusta, Georgia  30901


Also Present:                  Ms. Ann Marie Swindler
                                Risk Management, MCG HI


- - - - -


INDEX TO DEPOSITION EXCERPTS

Page

EXAMINATION BY MR. MCGRIFF

    FIRST SET OF CERTIFIED QUESTIONS . . . . . . . . . . 3

    SECOND SET OF CERTIFIED QUESTIONS  . . . . . . . . . 17

CERTIFICATE OF COURT REPORTER . . . . . . . . . . . . . 20

*AUGUSTA WEST REPORTING*

```
1                    30(b)(6) DEPOSITION OF

2                         DON SNELL

3           [Pursuant to O.C.G.A. 9-11-28(d), Augusta West

4       Reporting has no contract with any of the parties or

5       their counsel.  The court reporter's charges are the

6       usual and customary charges for services within the

7       industry and are available upon request by either

8       party, with no financial or services discount being

9       given to any party named in this litigation.]

10          [These excerpts are from the afternoon session of

11      the deposition that Mr. McGriff requested be certified

12      and expedited]

13                         - - - - -

14                         DON SNELL,

15         Having Been First Duly Sworn, was Examined

16                  and Testifies as Follows:

17                        EXAMINATION

18      BY MR. MCGRIFF:

19          Q.   So this data that goes to this organization and is

20      submitted by Health, Inc., it's submitted from information

21      collected within the hospital and provided to this

22      organization?

23          A.   All hospitals in the country have to file a

24      Medicare cost report if they participate in Medicare.  This

25      information is provided vis-a-vis the hospital, in our case
```

-3-

1    MCG Health, Inc., to Medicare or its fiscal intermediary as

2    a part of the cost reporting process.

3        Q.    Okay.  But that's not a report that says that John

4    Doe expired on the operating table on February the 1st as a

5    result of Physician X stapling an incorrect artery.  It

6    doesn't say that, does it?

7        A.    No.  What it--what it says is that for a year

8    period of time or a rolling three-year period of time that

9    the mortality rate is either as expected, worse than

10    expected or better than expected given the risk of the

11    population being treated.

12        Q.    Now, do you have any knowledge whatsoever that as

13    a result of your being the primary or the ultimate

14    responsible person over the clinical that Dr. Mawulawde was

15    incompetent or that he had harmed patients that had

16    presented to the Medical Center for treatment?

17            MR. ELLINGTON:  And I'm going to object to that

18        question on the grounds and to the extent that it seeks

19        information protected from disclosure by the Georgia

20        Peer Review Privilege set out at OCGA 31-7-133, the

21        Georgia Medical Review Committee Privilege set out at

22        31-7-141, and the Federal Self Critical Analysis

23        Privilege, and to the extent that it is not calculated

24        to lead to the discovery of admissible evidence under

25        the facts of this case.  And I object and direct him

-4-

*AUGUSTA WEST REPORTING*

1          not to respond based on the privilege.

2               MR. MCGRIFF:  Okay.  I'm going to ask him and let

3          him tell me he's not going to respond based on advice

4          of counsel.

5          A.    I'm not going to respond based on advice of--

6          Q.    [Mr. McGriff]  Do you want to let me--okay.  Go

7     ahead.  That's good.  Let me ask you another question.

8          A.    To that question.

9          Q.    Okay.  Dr.--or Mr. Snell, what is peer review in

10    your--what is your understanding of peer review?

11              THE WITNESS:  Can I answer the question?

12              MR. ELLINGTON:  In--

13              MR. MCGRIFF:  Wait a minute.  Wait a minute.  No,

14         no, no.

15              THE WITNESS:  Okay.

16              MR. MCGRIFF:  Not now.  I asked him his

17         understanding.  He either has an understanding or he

18         doesn't.  He just refused to answer on the basis of the

19         privilege.  Now I'm asking him his understanding.

20              MR. ELLINGTON:  If you understand the question you

21         may respond to that second question.

22         A.    The peer review process I--I understand.  It is an

23    evaluation of the care delivered by a practitioner by his or

24    her peers through a process that's pretty well prescribed

25    through most hospitals or academic medical centers that

-5-

*AUGUSTA WEST REPORTING*

1    involved multiple evaluation components all flowing up

2    eventually to a board of directors process.

3        Q.   Board of directors process, I don't understand.

4        A.   The board of directors at MCG Health, Inc.--the

5    board of directors of any hospital or academic medical

6    center in the country is ultimately accountable by law,

7    federal law and state laws as well as joint commission and a

8    wide variety of things, to be the ultimate decider of

9    privileges and credentials, appointment and reappointment

10   based on quality in the peer review process.

11       Q.   And those people that are on that board aren't

12   necessarily physicians, are they?

13       A.   In our particular case, in MCG Health, Inc. they

14   are physicians as well as lay people.  We have a combination

15   of both.

