ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2006 APR 27 AM 10: 46

CLERK _____
SO. DIST. OF GA.

KWABENA MAWULAWDE, M.D.,      )
                             )
        Plaintiff,           )
                             )
    v.                       )        CV 105-099
                             )
BOARD OF REGENTS OF THE      )
UNIVERSITY SYSTEM OF GEORGIA,)
et al.,                      )
                             )
        Defendants.          )

ORDER

The captioned employment discrimination suit is now before the Court on Plaintiff's motion to compel. Doc. no. 73. For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

I.    **BACKGROUND**

The instant discovery dispute is but the latest turn in a tortuous case. Before the case was transferred to this District, Plaintiff subjected the United States District Court for the Northern District of Georgia to months of meritless argument in an attempt to resist (1) the removal of the case to federal court and (2) the transfer of the case to this District. See Mawulawde v. Board of Regents of the Univ. Sys. of Ga., CV 104-2953, doc. nos. 6, 11, 17-19, 25-26, 29 (N.D. Ga. Jun. 30, 2005).[1] Since transfer, this Court has been required to

_____

[1]Plaintiff originally filed his complaint in the Superior Court of Fulton County, Georgia, on September 2, 2004. Correctly noting that Plaintiff's race discrimination claims arise under federal law and that nearly all the parties, as well as the relevant witnesses and documents, reside in this District, Defendants removed the case to the Northern District of Georgia on October 8, 2004 and moved to transfer venue to this District. CV 104-2953, doc. no. 29, p. 2. As a result of Plaintiff's ill-founded but persistent opposition to removal and transfer, the case remained stalled in the Northern District until late June 2005. This Court's characterization of

resolve two previous discovery disputes, both of which were resolved against Plaintiff. See doc. no. 23, *aff'd*, doc. no. 51; doc. no. 59. The Court is also aware that a separate, sealed discovery dispute is pending before the presiding District Judge. See doc. nos. 78-79, 81, 85-87, 93-94, 100-01. Thus, the instant issue is the latest permutation of increasingly protracted and bitter litigation between the parties. Bearing this history in mind, the Court will attempt to resolve the issues raised in Plaintiff's motion to compel with an eye towards encouraging the expeditious resolution of this case.

Plaintiff seeks to compel responses to: (1) various interrogatories, (2) requests for the production of documents, and (3) deposition questions. Doc. no. 73, p.1. The Court will explain each facet of the discovery sought, but assumes familiarity by the parties with the pertinent facts and background information.

### A.    Interrogatories

Plaintiff served Defendant MCG Health, Inc., ("Health") with 30 numbered "interrogatories." See Pl.'s Ex. 6. Health responded by answering the first seven numbered "interrogatories," contending that each "discrete subpart" constituted a separate interrogatory, making the first seven numbered "interrogatories" the equivalent of the full 25 interrogatories allowable under Fed. R. Civ. P. 33(a) and this Court's Order of October 6, 2005. See Pl.'s Ex. 7; doc. no. 23, *aff'd* doc. no. 51. Thus, according to Health, Plaintiff propounded not 30 interrogatories, but 141. Pl.'s Ex. 7, p. 138; see also doc. no. 97-1, p. 5.

Health also objected to various interrogatories on numerous grounds. Of particular note, Health objected to any interrogatory seeking information predating July 1, 2000, the

---

Plaintiff's prolonged attempt to resist removal and transfer to this District as "meritless" is deserved. The Honorable Orinda D. Evans, United States District Judge, described Plaintiff's arguments as "based on misunderstandings of the law or on areas of the law not relevant to this case," derived from "misread[ings]" of case law, and lacking any "legal or rational basis." Id. at 4, 6.

date it "began operating the hospitals and clinics of the Medical College of Georgia. Pl.'s Ex. 7, p. 7. Also noteworthy, Health objected to interrogatories seeking information regarding *all* the physicians in its medical staff as overbroad, burdensome, and not reasonably calculated to lead to admissible evidence. See, e.g., id. at 8. More specifically, Health objected to providing "information regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery . . . on the grounds that such requests are not relevant." See, e.g., id. at 35. Next, Health objected to certain interrogatories as seeking "protected health information . . . under the terms of the Health Insurance Portability and Accountability Act of 1986 ("HIPAA"). See, e.g., id. at 52 (citing 45 C.F.R. §§ 160.13 & 164.512(e)(1)(v)). Finally, Health objected to several interrogatories as seeking "information protected from disclosure by Georgia's peer review privilege, set out in O.C.G.A. § 31-7-133, *et seq.*, and by Georgia' medical review committee privilege, set out in O.C.G.A. § 31-7-141, *et seq.*, and by the federal self-critical analysis privilege." See, e.g., id. at 56.