16       Q.   I understand because most boards are composed of

17   both, however a peer review is peers.  So help me, if you

18   would, synthesize or whatever the two.  On one hand you say

19   the peer review is by doctors and it's a process of peers,

20   but ultimate responsibility for it rests with the board

21   which consists of lay people.

22       A.   Or in our case lay people and physicians.

23       Q.   Lay people and physicians.

24       A.   Uh-huh.

25       Q.   Okay.  Now, the question that I asked you was

-6-

1    about Dr. Mawulawde.  Your understanding of the peer review

2    is that any information that talks about a physician and the

3    physician's treatment of patients generally is protected and

4    privileged?  Is that your understanding?

5         A.   Correct.

6         Q.   You've never heard anyone say to you the process

7    upon which a investigation is conducted, such as the peer

8    review investigation, that is the privilege.  Did you ever

9    hear that said?

10        A.   No, I have not.

11        Q.   So you are understanding that anything that

12   someone like me would ask you about that process to be

13   privileged and protected; is that your--will you answer

14   that?

15        A.   As it would involve the care provided by an

16   individual practitioner, yes.

17        Q.   Even though it doesn't name a patient, even though

18   it talks generally about the standards or the practice

19   habits of a particular person, in this case the plaintiff;

20   and you are saying you would--you deem that information

21   about the plaintiff to be privileged.

22        A.   The information about the plaintiff regarding the

23   care and treatment of his patients would fall, I believe,

24   under the peer review process.

25        Q.   Okay.  In order for it to fall under the peer

-7-

1    review process wouldn't you agree with me that there had to

2    have been a peer review first before you can even say there

3    is a privilege?

4        A.    In terms of the peer review process it would have

5    to be aspects of the care that were reviewable by one of the

6    multiple committees under a peer review process.

7        Q.    Help me now, Mr. Snell.  The peer review--if there

8    is not a peer review then where is a privilege?

9            MR. ELLINGTON:  And I'm going to object to that

10            question on the same basis as I objected earlier, on

11            the grounds that it is seeking information protected by

12            the Peer Review Privilege set out at OCGA 31-7-133, the

13            Medical Review Committee Privilege set out--

14            MR. MCGRIFF:  Why don't you do it this way, why

15            don't you say I'm making a continuing objection on the

16            basis--

17            MR. ELLINGTON:  I will--why don't we do this.  Why

18            don't we indicate that a peer review privilege

19            objection from me encompasses the objection based on

20            the Peer Review Privilege at 31-7-133, 31-7-141 in the

21            Federal Self Critical Analysis Privilege.

22            MR. MCGRIFF:  No.  You can make the objection on

23            the record the way you see fit.

24            MR. ELLINGTON:  Okay.

25            MR. MCGRIFF:  However the question here, back to

-8-

1    Mr. Snell--and you are coming very close to coaching

2    the witness.

3    Q.    [Mr. McGriff]  Mr. Snell, again, very simple

4    question, if there has not been a peer review of a

5    particular doctor that you know of then how can there be a

6    privilege peer review because he hasn't been peer reviewed?

7    MR. ELLINGTON:  Let me state my objection for the

8    record--well, is the question finished?

9    MR. MCGRIFF:  Yes.  I mean it--you're going

10    to--you've got your objection.

11    MR. ELLINGTON:  I'm going to--

12    MR. MCGRIFF:  Let's certify this question.

13    MR. ELLINGTON:  That's fine.

14    MR. MCGRIFF:  And certify this one and certify all

15    the ones that--dealing with the question.

16    MR. ELLINGTON:  I'm going to object to these

17    questions on the grounds that it seeks information

18    protected from disclosure by the Georgia Peer Review

19    Privilege at OCGA section 31-7-133, Georgia's Medical

20    Review Committee Privilege set out at OCGA 31-7-141,

21    and the Federal Self Critical Analysis Privilege.  I

22    further object to that question on the grounds that

23    it's calling for a legal conclusion by a lay person in

24    this situation.

25    Q.    [Mr. McGriff]  Let's ask it this way.  Mr. Snell,

-9-

*AUGUSTA WEST REPORTING*

1    you know and understand what your peer review process is

2    within the Health, Inc.--MCG Health, Inc.; right?

3         A.    [Indicates affirmatively]

4         Q.    You're nodding your head.  You've got to say yes.

5         A.    Yes.

6         Q.    Okay.  In fact, have you done any research

7    independent of this attorney sitting to your right telling

8    you what the peer review is?

9         A.    I have a healthcare executive's understanding of

10   it from our own publications and trade journals, etcetera.

11        Q.    Okay.  Back to Dr. Mawulawde, how would you be

12   able to tell a judge that Dr. Mawulawde's outcomes were poor

13   and ranked below the national average?  How would you do

14   that?