**B.    Requests for Production of Documents**

Plaintiff also served Health with his "First Continuing Request for Production of Documents and Things" in which he made 68 separate document requests. See Pl.'s Ex. 8. Health objected to numerous requests as seeking information protected by state peer and medical review privileges, as well as the "federal self-critical analysis privilege." See Pl.'s Ex. 9, p. 4. Health also objected to several requests as seeking information which was irrelevant because it predated July 2000. Id. at 5. Next, Health stood by the stance taken in response to Plaintiff' interrogatories that information "regarding individuals other than surgeons who were members of the Section of Cardiothoracic Surgery" was irrelevant. Id.

3

at 8. In addition, Health reiterated its view that discovery requests "encompass[ing] all 633 physicians" in his medical staff were overbroad and unduly burdensome. Id. Furthermore, Health restated its view that much of the information Plaintiff sought was "protected health information." Id. at 9. Finally, Health objected to certain requests as being the functional equivalent of interrogatories because they did "not request documents or other tangible things in the possession or custody of [Health]." Id. at 34.

### C.    Deposition Questions

Also at issue are questions Plaintiff's counsel posed during depositions of Defendant Don Snell ("Snell") and Dr. Kevin Landolfo, the Chief of Cardiothoracic Surgery. First, Plaintiff's counsel asked both Snell and Dr. Landolfo a series of questions about specific patients who allegedly died while under Dr. Landolfo's care. See Defs.'s Ex. C, pp. 108-09 (hereinafter "Snell Depo."); Defs.' Ex. E, pp. 109-11, 114-18 (hereinafter "Landolfo Depo."). Plaintiff's counsel asked similar questions in other depositions. See Defs.' Exs. D & L. Health objected to these questions, relying upon HIPAA and the peer review, medical review, and self-critical analysis privileges detailed *supra*.

Having summarized the parties' dispute, the Court resolve the issues as follows.

## II.    DISCUSSION

### A.    Interrogatories: Plaintiff's Attempt to Circumvent Fed. R. Civ. P. 33

First, the Court addresses the matter of whether Plaintiff propounded more than 25 interrogatories without leave of court as required by Fed. R. Civ. P. 33(a). Rule 33(a) provides that, absent leave of court or written stipulation, the number of interrogatories to be served upon a party should not exceed 25, "including all discrete subparts." Of course, leave of court "to serve additional interrogatories shall be granted to the extent consistent

4

with the principles of Rule 26(b)(2)." Id. In the instant case, before attempting any discovery, Plaintiff requested leave of court to exceed Rule 33's 25-interrogatory limit. See doc. no. 11. The undersigned denied that request, noting that it was improper to request leave to propound additional interrogatories without first "exhaust[ing] the number of discovery requests allowed by the applicable rules." Doc. no. 23, p. 2. When Plaintiff objected to this ruling, see doc. no. 24, the presiding District Judge overruled his objections, explaining that Plaintiff must exhaust the discovery "allowed by the Rules before asking for more." Doc. no. 51, p. 2.

Plaintiff then deliberately ignored these court directives by serving 30 numbered interrogatories upon Health. Thus, Interrogatories 26 through 30 were clearly out-of-bounds, and Health's objections to them are wholly proper. Furthermore, the Court should add that it expects Plaintiff to obey its directives, and defiance of court orders will not be countenanced. See Loc. R. 41.1(b)(authorizing *sua sponte* dismissal for "[w]illful disobedience or neglect of any order of the Court").

Moreover, it is also clear that Plaintiff has attempted to circumvent Fed. R. Civ. P. 33(a)'s limit by artfully labeling separate interrogatories as subparts. "Parties cannot evade [the 25-interrogatory limit] through the device of joining as 'subparts' questions that seek information about discrete separate subjects." Fed. R. Civ. P. 33(a), Advisory Committee's Notes (1993). Admittedly, "[t]here remains a lack of a clear and easily applied rule about how subparts should be counted." Bell v. Woodward Governor Co., No. 03-C-50190, 2005 WL 3829134, at *1 (N.D. Ill. June 30, 2005); see also Swackhammer v. Sprint Corp. PCS, 225 F.R.D. 658, 664 (D. Kan. 2004)("Rule 33(a) does not define the term 'discrete subparts,' and courts have struggled to interpret the term's meaning."). Nevertheless, deciding whether

5

subparts are parts of a single inquiry or separate, independent inquiries should ultimately be a question of common sense. In addressing whether "subparts" actually constitute separate interrogatories, most courts consider whether the subparts are "logically or factually subsumed within and necessarily related to the primary question."[2] Trevino v. ACB Am., Inc., 232 F.R.D. 612, 614 (N.D. Cal. 2006)(quoting Safeco of Am. v. Rawston, 181 F.R.D. 441, 445 (C.D. Cal.1998)).