15        A.    I would--I would be able to say that the

16   performance of the department, the cardio-thoracic surgery

17   section of the department of surgery, had outcomes less than

18   expected based on healthgrades.com which would not be peer

19   review.

20        Q.    Okay.  Listen to my question again.  It was not

21   the department; it was Dr. Mawulawde.  I was asking you:

22   how would you be able to tell a judge that Dr. Mawulawde's

23   outcome was below the average?  That's the first question.

24        A.    I wouldn't be able to tell him unless he compelled

25   me to--to divulge information from the peer review process.

1      Q.   So it's--so now you say you have information

2   that's beyond the collective piece that now can show that

3   Dr. Mawulawde's performance or within the surgical outcomes

4   fall below the national average?  What are you saying now?

5      A.   I am saying the peer review process would allow us

6   to see the performance of any individual physician.

7      Q.   I understand that.  That's now after the fact.

8   I'm talking about but you didn't have that in place whenever

9   you made your decision because you've already said you just

10  looked at it collectively.

11     A.   We always have had that information.  What I have

12  said is I did not look and drill down to the individual

13  level.

14     Q.   Yeah, I understand.  You've already testified to

15  that several times.  And my question was:  what would you be

16  able to point the judge to to show the judge that you looked

17  at Dr. Mawulawde at that time and his performance and

18  surgical outcome fell below the national?

19     A.   I wouldn't be able to unless he compelled me

20  through the peer review process.

21     Q.   Okay.  I understand.  Now, do you have any

22  knowledge, personal or otherwise or brought to you, that Dr.

23  Mawulawde in the time that he was there was--had caused the

24  death of a patient?

25          MR. ELLINGTON:  Is that the question?

-11-

1           MR. MCGRIFF:  Yes.

2           MR. ELLINGTON:  Okay.  I object to this question

3      to the extent that it seeks information protected from

4      disclosure by the Peer Review Privilege set out at OCGA

5      31-7-133, the Medical Review Committee Privilege set

6      out at OCGA 31-7-141, and the Federal Self Critical

7      Analysis Privilege, and direct him not to answer the

8      question on that basis.

9      A.   And I agree with the advice of counsel.

10     Q.   [Mr. McGriff]  And you are--by agreeing with the

11     advice of counsel you're saying I ain't answering that

12     question.

13     A.   I'm saying that the peer review statutes don't

14     allow me to answer that question.

15     Q.   That's what your counsel said.  You ain't supposed

16     to know that.  That's your counsel's knowledge.

17          MR. MCGRIFF:  Let's certify all that--this whole

18     series of questions.

19     Q.   [Mr. McGriff]  Do you have any knowledge that

20     Dr.--that physicians within the department of thoracic

21     surgery have been sued for negligent malpractice?

22     A.   Yes.

23     Q.   Who?

24     A.   Again, from the--I am aware of at least case where

25     Dr. Anstadt was--was sued.

-12-

1        Q.   Do you get reports from the morbidity conferences

2    that are held?

3        A.   I personally do not.

4        Q.   Who on your staff does?

5        A.   Our director of quality would--would get them; the

6    chief medical officer of the facility would get them; the

7    medical directors of the two hospitals, children and adult,

8    would get them; the two presidents of the medical staff head

9    physicians would--would get them.

10       Q.   But you wouldn't?

11       A.   I wouldn't get them personally or individually,

12   no.

13       Q.   But would you get a summary of such morbidity?

14       A.   I would eventually at the level of the joint

15   conference committee get a summary report particularly as it

16   would affect privileging and credential.

17       Q.   Do you remember when Dr. Landolfo came to be

18   credentialed with Healthcare, Inc.?

19       A.   I'm waiting for the finishing of the--

20       Q.   No, that is the question.

21       A.   You are--the question was did I remember when Dr.

22   Landolfo was privileged and credentialed by Health, Inc.?

23       Q.   Yes.  When he was first credentialed.

24       A.   Not specifically, but I am aware of the process he

25   went through and it would have had to have been in--as he

-13-

1    was arriving in--

2        Q.   Just give me the year if you recall.

3        A.   Probably 2003, whatever that July was of the first

4    year he started in '03.

5        Q.   Have you at any time or any one designee of yours

6    or in conjunction with anyone else from the practice group

7    or from the Medical College saw fit to look at Dr.

8    Landolfo's morbidity practice?

9        A.   I have not.

10       Q.   Have you--you have not.

11       A.   I have not as president and chief executive

12   officer at MCG Health, Inc.

13       Q.   Have you or a designee of yours along with anyone

14   else looked at the morbidity practice of Dr. Landolfo?