The application of this principle is best explained through illustration. In Trevino, 232 F.R.D. at 614, the district court held that the following subparts should be counted as a single interrogatory: "Identify by caption, court, civil action number, and result all litigation filed against you alleging violations of the Fair Debt Collection Practices Act." In contrast, the Trevino court determined the following interrogatory was "compound" and actually constituted "three separate interrogatories:"

> Identify each person whom you expect to call as an expert witness at trial, state the subject matter on which the expert is expected to testify and the substance of the facts and opinions to which the expert is expected to testify, and provide a summary of the grounds for each opinion and the expert's qualifications.

Id.

---

[2] The Court is aware that some courts examine whether the subparts are "directed at eliciting details concerning a 'common theme,'" or instead "inquire into discrete areas." Border Collie Rescue, Inc. v. Ryan, CV 304-568-J-32-HTS, 2005 WL 662724, at *1 (M.D. Fla. Mar. 15, 2005)(quoting Swackhammer, 225 F.R.D. at 664-65). The Court does not find this amorphous standard particularly helpful. For one thing, in deciding what constitutes a "discrete subpart," a court applying this standard is directed to inquire whether the subparts concern "discrete areas." This seems tautological. At bottom, the issue is defining the word "discrete" as it is used in Rule 33. Generally speaking, a definition should not include the term it attempts to define.

Of course, at least one court has taken an "I know it when I see it" approach. Banks v. Office of Senate Sergeant-at-Arms, 222 F.R.D. 7, 10 n.4 (D.D.C. 2004)(quoting Jacobellis v. Ohio, 378 U.S. 184, 197 (1964)(Stewart, J., concurring)). Under this approach, courts ask whether a subpart "introduces a new topic that is a distinct field of inquiry." Id. at 10. The Court agrees with the Banks court's conclusion that there is no "bright-line test" and that an overly formalistic approach, such as "view[ing] each participial phrase as a subpart," would generate "draconian" results. Id. Nevertheless, the undersigned sees little functional difference between assessing whether a party is "putting together in a single question distinct areas of inquiry that should be kept separate" and asking whether a subpart is "logically or factually subsumed within and necessarily related to the primary question.." Id. Accordingly, the Court adopts the test applied by the majority of courts.

As these examples show, the issue is whether the subparts are so "necessarily related" that a meaningful and complete answer to the question cannot be given without providing the information sought by each subpart. Stated another way, "[i]f the first question can be answered fully and completely without answering the second question, then the second question is totally independent of the first and not factually subsumed within and necessarily related to the primary question." Estate of Manship v. United States, 232 F.R.D. 552, 555 (M.D. La. 2005)(internal quotation omitted). Returning to the example interrogatories in Trevino, providing a party with the "results" of certain litigation without also identifying the pertinent cases would have little point. On the other hand, a party may give a complete response to an interrogatory regarding an expert witness's identity or his qualifications without disclosing the substance of the expert's expected testimony.

Bearing these principles in mind, it is clear that nearly all of Plaintiff's interrogatories are compound inquiries. The Court will proffer two emblematic examples. Interrogatory #1 primarily asks Health to describe "the manner in which office space is allocated to physicians." Pl.'s Ex. 6, p. 5. It contains six labeled subparts. Subparts (a) and (b) request the "reasons" for office space allocation and the identities of those "responsible" for office space allocation. Pl.'s Ex. 6, p. 5. As these questions are "intimately and logically connected" to the primary question, the Court concludes that they should be treated as a single interrogatory.[3] Banks, 222 F.R.D. at 11; see also Manship, 232 F.R.D. at 557 (explaining that subparts asking for "'who, what, when, where, and how' information" should be construed as a single interrogatory). Similarly, subpart (c) requests the identities of those "entitled" to office space. Pl.'s Ex. 6, p. 5. This "who" question is "factually

_____

[3]Of note, Health also treated subparts (a) and (b) as a single interrogatory. See Pl.'s Ex. 7, pp. 3-4.

7

subsumed within and necessarily related to the primary question"--how office space is assigned.[4]  As a result, the Court concludes that subparts (a)-(c) constitute a single interrogatory.