15           MR. ELLINGTON:  Let me object to that question to

16       the extent that it seeks information possessed by this

17       witness protected from disclosure by the Peer Review

18       Privilege set forth at 31-7-133, the Medical Review

19       Committee Privilege set forth at 31-7-141, and the

20       Federal Self Critical Analysis Privilege.  To the

21       extent that any knowledge is gained through those

22       privileges I would direct you not to answer that

23       question, to that extent.

24       A.   All medical care provided in--in a facility, all

25   of the hospitals, academic medical centers in the country,

-14-

1      all of the care gets reviewed by the peer review process so

2      it is not just a specific incident but all aspects of the

3      care.  So I am certainly aware that every physician at the

4      Medical College of Georgia, every faculty physician,

5      everyone on the staff at MCG Health, Inc., all of their care

6      is reviewed by the peer review process.

7          Q.    [Mr. McGriff]  Is it peer review or it is a

8      quality assurance process?  Which is it?

9              MR. ELLINGTON:  I object to that question to the

10             extent--to the form of that question.

11             MR. MCGRIFF:  Well, he just said all reviewed.

12         Q.    [Mr. McGriff]  And the question is:  are you sure

13     it's all peer review or is it quality assurance?

14         A.    I believe it is all protected, if it is reviewed

15     by the various committees and functions in the peer review

16     process that it is all protected.  But all care is reviewed.

17         Q.    And the quality assurance--you have a quality

18     assurance committee, don't you?

19         A.    We have numerous--

20         Q.    Quality assurance.

21         A.    --committees.

22         Q.    Okay.  And those are staffed primarily by nurses,

23     aren't they?

24         A.    No.  They are staffed by administrative people,

25     physicians, nurses, ancillary personnel, Allied Health

-15-

1    professionals.

2        Q.   But would you agree with me that a quality

3    assurance function is one thing and a peer review is a

4    review of conduct by physicians, not anyone else, by

5    physicians.

6        A.   No, I wouldn't agree with that.

7        Q.   So you say even any review whatsoever of any

8    physician's treatment of any patient is privileged.

9        A.   Particularly as it involves the individual

10   patients, yes, sir.

11       Q.   I'm--I didn't say individual patient.  I just said

12   treatment of any patient is privileged.

13       A.   If it is--if it is reviewed and evaluated by one

14   of the subcommittees or components of the--either the

15   quality or the peer review process, yes, I believe it is

16   protected by peer review.

17       Q.   Okay.  Back to my question, Mr. Snell.  If there

18   was not a review what's there to protect?  Can you help me

19   and tell me that?

20       A.   All care is--is reviewed by the peer review

21   process and the quality process.  It doesn't have to be

22   triggered by a specific incident.  Every patient who is

23   treated in the institution goes through one of multiple

24   quality and peer review processes.

25       Q.   Okay.  Right.  Now you're getting quality or peer

-16-

1    review.  Is quality the same as peer review?

2        A.    Yes, sir, it is.  Quality--quality review is

3    protected by peer review.

4        Q.    Okay.

5        MR. MCGRIFF:  That whole series of questions,

6        please certify them.

7                        - - - - -

8        SECOND EXCERPT (SET OF CERTIFIED QUESTIONS)

9        Q.    [Mr. McGriff]  Let me just ask you this question

10   and you tell me whether or not you--if Ms. Debbie Clark said

11   that--you were at--you were the CEO at MCG Health, Inc. at

12   the time that the cardio-thoracic program had been

13   re-credentialed, weren't you?

14       A.    Re-credentialed?

15       Q.    Or re-accredited.

16       A.    I would guess I was if it happened after July 1st

17   of 2000.

18       Q.    Okay.  Do you recall people associated with the

19   cardio-thoracic department being jubilant and talking about

20   the--gaining back their accreditation?  Do you recall any

21   such events?

22       A.    I wasn't involved in any events.

23       Q.    Anyone ever come to you and say, Mr. Snell, we

24   have gotten our accreditation back, we are no longer on

25   probation?

-17-

*AUGUSTA WEST REPORTING*

1          A.    I'm sure somebody had mentioned that to me, maybe

2     the dean, maybe Dr. Gadacz.

3          Q.    Do you think you would have said to such a person,

4     well, I'm glad but we're going to clean house over there?

5          A.    I would have never said that.

6          Q.    So you would call that person an outright liar.

7          A.    I would call that--I would say that person

8     misrepresented a conversation if I indeed had it.

9          Q.    Okay.   Now, would you have been privy to or should

10    you have been privy to any complaints that were made against

11    Dr. Landolfo?

12         A.    What type of complaints?

13         Q.    Misconduct.

14               MR. ELLINGTON:   I'm going to object to the

15          question to the extent that it's seeking information

16          protected from disclosure by the peer review privilege,

17          the medical review committee privilege and the federal

18          self critical analysis privilege, and would direct my

19          client not to answer questions of complaints, if any,

20          that came to him via those methods.