However, subparts (d), (e), and (f) request "written policies and procedures" governing office space allocation, documents showing to whom office space was assigned, as well as the names of persons having "custody and control" of the documents. Id. These subparts are clearly a separate inquiry from the primary question asked in Interrogatory # 1. See Banks, 222 F.R.D. at 10 ("The first and most obvious example [of a compound interrogatory] is the combining in a single interrogatory of a demand for information and a demand for the documents that pertain to that event."). With the exception of Interrogatory # 19, Plaintiff repeats this tactic of combining a request for information with a demand for pertinent documents in *all* of his interrogatories. See generally, Pl.'s Ex. 6.

Next, although Plaintiff's document-related subparts are the most obvious examples of "discrete subparts" that should be counted as separate interrogatories, they are not Plaintiff's most egregious attempts to label discrete questions as subparts. For instance, in Interrogatory #7 Plaintiff primarily asks for the hire dates, job titles, and positions held by certain named physicians. Id. at 9. Then, in subparts (c) & (d), Plaintiff switches gears by requesting specific information regarding all the residents supervised by each named doctor. Id. Although these requests perhaps bear a conceivable relationship to each other, they are clearly independent questions. Health can fully answer Plaintiff's questions regarding the named physicians' employment histories without reference to the names of each doctor's residents.

---

[4]The Court assumes that Plaintiff is asking to whom office space has been assigned.

8

As these examples show, Plaintiff has patently ignored Fed. R. Civ. P. 33(a)'s 25-interrogatory limit, "including all discrete subparts."[5] Nevertheless, it is also clear that Health (perhaps understandably perturbed with Plaintiff's discovery conduct), has focused on ways to object to interrogatories as compound questions rather than on cooperating in discovery. For example, Health objected to subpart (c) of Interrogatory #1 as a discrete subpart. See Pl.'s Ex. 7, p. 4. Yet, the Court has just concluded that subpart (c) bears a close relationship to the primary question in Interrogatory #1 and is properly considered part of that interrogatory.

Consequently, resolving with finality the issue of Plaintiff's compound interrogatories would require the Court to conduct an exhaustive analysis of each subpart of Plaintiff's interrogatories. Essentially, the Court has four options: 1) direct Plaintiff to propound a new set of interrogatories which complies with the Court's previous instructions and this Order, 2) grant Plaintiff leave to exceed the 25-interrogatory limit, 3) perform the afore-mentioned exhaustive analysis and issue a protective order relieving Health of answering the extra interrogatories, or 4) direct the parties to come to an agreement. Banks, 222 F.R.D. at 11. In addressing this issue, it should be recognized that the purpose of Rule 33(a)'s 25-interrogatory limit is not to prevent the discovery of relevant information, but rather to "reduce the frequency and increase the efficiency of interrogatory practice" and to prevent the use of interrogatories "as a means of harassment." Fed. R. Civ. P. 33(a), Advisory Committee's Notes (1993). Consequently, courts are empowered to grant leave to serve additional interrogatories "consistent with the principles of Rule 26(b)(2)," and parties may also stipulate to an increase. Fed. R. Civ. P. 33(a).

---

[5] As it would be both tedious and unnecessary to catalog each compound question, the Court declines to do so.

The issue here is simply how best to allow Plaintiff to obtain relevant information without abusing the discovery process. The Court will not reward Plaintiff's decision to ignore its directives by granting him leave to exceed the 25-interrogatory limit; as noted, "judicial orders are to be obeyed, not ignored." Banks, 222 F.R.D. at 11. Nor is it likely that directing Plaintiff to "try again" will be a fruitful exercise. Issuing a protective order is also not an attractive option. Instead, the Court is persuaded that the best course is "to demand that the parties do something that, in [the Court's] judgment, they have yet to do: cooperate." Id.

Accordingly, the Court will not further address the matter of "discrete subparts" herein. Rather, the Court will attempt to explain the boundaries of discovery pertinent to this dispute, and leave it to counsel to conduct themselves as mature adults, members of the bar, and officers of the court in crafting a compromise. It is the Court's hope that, with the benefit of the Court's reasoning herein, the parties will be able to "resolve their differences and relieve themselves and the Court of further time and expense." See id. The Court expects the parties to meet and agree on what interrogatories will be answered. Should the parties be unable to do so, they should inform the Court "by *praecipe* that they cannot" within 15 days of the date of this Order. Id. If this should occur, the Court will issue the parties appropriate instructions. All that said, the Court will now address Health's substantive objections as they pertain to the breadth of this discovery dispute (interrogatories, requests for production of documents, and deposition questions).

**B.    Health's Substantive Objections**

**1.    Information Predating July 2000**

First, the Court addresses Health's contention that Plaintiff's requests for information

10

predating July 2000 are improper. Essentially, Health argues that information which predates its operation of the "hospitals and clinics associated with the Medical College of Georgia," and Plaintiff's own tenure at the Medical College of Georgia is of questionable relevance. Doc. no. 97-1, pp. 14-16. Health also argues that many of Plaintiff's discovery requests are overbroad because they contain *no* temporal limit, and literally "seek information dating back decades." Id. at 15.