21         A.    On the administrative side, if there were

22    complaints against Dr. Landolfo in terms of administration,

23    if it involved MCG Health, Inc. employees or leased

24    employees, those normally would come to my attention.

25         Q.    [Mr. McGriff]   Then Ms. Debbie Clark would have

-18-

*AUGUSTA WEST REPORTING*

1    been an MCG Health, Inc. employee, wouldn't she?

2        A.    Maybe not.  Many of the secretaries are employees

3    of the Medical College of Georgia.

4        Q.    She was a secretary?

5        A.    I don't know what she--I don't know what her title

6    is.

7        Q.    Okay.

8        A.    What I'm saying is that we have in MCG Health,

9    Inc. facilities many support folks to the department that

10   are employees of the Medical College of Georgia as opposed

11   to MCG Health, Inc.  They're not even leased employees.

12   They are employees of the college.  If it was an employee of

13   MCG Health, Inc. or a leased employee there avenue would be

14   human resources at MCG Health, Inc. and then Mr. Hayes would

15   then alert me to any complaints or significant problems.

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

-19-

CERTIFICATE OF COURT REPORTER

I hereby certify that the foregoing deposition was reported as stated in the caption, by the method of Stenomask, and the questions and the answers thereto were reduced to typewriting by me or under my direction; that the foregoing pages numbered 3 through 19 represent a true, correct, and complete transcript of excerpts of evidence given on February 3, 2006, by the witness, DON SNELL, and signature was waived.

I further certify that I am not kin or counsel to the parties in the case and I am not in the regular employ of counsel of said parties.

I further certify that I have no contract with any of the parties or their counsel. The court reporting charges are the usual and customary charges for services within the industry and are available upon request by either party. No financial or services discount has been or will be given to any party named in this litigation.

This the 5th day of February, 2006.

LAURIE M. HANNON-STAIR, CCR, CVR

CERTIFIED COURT REPORTER

GEORGIA CERTIFICATE # B-2199

-20-

*AUGUSTA WEST REPORTING*

# EXHIBIT 11

```
                         Landolfo Excerpts.txt
              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF GEORGIA
                        AUGUSTA DIVISION
```

KWABENA MAWULAWDE, M.D.,          )
                                  )
        Plaintiff,                )      Civil Action File
                                  )      No. 1:05-CV-99
vs.                               )
                                  )
BOARD OF REGENTS OF THE           )
UNIVERSITY SYSTEM OF GEORGIA;     )
MEDICAL COLLEGE OF GEORGIA;       )
DANIEL W. RAHN, M.D.,             )
Individually and in his          )
official capacity as president,   )
Medical College of Georgia;      )
DAVID STERN, M.D., Individually   )
and in his official capacity as   )
dean, School of Medicine, MCG;    )
DON SNELL, Individually and in    )
his official capacity as          )
president and CEO, MCG            )
Health, Inc.,                     )
                                  )
        Defendants.               )
                                  )
                          - - - - -

          DEPOSITION EXCERPTS OF KEVIN P. LANDOLFO, M.D.
                  30(b)(6) on items 7 and 8

              Taken By Counsel For the Plaintiff

       Before Laurie M. Hannon-Stair, Certified Court Reporter

     At the Offices of Hull, Towill, Norman, Barrett & Salley

    801 Broad Street, SunTrust Bank Building, Augusta, Georgia

                    On February 15, 2006

                          - - - - -
      ÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎÎ

                   AUGUSTA WEST REPORTING
                   Certified Court Reporters
                      505 Courthouse Lane
                    Augusta, Georgia  30901
              (706) 722-3746 or  (706) 863-3918
                     1-800-592-3376 (Depo)
 ÐPPEARANCES OF COUNSEL

        For the Plaintiff:          Mr. George William McGriff
                                    Ms. Dell Cody
                                    McGriff & Associates
                                    Century Lake Office Park
                                    1774 Century Boulevard NE
                                    Atlanta, Georgia  30345-3312


        For the Defendants          Mr. James B. Ellington
        MCG Health Inc./            Hull, Towill, Norman, Barrett
        Don Snell:                    & Salley
                                         Page 1

Landolfo Excerpts.txt
                    801 Broad Street
                    SunTrust Bank Building, Floor 7
                    Augusta, Georgia  30901

For the Defendants          Ms. Alana Kyriakakis Heaton
Board of Regents/           Hull, Towill, Norman, Barrett
Daniel Rahn, MD/              & Salley
David Stern, MD:            801 Broad Street
                            SunTrust Bank Building, Floor 7
                            Augusta, Georgia  30901


                    - - - - -


          INDEX TO DEPOSITION EXCERPTS

                                              Page

FIRST CERTIFIED QUESTION EXCERPT . . . . . . . . . . . 3

SECOND CERTIFIED QUESTION EXCERPT. . . . . . . . . . .10

CERTIFICATE OF COURT REPORTER. . . . . . . . . . . . .16

DEPOSITION EXCERPTS OF
                KEVIN P. LANDOLFO, M.D.
          [Pursuant to O.C.G.A. 9-11-28(d), Augusta West
     Reporting has no contract with any of the parties or
     their counsel.  The court reporter's charges are the
     usual and customary charges for services within the
     industry and are available upon request by either
     party, with no financial or services discount being
     given to any party named in this litigation.]