To begin, the Court readily agrees with Health's contention that discovery requests such as Plaintiff's Request for Production # 23, which seeks documents regarding "'each and every lawsuit of any kind that has ever been filed against the Medical College of Georgia, MCG HealthCare and MCG Health, Inc.,'" and Request for Production # 26, which seeks the identity of "'each and every physician that was ever peer reviewed for any reason,'" to be "overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence." Id. In response to Health's objection to discovery requests which are "unlimited as to time," id., Plaintiff offers the vague averment that Health is "try[ing] to conceal relevant information" and that the requested discovery is "relevant to the issue of pattern and practice of discrimination." Doc. no. 73, p. 40.

Unfortunately for Plaintiff, it will take more than casting aspersions on his opponent to demonstrate entitlement to the nearly unbounded discovery he seeks. Contrary to Plaintiff's argument, "a plaintiff will not be permitted an open-ended review of corporate records in order to establish discriminatory employment practices." Briddell v. Saint Gobain Abrasives Inc., 233 F.R.D. 57, 60 (D. Mass. 2005); see also Washington v. Brown & Williamson Tobacco Corp., 959 F.2d 1566, 1570 (11th Cir. 1992) ("The scope of discovery in Title VII cases is not without limits."). In the face of objections to broad discovery

11

requests, it is fair to expect a plaintiff to "narrow his request" by "identif[ying] particular items within the expansive request" or "provid[ing] a theory of relevance that might narrow the scope of his request." Wright v. AmSouth Bancorp., 320 F.3d 1198, 1205 (11th Cir. 2003). Except to offer a conclusory allegation of a "pattern and practice of discrimination," Plaintiff has neither provided a theory of relevance nor attempted to narrow the temporal scope of his request. Such will not suffice.

Next, the Court addresses Health's attempt to prevent discovery of all material predating July 2000. Of note, "[a]lthough courts have permitted discovery periods as long as eight to ten years, the norm in employment discrimination cases seems to be anywhere between three and five years." Briddell, 233 F.R.D. at 60 (citing United States v. Massachusetts Indus. Fin. Agency, 162 F.R.D. 410, 414 (D. Mass. 1995) (three year window of discovery); Obiajulu v. City of Rochester, 166 F.R.D. 293, 296 (W.D.N.Y.1996) (discovery allowed from three years prior to suit until the time the case was heard); Glenn v. Williams, 209 F.R.D. 282 (D.D.C. 2002) (three year time frame for discovery); Swackhammer, 225 F.R.D. at 662 (time period of three years prior to discrimination and two years afterwards allowed)). At any rate, given Plaintiff's propensity for overly broad discovery requests, discussed *supra*, it is clear that a time limit is appropriate in this case.

Of course, Plaintiff is quite correct that, as a general principle, "conduct predating the liability period of a Title VII lawsuit is relevant." Miller v. Hygrade Food Prods. Corp., 89 F. Supp.2d 643, 657 (E.D. Pa. 2000). As a result, the Court rejects Health's proposed cutoff date of July 1, 2000. Plaintiff's complaint alleges that he was discriminated against in connection with employment decisions dating back to March 2000, when Defendants allegedly "intentionally failed to take action on [Plaintiff's] application for appointment to

12

the faculty" because he is Black. CV 104-2953, doc. no. 1, p. 16. Thus, limiting Plaintiff to the period postdating July 2000 would prevent him from accessing *any* information predating the allegations of his complaint. "Courts typically will permit discovery in employment discrimination cases to cover a reasonable number of years *before and after* the alleged discrimination." E.E.O.C. v. Autozone, Inc., 258 F. Supp.2d 822, 831 (W.D. Tenn. 2003)(emphasis added).

In addition, even if Health was not involved in employment decisions predating July 1, 2000, Plaintiff has correctly pointed out that other Defendants were.[6] See doc. no. 73, p. 26. Also of note, it appears Health has miscast its proposed "five year rule," as those courts which embrace this rule "limit[] discovery to five years prior to the date of the alleged discriminatory act." Autozone, 258 F. Supp.2d at 831; see also Cormier v. PPG Industries, Inc., 452 F. Supp. 594, 596 (W.D. La. 1978)(same); Georgia Power Co. v. E.E.O.C., 295 F. Supp. 950, 954 (N.D. Ga. 1968)(same). The last allegedly discriminatory act listed in Plaintiff's complaint (his termination) occurred in 2003. CV 104-2953, doc. no. 1, p. 26. Thus, even moving backward in time from this date (rather than the earlier acts of discrimination alleged in the complaint), Health's proposed cut-off date of July 1, 2000 would only give Plaintiff access to information predating his termination by roughly three years, not five.