                    - - - - -
                KEVIN P. LANDOLFO, M.D.,
     Having Been First Duly Sworn, was Examined
              and Testifies as Follows:
          FIRST CERTIFIED QUESTION EXCERPT
BY MR. MCGRIFF:
     Q.   Isn't it true that the first off-pump surgery that
you performed at the Medical College of Georgia was
problematic?
     A.   No, that's not true.  That's not true.
     Q.   You had no problems at all with it.
     A.   Not that--not that I recall.
     Q.   None whatsoever.  It went as a breeze.
     A.   Well, surgery never goes as a breeze.  We always
have--we always have--and I believe most good off-pump or

minimally invasive surgeons always have plans and
contingency arrangements so that whatever befalls and
changes in the operating room you can address.  And so--
     Q.   Okay.
     A.   --so I don't view heart surgery as a breeze under
any circumstances.
     Q.   My question is:  an off-pump procedure--the first
off-pump procedure that you did here at the Medical College
of Georgia was problematic.
               MS. HEATON:  I just want to put an objection on
          the record--
                              Page 2

Landolfo Excerpts.txt
A.   NO.  Not that I recall.
     MS. HEATON:  --to the extent that your question
seeks to have the witness reveal identifiable protected
health information in violation of HIPAA.  As this
witness' attorney I would instruct him not to answer
question that would be a violation of HIPAA and reveal
protected health information in that it could subject
him to imprisonment and fines.
     MR. MCGRIFF:  The question is--this is a fact
witness and the witness knows or should know what
surgeries he performed and if in fact there were
problems with the first off-pump surgical procedure
that he performed at the Medical College of Georgia.
It's certainly relevant.  And there are no specifics

about patient names or anything that this witness is
being asked to divulge--
     MS. HEATON:  Well, with all due respect--
     MR. MCGRIFF:  --which would be a proper HIPAA
violation.
     MS. HEATON:  With all due respect, if you have a
name you have revealed in prior depositions, specific
names, if you are asking about a specific patient of
whom you know and you are just not--
     MR. MCGRIFF:  Did I ask, Ms. Heaton, about a
specific patient?
     MR. HEATON:  If you would let me finish my
objection.  If you know of a specific patient's name
and you are asking this witness you are encouraging him
to violate a federal statute, then I believe that my
client should not answer that question.  It would be a
charade for us to pretend that it is not identifiable
protected health information.  If you want to ask him,
you know--
     MR. MCGRIFF:  Because I'm going to ask him
questions about his involvement with patient care.
It's fair game.  He is fair.  You can sit here and
object and I--again, I am going to suggest--because if
we keep doing it this way I'm going to suspend the
deposition.  You can object, state your basis.  You can

instruct him not to answer, but let's don't go on with
all of these speaking objections.  Let's don't do that.
Let's not get into that.  Okay?
     MS. HEATON:  Mr. McGriff, I do not feel that my
objections are speaking objections.
     MR. MCGRIFF:  Yes, they are.
     MS. HEATON:  For the record I have to state the
legal basis of my objection--
     MR. MCGRIFF:  State your legal basis and object
and let it go.  You don't have to try to cue this
witness.  This witness is going to have to answer the
questions either today or tomorrow.  He's going to have
to answer them.  So make your objection.  Let's not get
into trying to cue because I perceive you're cuing the
witness or attempting to.  Okay?
     MS. HEATON:  As his attorney I have an obligation
to my client to advise him of HIPAA.
     MR. MCGRIFF:  Well, that's your objection, HIPAA;
right?
     MS. HEATON:  Yes.
     MR. MCGRIFF:  Okay.  Is the basis for your
objection HIPAA and based on the objection you are
                        Page 3

Landolfo Excerpts.txt

instructing your witness not to answer?
          MS. HEATON:  I'm instructing him not to answer
questions that would reveal protected health

information.
          MR. MCGRIFF:  Well, what information--let me
just--that's your objection.  It's been made.  Okay.
We good?  Because I'm going to continue to ask him
questions, fact questions.  I'm going to ask this
witness.
          MS. HEATON:  If you're going to ask him about
specific patients then I am going to continue to
object.
          MR. MCGRIFF:  Okay.
     Q.   [Mr. McGriff]  Dr. Landolfo, in the series of
questions that I asked did I ask you a patient name?
     A.   No.
     Q.   Do you understand or do you have any knowledge of
HIPAA?
     A.   I don't have--I have a laymen's--well, a medical
professional's understanding.
     Q.   Okay, a medical professional's knowledge of HIPAA.
What is that knowledge that you have?
     A.   That we treat the right of privacy for patient
information with a high degree of sanctity and it is
punishable by several offenses, and people's medical records
are their private right unless they give--
     Q.   Consent.
     A.   --consent.