Regardless, the issue here is the clear need for a reasonable discovery limit. Of course, the choice of any particular date is "admittedly arbitrary" to some extent. Cormier,

---

[6]Of course, Health may raise the common sense objection that discovery requests for information predating July 2000 should then be addressed to other Defendants. That said, Health proposes a blanket prohibition on all discovery predating July 1, 2000--a proposal the Court rejects. The matter of which Defendant is best situated to respond to a particular discovery request is a matter best left to counsel. Of course, it should also be apodictic that the Court cannot compel a party to produce documents that it does not possess. Fed. R. Civ. P. 34(a).

452 F. Supp. at 596 (quoting Georgia Power, 295 F. Supp. at 954). Here, on balance, the lower end of the normative range (3-5 years predating the alleged discriminatory acts) appears adequate. Accordingly, the Court will limit all discovery to the period postdating March 1, 1997. This will give Plaintiff access to materials predating the alleged discriminatory acts by a full three years, which should be sufficient to develop his allegations of a history of discriminatory practices. Allowing Plaintiff to delve further into the past would serve little point "absent some special showing of the need and relevancy of a longer period." Georgia Power, 295 F. Supp. at 954. Plaintiff has made no such showing.

### 2. Access to Material Regarding Doctors Outside the Cardiothoracic Surgery Section

Next, the Court addresses Health's contention that discovery should be limited to the Cardiothoracic Surgery Section. See doc. no. 97, pp. 13-14. Health is correct that discovery in employment cases is generally limited to the employee's "work unit." Id. at 14 (citing Earley v. Champion Int'l Corp., 907 F.2d 1077, 1084 (11th Cir. 1990)). However, Health's interpretation of this general rule is too narrow. The rule is applied to place reasonable geographic limits upon the scope of discovery, or to limit discovery to "the most natural focus of the inquiry," which is the "source of the complained of discrimination." Id. at 1084-85. For example, in Earley, a case relied upon by Health, the plaintiffs were attempting to compel "nationwide discovery" despite the fact that the decision to terminate them was made locally. 907 F.2d at 1085. The other cases cited by Health, Chavez v. Daimler Chrysler Corp., 206 F.R.D. 615, 620 (S.D. Ind. 2002), and Serina v. Albertson's, Inc., 128 F.R.D. 290, 292 (M.D. Fla. 1989), are similar. The Chavez court limited discovery to the plant where Chavez worked, 206 F.R.D. at 620, while in Serina, the plaintiff was denied access to information regarding employees from outside of the plaintiff's "region." 128 F.R.D. at 292.

14

Here, Health apparently seeks to limit discovery to a four-person section. See CV 104-2953, doc. no. 1, p. 25. To the contrary, Plaintiff is entitled to discovery regarding any "comparable" or "similarly situated" employees. See, e.g., Miller v. Federal Express Corp., 186 F.R.D. 376, 383-84 (W.D. Tenn. 1999)(Title VII case involving allegedly discriminatory discipline of employee). Of note, "comparable" does not mean "identical." Id. In assessing whether individuals are "similarly situated," whether the individuals worked under the "same supervisor" is an important factor to consider. Id. In this case, Plaintiff alleges that the Chairman of the Department of Surgery was responsible for his "direction and supervision." CV 104-2953, doc. no. 1, p. 19.

More generally, Health's attempt to limit discovery to the Cardiothoracic Section generates a distinction without a meaningful difference. Is another surgeon and professor at the Medical College of Georgia not "similarly situated" to Plaintiff merely because he performs operations on legs rather than hearts? Simply put, although the Court agrees with Health that requiring discovery involving "all 633 physicians" who have "privileges to practice at the hospitals and clinics associated with the Medical College of Georgia" would be burdensome, Health has identified no reason to suppose that information regarding surgeons outside Plaintiff's tiny Cardiothoracic Surgery Section cannot be considered relevant to the instant case. Doc. no. 97, p. 13.

That said, a key issue here is that Plaintiff's discovery requests are not aimed with precision at similarly situated employees. Instead, he has phrased his discovery requests in the broadest terms possible, i.e., "each and every physician." Doc. no. 73, p. 41. As the Court has noted, it is fair to expect a plaintiff to narrow a broad request by "identif[ying] particular items within the expansive request" or "provid[ing] a theory of relevance that

15

might narrow the scope of his request." <u>Wright</u>, 320 F.3d at 1205. Plaintiff should narrow his request by targeting groups of physicians he believes should be considered "similarly situated" to himself. Plaintiff's approach simply does not adequately frame the discovery sought.