     Q.   Okay.  Have you been asked--when I asked you about
your first off-pump surgical procedure were you asked about
a patient's name?
     A.   No.
     Q.   When I asked you about the first off-pump
procedure did I ask you who was involved other than you?
     A.   No.
     Q.   Did I ask you--in fact, the only question I asked
you was whether or not there were problems with the off-pump
procedure that you performed; isn't that correct?  Yes or
no.
     A.   Yes.
     Q.   In fact, as I stated and you confirmed, you stated
that you have done hundreds of off-pump procedures.
     A.   Correct.
     Q.   In fact, you've written articles on off-pump
procedures; is that correct?
     A.   Correct.
     Q.   And based on that you would consider that you were
an expert in off-pump procedures, wouldn't you?
     A.   It depends on what you mean by expert.  I'm
experienced.
     Q.   Okay.  You are experienced.  In fact--and your
testimony was, if I understand you correctly, that there
were no problems with the first off-pump procedure that you

performed at the Medical College of Georgia.
     A.   There are always problems in surgery.
     Q.   Listen to me carefully.  I understand that.  My
question was, again, were there problems that you
encountered in performing that first off-pump procedure when
you--at the Medical College of Georgia?  Yes or no.
          MR. ELLINGTON:  Objection.
                         Page 4

Landolfo Excerpts.txt

      MS. HEATON:  Objection on the grounds of HIPAA
because you are asking him about a specific individual.
There is no protective order, there is no patient
consent form, and you have not provided notice to a
patient with an opportunity to object to your
requesting the witness to reveal protected health
information.
      Q.   [Mr. McGriff]  Are you going to answer the
question, Dr. Landolfo?
      MS. HEATON:  I am instructing him not to answer
the question.
      MR. MCGRIFF:  Let's certify this whole series of
questions with respect to the attempt to prevent Dr.
Landolfo from asking or responding to factual
information.  And please capture all of the
objectionable statements, please.
                       - - - - -

            SECOND CERTIFIED QUESTION EXCERPT
      Q.   Now, you ever have a patient at the Medical Center
of Georgia die from--let me ask you, what happens when you
cut me down the middle?  What's that--
      A.   Sternotomy?
      Q.   That's what you call it.  You cut me down there
and then you spread me open, right, to work so I don't cut
you, my ribs don't cut you and give you AIDS.
      A.   No, no.  We don't cut the ribs.  We cut the breast
bone and we put a retractor in, not to prevent you from
cutting me but for--actually to get exposure to the heart.
And we do that carefully with instruments that have been
designed and used for sixty years.
      Q.   Okay.  Now, and then you sew me back up.  What
kind of infection would you call that that was down that
line, sternum?
      A.   Well, there are various depending on the depth.
They are everything from a superficial wound infection to
something that we worry about a lot which is called
mediastinitis which is when it involves and can involve the
bone and down into the anterior surface of the heart.
      Q.   Okay.  Now, you've seen that infection many times,
haven't you?
      A.   Absolutely.
      Q.   And that requires that a patient spends prolonged

time in the hospital to deal with that infection; isn't
that--
      A.   Yes.  And associated with increased mortality,
which is death, and morbidity.  It's a serious complication.
      Q.   And chances are pretty good that once a patient
develops that kind of infection, unless it's caught and
attacked very vigorously mortality is almost certain, death
is almost certain.
      A.   Absolutely not.
      Q.   It's not.
      A.   I just told you that the mortality rate used to--
historically the mortality rate if you did nothing was about
30 percent which would mean three in ten people would die
from mediastinitis if it wasn't identified and treated.  In
fact, it often presents late because it's hard to make the
diagnosis in many patients.  with our current mode of
therapy the mortality rate, meaning the likelihood that you
would die from such a serious infection, is about 10 percent
nationally.  That still is significant but not certain.
                          Page 5