### 3.    Privileged Information

#### a.    Peer/Medical Committee Review Privilege & "Self-Critical" Analysis Privilege

Next, the Court addresses Health's assertion that Plaintiff seeks material which is privileged under Georgia's peer review and medical review committee privileges, set out in O.C.G.A. § 31-7-133, *et seq.*, and O.C.G.A. § 31-7-141, *et seq.*, respectively. In response, Plaintiff argues that these state statutory privileges have no place in "civil rights" cases, and that Health's reliance upon them is evidence of "bad faith." Doc. no. 73, p. 8. The Court disagrees. Of note, the Middle District of Georgia has applied these privileges to appropriate federal civil rights cases. See <u>Keh v. Americus-Sumter County Hosp.</u>, CV 103-068, doc. no. 114 (M.D. Ga. Mar. 31, 2005)(Sands, J.); <u>Adkins v. Hosp. Auth. of Houston County</u>, CV 504-080, 2004 U.S. Dist. LEXIS 23010, at *1 (M.D. Ga. Nov. 10, 2004).

Of course, Plaintiff cites a number of federal cases which have declined to enforce state peer review privileges in civil rights actions. <u>See</u> doc. no. 73, pp. 9-15. However, the cases Plaintiff cites all bear a distinguishing characteristic--the plaintiffs in those cases alleged that the peer review process itself had been used to effect discrimination or to otherwise violate federal law. <u>See, e.g.</u>, <u>Virmani v. Novant Health Inc.</u>, 259 F.3d 284, 285 (4th Cir. 2001)(peer review process allegedly used to discriminate on the basis of race); <u>Marshall v. Americus-Sumter County Hosp. Auth.</u>, CV 101-079, 2002 U.S. Dist. LEXIS 26822, at *9 (M .D. Ga. Nov. 22, 2002) (Sands, J.) (peer review committee's ostensible

concerns regarding patient care allegedly a "pretext" for discrimination); Pagano v. Oroville Hosp., 145 F.R.D. 683, 686 (E.D. Cal. 1993)(plaintiff alleged defendants used peer review process to violate antitrust laws). Thus, access to peer review materials in those cases was of paramount importance to proving the plaintiffs' underlying claims.

The Court rejects Plaintiff's blanket notion that defendants in federal civil rights actions may never avail themselves of Georgia's peer review and medical review committee privileges. The determination of whether to apply the peer review privilege involves a case-specific balancing of the pertinent interests given the "particular circumstances" at issue. Adkins, 2004 U.S. Dist. LEXIS 23010, at *11. Unlike the plaintiffs in the cases he cites, Plaintiff does not aver that the peer or medical committee review process was used to effect discrimination against him behind closed doors. Thus, Plaintiff's interest in obtaining information which is subject to the peer review privileges is comparatively weak in this case.

In contrast, there are "compelling reasons" to recognize the privileges in this case. Id., at *11. As the Adkins court aptly explained,

> it is certainly in the interest of the public that the documents at issue be protected from disclosure. The peer review process, as it relates to the plaintiff and the other physicians, serves as an integral part of the hospital's fulfillment of its duty to provide the best health care available and to ensure that any physicians who, for whatever reason, are not performing up to the hospital's expectations are subjected to a suspension of their hospital privileges.

Id. at *11-12. Indeed, the Eleventh Circuit has described confidential peer review as "an integral component of the health care system in the United States." Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1321 (11th Cir. 1994). In short, Georgia's interest in preserving the "confidence and trust" that peer review documents will not be subject to civil discovery is "imperative" and overriding in this case. Adkins, 2004 U.S. Dist. LEXIS

23010 at *13.

Also of note, Health has correctly pointed out that Plaintiff has made no attempt to secure relevant information through non-privileged means. Doc. no. 97, p. 37. Plaintiff's counsel has already been chided on this point by another court. See Keh, CV 103-068, doc. no. 114, p. 14 ("Plaintiff apparently seeks to immediately discover matters falling within the purview of peer review without first exhausting available avenues of discovery."). The Georgia statutory privileges at issue in this case expressly exempt material from "original sources" and "matters within [a witness's] knowledge," from their purview. Patton v. St. Francis Hosp., 246 Ga. App. 4, 7 (2000); see also O.C.G.A. §§ 31-7-133 & 31-7-143. Plaintiff should attempt to secure relevant employment data from non-privileged sources before attempting to obtain that information from privileged documents.