Landolfo Excerpts.txt
```
Q.    Yeah, if you're one of those ten--
A.    Absolutely.
Q.    --it's serious.
A.    Yes.
Q.    Have you ever had that happen to you, a patient
die from that type of infection?

A.    Yes, I have.
Q.    Have you had a patient die from that type of
infection at the Medical College?
A.    Yes.
Q.    Okay.  If I took your document--and tell me again,
what's the name of that document that you've been telling me
about where you say that all of these procedures and
outcomes and things is on?  What do you call it?
A.    Well, it's a database.  And we use a commercially
available product from a company called Chaos in which we
collect that information and then we are in the process of
collating it so that we can submit it to the Society of
Thoracic Surgery databases and compare our results.  And
it's d-identified in a d-identified way with people from
Atlanta and New York and--
Q.    Now, this is not data that has been peer reviewed
by anyone, is it?
A.    What do you mean by peer reviewed?
Q.    Meaning the data, this is your data that's being
collected in the department of surgery.  It has not made its
way to any peer review committee or group.
A.    No.  I'm not--to be honest, I'm not sure what the
peer review process is within the hospital.  But the data
that I'm talking about has been collected by a whole bunch
of people that starts with secretary who collects the name,

date of birth, the date of surgery.  Then my PAs who see the
patients with me before surgery and enter all the risk
factors.  Then the perfusionists who enter with me all the
operative findings.  And then again my PAs and nurse
clinicians who enter the postoperative and discharge
information that you talked about.
Q.    Now, these are all people that you just named that
are people that have been budgeted for your department or
your section and paid for your budget and your section; is
that--
A.    No, not quite.  Many of them are.  Some are paid
by the hospital who do work for us but aren't--I don't have
a budget in the hospital per se.
Q.    Would you call them--do you understand--have you
heard the term leased employees?
A.    Yeah, they're not leased.  They work fulltime for
the hospital.  Then--
Q.    Are they in any quality assurance role?
A.    Not that I--
      MS. HEATON:  Objection.  It calls for--
      MR. MCGRIFF:  No, no.
      MS. HEATON:  --a legal conclusion.
      MR. MCGRIFF:  Listen to--no, no.  This is--this is
a witness who is a physician.  He's a managerial
physician at a teaching hospital and this witness

speaks--he speaks from within--information that is in
his head and in his knowledge.
      MS. HEATON:  Agreed.  He cannot provide a legal
conclusion.  He can provide--
                    Page 6
```

Landolfo Excerpts.txt

          MR. MCGRIFF:  It's not a legal conclusion at all
     as to whether or not this witness--
     Q.   [Mr. McGriff]  You understand, Dr. Landolfo, the
quality assurance function within the medical--within the
hospital, don't you?
     A.   Yes.  You know, I have a--I have a understanding.
     Q.   Now, you know who is--you know quality assurance.
You've run into a quality assurance committee, haven't you?
     A.   Yes.  I mean I know what they are, yes.
     Q.   And we're not talking about a QA committee, are
we?
     A.   You're what?
     Q.   You're not talking to me about a QA committee.
You're just talking to me about people who are at your
direction collecting data to provide and compare.
     A.   Yes.  The people that I've talked to you about
have no--I mean their--their task has not been a--I mean
it's not specifically mandated by the hospital that they--
     Q.   Okay.
     A.   --do this.
     Q.   No rules, no regulations required that you do

this; is that correct?
     A.   Well, it depends.  There are increasingly strong
suggestions that if data is not collected on individual
patients and outcomes known and submitted that it
jeopardizes accreditation, ability to develop manage-care
contracts so it is in the process of becoming mandated
that--
     Q.   But it's not--
     A.   --this data is collected.
     Q.   But it's not mandated by any quality assurance per
se.
          MR. ELLINGTON:  I'm going to object to the form of
     that question.
     Q.   [Mr. McGriff]  What entity do you know mandate
that collection of data?  You say it's becoming.  The
question is what entity do you know as of right now that
mandate that you collect the date in the manner in which you
collect it?
     A.   I'm not--I'm not aware of any that mandates--
     Q.   Okay.
     A.   --that.
          [Momentary interruption]
//
//
//


                    CERTIFICATE OF COURT REPORTER
          I hereby certify that the foregoing deposition was
reported as stated in the caption, by the method of
Stenomask, and the questions and the answers thereto were
reduced to typewriting by me or under my direction; that the
foregoing pages numbered 3 through 15 represent a true,
correct, and complete transcript of excerpts of the evidence
given on January 15, 2006, by the witness, KEVIN P.
LANDOLFO, M.D., and signature was waived.
          I further certify that I am not kin or counsel to
the parties in the case and I am not in the regular employ
of counsel of said parties.
          I further certify that I have no contract with any
of the parties or their counsel.  The court reporting
charges are the usual and customary charges for services
                         Page 7

Landolfo Excerpts.txt
within the industry and are available upon request by either
party.  No financial or services discount has been or will
be given to any party named in this litigation.
          This the 20th day of February, 2006.


                    _____
                    LAURIE M. HANNON-STAIR, CCR, CVR
                    CERTIFIED COURT REPORTER
                    GEORGIA CERTIFICATE # B-2199