In sum, Plaintiff has not articulated sufficient reason to set aside the peer review privileges wholesale, as he proposes. Nor has he pointed to any specific instance in which Health has attempted to apply these privileges to materials (or deposition questions) which do not fall within the ambit of O.C.G.A. §§ 31-7-133 and § 31-7-141. Accordingly, Plaintiff's attempt to compel discovery of privileged documents is **DENIED**. In light of the Court's disposition in this regard, it is unnecessary to address Health's contention that discovery is also barred by the so-called "self-critical analysis" privilege.

        **b.**    **HIPAA**

Finally, the Court addresses Plaintiff's attempt to obtain information about specific patients via discovery requests and deposition questions. HIPAA forbids the disclosure of "protected health information" absent the consent of the patient, an opportunity for the patient to agree or object to the disclosure, or a court order directing the disclosure. See 45

C.F.R. § 164.512. "Protected health information" includes all "individually identifiable health information." 45 C.F.R. § 160.103. Here, Plaintiff avers that access to information regarding the care of specific cardiothoracic patients will enable him to compare Plaintiff's performance with that of other cardiothoracic surgeons at the Medical College of Georgia. Id. at 4, 34. Plaintiff also denies that responses to his inquiries would be "likely to reveal confidential information about a patient" and expresses his willingness to "enter[] into a qualified protective order." Id. at 18

Plaintiff's requests are clearly problematic. To begin, the Court expresses its obvious concern that Plaintiff's counsel revealed the names of specific deceased patients during depositions. In addition, Plaintiff now requests the charts and records of cardiothoracic patients who died or were not treated properly. Id. at 34. More concrete examples of information protected by HIPAA are difficult to imagine. Furthermore, nowhere in Plaintiff's motion to compel does he address whether he has attempted to obtain material regarding his performance or that of other doctors without reference to privileged peer review materials or HIPAA documents.

To be blunt, Plaintiff's contention that he could insist that Defendants produce patient materials in discovery without first obtaining permission and a qualified protective order from this Court is baffling. Rather than rushing headlong into attempted discovery of confidential documents and patient records and querying deponents about specific patients, Plaintiff should have first explained his need for the discovery to the Court, as well as a suggested course of action in order to avoid any HIPAA problem (perhaps via a proposed protective order).

That said, the Court is not persuaded by Health's argument that Plaintiff's counsel

is necessarily "trolling" for evidence he can use in later medical malpractice cases. See doc. nos. 97 & 98. Plaintiff seeks to use patient information to establish the relative proficiencies of Plaintiff and his colleagues--an issue which is clearly relevant to Plaintiff's claims that he was discriminated against in favor of lesser-qualified White doctors. Although it is unclear whether Plaintiff can obtain performance-related information more easily or readily from some other source, the Court sees no reason to issue a blanket prohibition from discovery of all patient records at this time. The Court is simply not positioned to assess the need for Plaintiff's proposed discovery. Moreover, much like the interrogatory subpart problem discussed *supra*, the Court is persuaded that the parties should be able to confer on this issue and reach a compromise.

In this regard, the Court reiterates that it is not persuaded by the argument that fears of misuse of confidential information, however well-founded, make it impossible to craft an adequate protective order. See doc. no. 98, p. 13. The Court is perfectly capable of ordering the parties not to use or disclose certain information for purposes other than the instant proceeding, and to return that information (or destroy it) at the end of the litigation. 45 C.F.R. § 164.512(e)(1)(ii), (v). Should any party (or counsel) disobey such an order, the aggrieved parties (and the Court) are not without recourse. At any rate, HIPAA is not the absolute bar to discovery of patient information which Health seems to think.

## III.  CONCLUSION

Accordingly, Plaintiff's motion to compel is **GRANTED IN PART** and **DENIED IN PART**. The parties **SHALL** confer and agree on what interrogatories will be answered. Plaintiff is **DENIED** access to materials which are subject to the peer review and medical committee review privileges. Health's objections to discovery regarding physicians outside

the Cardiothoracic Surgery Section are **OVERRULED**.  The parties shall confer regarding the issue of discovery of patient records subject to HIPAA.  Afterwards, Plaintiff may file an appropriate motion with the Court, along with a proposed protective order.  Finally, Plaintiff may discover information postdating March 1, 1997, but not before.[7]

SO ORDERED this 27th day of April, 2006, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

---

[7]The Court also notes Defendants' still pending "Motion for a Show Cause Order."  Doc. no. 67.  As it appears the issue raised therein has been resolved, see doc. nos. 70 & 71, the Clerk of Court is **DIRECTED** to **TERMINATE** the motion from the motions report.  Defendants are of course free to renew their motion if necessary.